# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SETH CAMERON VIRGIL | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:25-cv-01641 |
| | ) | |
| EXPERIAN INFORMATION SOLUTIONS INC, | ) | |
| FIRST ADVANTAGE BACKGROUND | ) | |
| SERVICES CORPORATION, | ) | |
| LEASINGDESK  SCREENING, | ) | |
| REALPAGE  ON-SITE, | ) | |
| CORELOGIC SAFERENT, | ) | |
| CORELOGIC BACKGROUND  DATA, | ) | |
| ENTRATA, INC, | ) | |
| RESIDENT VERIFY LLC, | ) | |
| YARDI  SYSTEMS  INC, | ) | |
| RENTGROW INC, | ) | |
| XACTUS LLC, | ) | |
| COLUMBIA DEBT RECOVERY, LLC *dba* | ) | |
| GENESIS  CREDIT MANAGEMENT LLC, | ) | |
| ACENTO  REAL  ESTATE  PARTNERS  LLC, | ) | |
| AION MANAGEMENT, LLC, | ) | |
| ALLEGIANT-CARTER MANAGEMENT LLC, | ) | |
| ALLEN & ROCKS INCORPORATED, | ) | |
| AVALONBAY COMMUNITIES INC, | ) | |
| THE  BAINBRIDGE COMPANIES LLC, | ) | |
| BELL  PARTNERS  INC, | ) | |
| BOZZUTO MANAGEMENT COMPANY, | ) | |
| BRICK  LANE  PM  LLC, | ) | |
| BROOKFIELD PROPERTIES | ) | |
| MULTIFAMILY  LLC, | ) | |
| C I M  GROUP LP, | ) | |
| COUNTRY VILLAGE GARDENS LLC, | ) | |
| CUSHMAN & WAKEFIELD U.S., INC., | ) | |
| DONALDSON  GROUP  LLC, | ) | |
| DRUCKER + FALK  LLC, | ) | |
| DWECK PROPERTY MANAGEMENT LLC, | ) | |
| ELME  COMMUNITIES, | ) | |
| FAIRFIELD PROPERTY MANAGEMENT II INC, | ) | |
| GENE B.  GLICK  COMPANY, | ) | |
| GREYSTAR MANAGEMENT SERVICES LLC, | ) | |
| HIGHMARK  RESIDENTIAL,  LLC, | ) | |
| JLB RESIDENTIAL  LLC, | ) | |
| KLINGBEIL CAPITAL MANAGEMENT LTD, | ) | |
| LARAMAR  COMMUNITIES  LLC, | ) | |
| LEGEND MANAGEMENT GROUP LLC, | ) | |
| MISSION  ROCK  RESIDENTIAL  LLC, | ) | |

MORGUARD FENESTRA APARTMENTS LLC,  )
PINNACLE  PROPERTY                          )
MANAGEMENT SERVICES,                       )
REDPEAK PROPERTIES LLC,                     )
SIGNATURE PROPERTIES LLC,                   )
UDR  INC,                                   )
WILLOW BRIDGE PROPERTY                      )
COMPANY NATIONAL LLC,                       )
ABBOTTS RUN ASSET MANAGEMENT LLC,   )
29 SC SHELBY PROPERTY OWNER LLC,  AND )
MRI SOFTWARE LLC.                           )

---

## COMPLAINT  FOR  DAMAGES

---

Protracted fraud victim Seth Cameron Virgil, by this Complaint and through undersigned counsel, pursues actual and trebled damages, minimum and enhanced statutory damages, equitable and punitive damages, and remunerated costs and attorney fees to rectify Defendants' fraud-enabling and tortious conduct and to remedy their applicable violations of the Fair Credit Reporting Act (FCRA), the Fair Debt Collection Practices Act (FDCPA),the Indiana Deceptive Consumer Sales Act (DCSA), the Indiana Crime Victim's Relief Act (CVRA), and the Indiana Racketeer Influenced and Corrupt Organizations Act (RICO), as set forth and alleged below.

### PRELIMINARY  STATEMENT

Plaintiff has been cast a nonpaying, apartment-fleeting nomad, despite renting the same apartment unit in Indianapolis, Indiana from March of 2022 to the current date— the **Whit Apartment**.

Throughout this time, Plaintiff's social-security number, date-of-birth, and first and last name became misappropriated by an identity imposture(s) and then between the Defendants—the **PII**.

The misappropriations of Plaintiff's PII occurred in conjunction with his obsolete Chicago, Illinois apartment address of 925 W Huron St (the "Huron Address")—the  underlying  **Identity  Theft**.

This Identity Theft was serially committed, somehow undetected, and implicated numerous out-of-state multifamily rental property owners, operators, and management companies—the  **Fraud**.

The Fraud was effected through fabricated rental applications submitted electronically to property rental providers under Plaintiff's misused PII and Huron Address—the  **Falsified  Applications**.

These Falsified Applications, besides the fraudulently appropriated PII and Huron Address, encompassed detectably fabricated or else unanswered applicant information—the  **Lease Fraud**.

This Lease Fraud, while preventable, was not detected by the apartment operators and management companies, which actuated the serially committed Lease Fraud—the **Apartments**.

The Apartments blindly relied on unreliable background screening companies instead, who automatedly and haphazardly processed the Falsified Applications—the **Tenant Screeners**.

The Tenant Screeners blindly relied on outsourced data vendors, whose impermissibly procured reports were utilized to vet and 'verify' the Falsified Applications—the **Screening Furnishers**.

The Screening Furnisher's reports were integrated in the Tenant Screeners' background reports, which recommended approving the Falsified Applications—the **Tenant Screening Reports**.

These Tenant Screening Reports' recommendations were suggestibly accepted by the corresponding Apartments, who opened up derived lease accounts—the **Fraudulent Accounts**.

These Fraudulent Accounts encompassed unpaid application fees, insufficient fund charges, and delinquent lease fees, which various Apartments assigned to collection—the **Debt Collectors**.

The Debt Collectors dunned Plaintiff, with some going farther by furnishing the delinquent Fraudulent Account information to involved credit reporting agencies—the **Credit Furnishers**.

The Credit Furnishers, in conjunction with the credit reporting agencies (the "CRAs") thereby misattributed those delinquent Fraudulent Accounts to Plaintiff's credit record—the **Tradelines**.

This interconnected conduct by and between the Apartments, the Tenant Screeners, their Tenant Screening Furnishers, and the CRAs proximately enabled, as well as protracted, the Lease Fraud.

Otherwise, the Lease Fraud would have been prevented, the below Fraudulent Tradelines would not have been reported, and Plaintiff's foreseeably caused damages would have been avoided.

| | | |
|---|---|---|
| Elme Communities<br>*Assembly Manassas* | Fair Collections Outsourcing<br>Account No. ****1421 | $410.00  reported balance<br>*13690 Legacy Cir., Herndon, VA* |
| Bozzuto Management<br>*The Haden* | Hunter Warfield (non-party)<br>Account ***7172 | $150.00  reported balance<br>*1575 Anderson Rd, McClean, VA* |
| Dweck Properties<br>*Crystal Square* | Hunter Warfield (non-party)<br>Account ***1436 | $110.00  reported balance<br>*1515 Richmond Hwy, Arlington, VA* |
| Acento Real Estate Partners<br>*Crystal Woods* | National Credit Systems<br>Account ***0657 | $10,096.00  reported balance<br>*5017 Caryn Ct., Alexandria, VA* |
| Acento Real Estate Partners<br>*Centre at Silver Spring* | National Credit Systems<br>Account ***9772 | $17,500.00  reported balance<br>*3310 Teagarden Cir., Silver Spring, MD* |
| Mission Rock Residential<br>*Abbotts Run* | Genesis Credit Management<br>Account  ***7366 | $14,661.00  reported balance<br>*5808 Woodlawn Green, Alexandria, VA* |
| Mission Rock Residential<br>*Abbotts Run* | Genesis Credit Management<br>Account ***7368 | $14,513.00  reported balance<br>*5808 Woodlawn Green, Alexandria, VA* |

| | | |
|---|---|---|
| Greystar | Genesis Credit Management | $152.00  reported balance |
| *Addison Row* | Account S0GS22*** | *Addison Rd, Capitol Heights, MD* |
| Greystar | Genesis Credit Management | $12,511.00  reported balance |
| *Ravens Crest* | Account  ***1761 | *11035 Edgepark Cir., Manassas, VA* |
| Greystar | Genesis Credit Management | $152.00  reported balance |
| *Addison Row* | Account S0GS21*** | *4800 Addison Road, Capital Heights, MD* |
| Greystar | Genesis Credit Management | $96.00  reported balance |
| *Pallas at Pike + Rose* | Account S0GS13*** | *11550 Old Georgetown Rd, N Bethesda, MD* |
| Greystar | Genesis Credit Management | $96.00  reported balance |
| *Persei at Pike + Rose* | Account S0GS13*** | *900 Persei Pl. N Bethesda, MD* |
| UDR, Inc. | Genesis Credit Management | $16,436.00  reported balance |
| *Quarters at Towson* | Account ***8388 | *960 Southerly Rd., Towson, MD* |
| Donaldson | Genesis Credit Management | $60.00  reported balance |
| *Rollingwood* | Account ***8928 | *2535 Ross Rd., Silver Spring, MD* |

By appropriating Plaintiff's PII and consumer reports without authorization or a permissible purpose, and absent proper identity verification, applicant screening, or informational security measures in place, Defendants placed financial gain over a Fraud victim's violated statutory and privacy rights, implicating perceivable public policy concerns with regard to the integrity of the housing rental, lease management, tenant screening, credit reporting, and debt collection industry.

## JURISDICTION AND VENUE

1.    The preceding Complaint allegations are hereby reincorporated by reference as if restated below.

2.    This United States District Court, for the Southern District of Indiana, has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337 pursuant to the pleaded federal causes of action, including per the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. (the "FCRA"), and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*.  (the "FDCPA").

3.    This District Court has supplemental jurisdiction pursuant to the state law causes of action, see 28 U.S.C. § 1367(a), as well as pendent jurisdiction in connection with the common law tort actions.

4.    Venue is proper under 28 U.S.C. §§ 1391(b), (c), and (d), respectively, as Plaintiff resides within this District Court's locality of Marion County, Indiana, Defendants' acts and omissions substantially occurred and/or caused Plaintiff's alleged injuries to be incurred within this State and judicial locality, and the current named Defendants are principally located in Indiana, registered to do business in Indiana, and/or conduct, transact, or direct business within or toward this State.

5.    This District Court has personal jurisdiction over each Defendant as each is either incorporated or organized in this State, licensed to transact business in this State, engaged in acts, practices, and/or omissions directed at or toward this State or affecting citizens of this State, and/or caused personal, property, and/or reputational injury to be sustained in this State as a result of conduct originating outside of this State while rendering business, soliciting business, and/or monetizing or benefiting from business rendered, products distributed, and/or services provided within this State.

## PLAINTIFF AND DEFENDANTS

6.  The preceding Complaint paragraphs are hereby reincorporated by reference as if restated below.

7.  Plaintiff is a thirty-four-year-old real estate broker, a *consumer* as defined by 15 U.S.C. § 1681a(c), and, at all times relevant, resided at the same Whit Apartment unit in Marion County, Indiana.

8.  The respective CRA Defendants, including the Tenant Screeners and Tenant Screening Furnishers, are *consumer reporting agencies*, or CRAs, in accordance with the FCRA. See *id*. at § 1681a(f).

9.  These CRA Defendants regularly and nationally engaged in the assembly, evaluation, and furnishing of *consumer reports*, see *id*. at § 1681a(d), under contract for monetary compensation.

10. The Credit Furnisher, applicable Screening Furnisher, implicated Apartment, and affiliated Debt Collector Defendants are each regulated under the FCRA as data *furnishers*. See *id* at § 1681s-2.

11. The Debt Collector Defendants are *debt collectors* under the FDCPA, § 1692a(6), and their agent Apartments are subject to imputed tort liability. *Hill*, 812 N.E.2d 1060, 1064 (Ind. Ct. App. 2004).

12. This action derives from *consumer transactions* involving "a sale, lease, assignment … or other disposition of an item of personal property, … a service, or an intangible . . . to a person … that are primarily personal … or a solicitation to supply any of these things. Ind. Code § 24-5-0.5-2(a).

13. The CRA Defendants, including the Tenant Screeners, in regularly engaging in or soliciting consumer transactions under the DCSA, are also *suppliers* under this statute. *Id*. § 24-5-0.5-2(a).

14. The Debt Collector Defendant(s) are *suppliers* under the DCSA, which specifically defines a consumer transaction as including the collection of debts by debt collectors. *Id*. § 24-5-0.52(a)(1). See also *id*. at § 24-5-15-5 ("debt collector" also encompasses a debt buyer under Indiana law).

15. The Apartment Defendants are *suppliers* under the DCSA by regularly engaging in or soliciting consumer transactions, which encompasses soliciting, servicing, and approving residential leases.

16. The Defendants are also *persons* under Indiana's Crime Victim Relief Act and racketeering statute.

17. The Defendants are alleged to have acted as an agent of, or for, the other Defendants, whether directly, indirectly, or by imputed conduct of Defendants' respective representatives and/or agents.

18. The Defendants and their agents and representatives are also alleged to have acted in concert as joint or co-venturers by operating, directing, managing, controlling, or furthering their affairs.

19. **Experian Information Solutions, Inc.** ("Experian") is an Ohio corporation with a principal office address of 475 Anton Boulevard, Costa Mesa, CA, is licensed to do business in Indiana via its commercial registered agent C T Corporation System, located at 334 N Senate Ave, Indianapolis, IN 46204, and is a nationwide consumer reporting agency under Section 1681a(f) of the FCRA. Experian's conduct here is also implicated by and through the conduct of **Experian RentBureau**, a division of Experian and a specialty consumer reporting agency under the FCRA. See *id*. Experian, through Experian RentBureau, provided rental background history data on Plaintiff to RentGrow, which was integrated into Tenant Screening Reports and sold to various Apartments.

20. **First Advantage Background Services Corp.** ("First Advantage") is a Florida corporation with a principal office address of 1 Concourse Parkway NE, Suite 200, Atlanta, GA 30328. First Advantage is licensed to do business in Indiana, with Corporation Services Company designated as its foreign commercial registered agent. First Advantage is nationwide consumer reporting agency under the FCRA, § 1681a(f), furnishing consumer reports that include credit, criminal, and eviction histories, which are used by third parties in making residential leasing decisions. First Advantage also conducts residential screening under its Resident Solutions division, offering tenant screening services to landlords and management companies throughout the United States.

21. **RealPage LeasingDesk Screening** ("LeasingDesk"), a subsidiary of RealPage, Inc., is a Delaware corporation with a principal office address of 2201 Lakeside Boulevard, Richardson, Texas 75082 and a registered office address of 1209 Orange Street, Wilmington, DE 19801 via its commercial registered agent The Corporation Trust Company. LeasingDesk is a nationwide specialty consumer reporting agency, *id*. § 1681a(f), as well as a reseller CRA under the FCRA, in that it requests, procures, reassembles, and refurnishes reintegrated credit and tenant screening data by selling its own generated background screening report products to rental housing landlords.

22. **RealPage On-Site LLC** ("On-Site"), a separate subsidiary of RealPage, Inc., is a Delaware corporation with a principal office address of 2201 Lakeside Boulevard, Richardson, Texas 75082 and a registered office address of 1209 Orange Street, Wilmington, DE 19801 via its registered agent The Corporation Trust Company. On-Site also operates as a consumer reporting agency under the FCRA, *id*. § 1681a(f), specializing in preparing consumer reports by collecting criminal record, eviction, and other credit-related histories from private vendors and assembling that data for use by landlords and property managers in vetting and making rental screening decisions.

23. **CoreLogic SafeRent Solutions LLC** ("SafeRent") is a Delaware limited liability company with a principal office address of 40 Pacifica Avenue, Ste. 900, Irvine, CA 92618 and a registered office address of 251 Little Falls Drive, Wilmington, DE 19808 via its registered agent Corporation Service Company. SafeRent is nationwide specialty CRA under the FCRA, *id*. § 1681a(f), providing tenant screening services to landlords, property managers, and rental housing providers. SafeRent's screening reports derive from the "Multistate Database," which SafeRent owns, manages, and updates. SafeRent furnishes aggregated third-party data from the Multistate Database to NBD, who reintegrates this information into a SafeRent report, which is sold to reseller CRAs, who rebrand and sell their own screening reports to landlords and management companies.

24. **CoreLogic Background Data LLC** ("NBD") is a Delaware limited liability company with a principal office address of 40 Pacifica Avenue, Ste. 900, Irvine, CA 92618 and a registered office address of 251 Little Falls Drive, Wilmington, DE 19808 via its registered agent Corporation Service Company. NBD is a back-end tenant history data aggregator and a front-end consumer reporting agency under § 1681a(f). NBD's aggregated data is obtained from SafeRent's Multistate Database, which NBD reintegrates into tenant screening reports sold to landlords for tenant screening purposes. NBD's offered consumer report products include **CrimeSAFE** reports, **ScorePlus** reports, and **RegistryCHECK** reports that are composed of outsourced credit and screening data from Experian, collection agencies, public records, and CoreLogic's Teletrack.

25. **Entrata, Inc.** ("Entrata") is a Delaware corporation with a principal office address of 4205 Chapel Ridge Road, Lehi, UT 84043. Entrata is registered to do business in Indiana, with Corporation Service Company designated as its foreign commercial registered agent. Entrata owns and operates a tenant screening platform called Resident Verify, which it licenses to landlords and property

management companies nationwide, including in this District. Entrata operates as a consumer reporting agency under the FCRA by compiling and maintaining residential and tenant history data from which it categorically assembles and disperses consumer reports to third parties for profit.

26.    **Entrata Resident Verify LLC** ("Resident Verify"), a wholly owned subsidiary of Entrata, is a Utah limited liability company with a principal office address of 4205 Chapel Ridge Road, Lehi, UT 84043. Resident Verify designates Corporation Services Company as its domestic commercial registered agent, at 15 West South Temple, Ste. 1701, Salt Lake City, Utah 84101. Resident Verify is a consumer reporting agency under the FCRA, § 1681a(f), assembling and furnishing tenant screening reports to third parties for housing decisions. Resident Verify directly furnishes consumer reports whereas Entrata controls and implements the back-end platform functionalities.

27.    **MRI Software, LLC** ("MRI")  is a Delaware limited liability company with a principal office address of 28925 Fountain Parkway, Solon, Ohio, 44139 that is registered to do business in Indiana via its foreign registered agent National Registered Agents, Inc., located at 334 North Senate Avenue, Indianapolis, IN, 46204. MRI operates a global property management and real estate software platform that integrate tenant-screening services such as SafeRent. Through its "MRI Resident Screening" platform, MRI functions as a consumer reporting agency (CRA) under the FCRA by transmitting or packaging tenant-screening reports (including SafeRent Score reports) to landlords and property managers.  Upon information and belief, here, MRI's software and provision of background tenant screening data was utilized in generating scored SafeRent reports.

28.    **Yardi Systems, Inc.** ("Yardi"), a parent company of RentGrow, Inc. (named below), is a California corporation with a principal office address of  430 S Fairview Avenue, Goleta, California 93117, which is registered to do business in Indiana as a foreign corporation, with Corporation Service Company as its Indiana registered agent. Yardi offers technological rental housing and management services through platforms such as RentCafe and ScreeningWorks. **RentCafe** offers property marketing, unit advertising, application processing, applicant background screening, digital lease signing, and rental payment transaction services whereas **ScreeningWorks** functions as a fully integrated automated tenant screening, identity verification, income validation, and fraud prevention system within Yardi's property-management suite.

29.    **RentGrow, Inc.** ("RentGrow"), a subsidiary of Yardi Systems, Inc. (named above), is a Delaware corporation with a principal office address of 400 5th Avenue, Suite 120, Waltham, MA and a registered office address of 251 Little Falls Dr, Wilmington, DE 19808 via its commercial registered agent Corporation Service Company. RentGrow operates as a nationwide specialty consumer reporting agency under the FCRA, *id*. § 1681a(f), compiling residential tenancy history information from which it assembles and disperses consumer reports to third parties for profit.

30.    **Xactus, LLC** ("Xactus") is a Delaware limited liability company with a principal office address of 370 Reed Road, Ste. 100, Broomall, PA 19008, which is registered to do business in Indiana as a foreign corporation, with Corporation Service Company as its Indiana registered agent. Xactus is a consumer reporting agency, *id*. § 1681a(f), as well as a reseller CRA under the FCRA, in that it requests, procures, assembles, and resells credit report data procured from Experian, Equifax, and TransUnion via tri-merged consumer reports in response to mortgage financing  applications.

31.    **Columbia Debt Recovery, LLC**, *dba* Genesis Credit Management ("Genesis"), is a Washington limited liability company with a principal office address of 906 SE Everett Mall Way, Suite 301, Everett, WA, 98208. Genesis is licensed to do business in Indiana as Genesis Credit Management,

designating Corporation Service Company as its foreign commercial registered agent. Genesis operates as a debt collection company in the housing rental industry and is thus a "debt collector" under the FDCPA, § 1692a(6), as well as a data "furnisher," § 1681s-2(a) & (b), under the FCRA.

32. **Acento Real Estate Partners, LLC** ("Acento") is a Delaware limited liability company with a principal office location in Delaware and a registered office address of 7 St. Paul Street, Suite 820, Baltimore, MD 21202 via CSC-Lawyers Incorporating Service Company. Acento operates as a property management company which, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **Crystal Woods** | Alexandria, Virginia | (4905 Southland Ave) |
| **Centre at Silver Spring** | Silver Spring, Maryland | (3310 Teagarden Cir) |

33. **AION Management LLC** ("AION") is a Delaware limited liability company with a principal office address of 11 East 44th Street, Ste. 1000, New York, NY and a registered office address of 2405 York Road, Ste. 201, Lutherville, Timonium, MD 21093 via its commercial registered agent National Registered Agents, Inc. of Md. Morguard, a residential rental management company, upon reasonable belief, managed, controlled, and/or operated the following or more Apartment rental properties during the relevant time period:

| | | |
|---|---|---|
| **Stone Gate at Iron Ridge** | Elkton, Maryland | (4301 Stone Gate Blvd) |

34. **Allegiant-Carter Management LLC** ("Allegiant-Carter") is a Florida limited liability company with a principal office address of 4890 W Kennedy Blvd, Ste. 200, Tampa, FL 33609, which is registered to do business in Indiana as a foreign limited liability company, with Corporation Service Company designated as its Indiana commercial registered agent. Allegiant-Carter operates as a real estate owner and a residential property management provider which, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **Courts of Avalon** | Pikesville, Maryland | (9000 Iron Horse Ln) |
| **Post Park Maryland** | Hyattsville, Maryland | (330 East-West Hwy) |
| **Springwoods at Lakeridge** | Woodbridge, Virginia | (12395 Midsummer Ln) |

35. **Allen & Rocks Inc.** ("Allen & Rocks") is a Delaware corporation with a principal office address of 1127 Ivy Club Lane, Landover, MD 20785 and a registered office address of 1209 Orange St, Wilmington, DE 19801 via its commercial registered agent Corporation Trust Company. Allen & Rocks is a property management provider that, upon reasonable belief, operated and/or managed the following or more implicated Apartment properties during the relevant time period:

| | | |
|---|---|---|
| **Trevor's Run at Dulles Center** | Herndon, Virginia | (2411 Little Current Dr) |

36. **AvalonBay Communities, Inc.** ("AvalonBay") is a Delaware corporation with a principal office address of 4040 Wilson Blvd, Ste. 1000, Arlington, VA 22203 and a registered office address of 4701 Cox Rd, Ste. 285, Glen Allen, VA 23060 via its Virginia commercial registered agent C T Corporation System. AvalonBay is a real estate investment trust (REIT) that develops and manages residential rental properties, including the following or more implicated Apartment properties that, upon reasonable belief, AvalonBay operated and/or managed during the relevant time period:

| | | |
|---|---|---|
| **Avalon at Traville** | North Potomac, Maryland | (14240 Alta Oaks Dr) |

**Bainbridge Companies LLC** ("Bainbridge") is a Florida limited liability company with a principal office address of 12765 West Forest Hill Blvd., Ste. 1307, Wellington, FL 33414 and a registered office address of 1201 Hays Street, Tallahassee, FL 32301 through Corporation Service Company. Bainbridge operates as a property management company which, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **Bainbridge—Bethesda Place** | Bethesda, Maryland | (4918 St Elmo Ave) |
| **Bainbridge—Shady Grove Metro** | Rockville, Maryland | (15955 Frederick Rd) |

37. **Bell Partners, Inc.** ("Bell Partners") is a North Carolina corporation with a principal office address of 300 North Greene Street, Greensboro, NC, 27401, which is registered to do business in Indiana as a foreign limited liability company, with CT Corporation System as its Indiana commercial registered agent. Bell Partners owns and/or manages multifamily rental properties and, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **Bell Warner Center** | Canoga Park, CA | (21050 Kitteridge St) |
| **Bell—Fair Oaks** | Fairfax, Virginia | (12201 Pender Creek Cir) |
| **Bell—Stonebridge** | Woodbridge, Virginia | (14701 River Walkway) |
| **Revel—Noma Centre** | Washington, D.C. | (1005 First St NE) |

38. **Bozzuto Management Company** ("Bozzuto") is a Maryland corporation with a principal office address of 6406 Ivy Lane, Ste 700, Greenbelt, MD 20770 and a registered office address of 6406 Ivy Lane, Ste 700, Greenbelt, MD 20770 via its commercial registered agent Michael A. Schlegel. Bozzuto operates as a real estate management company which, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **Enclave at Box Hill** | Abingdon, Maryland | (3405 McCurley Dr) |
| **West Broad** | West Falls Church, Virginia | (301 W Broad St) |
| **Ovation—Park Crest** | McLean, Virginia | (8231 Crestwood Heights Dr) |
| **View Ballston** | Arlington, Virginia | (4000 Wilson Blvd) |
| **Park + Ford** | Alexandria, Virginia | (4401 Ford Avenue) |
| **Woodway at Trinity Ctr.** | Centreville, Virginia | (5751 Wood Meadow Way) |

39. **Brick Lane PM LLC** ("Brick Lane") is a District of Columbia limited liability company with a principal office address of 3506 Connecticut Ave NW, Washington, DC 20008 and a registered office address of 508 Meeting Street, West Columbia, South Carolina 29169 via Corporation Service Company. Brick Lane, a residential property development, investment, and management company, upon reasonable belief, managed the following Apartment property during the relevant time period, prior to Drucker + Falk's Apartment management acquisition:

| | | |
|---|---|---|
| **The Flats at Shady Grove** | Rockville, Maryland | (1380 Piccard Dr) |

40. **Brookfield Properties Multifamily LLC** ("Brookfield Properties") is a Delaware limited liability company with a principal office address of 127 Public Square, Suite 3200, Cleveland, OH, 44114, which is also registered to do business in Indiana as a foreign limited liability company, with Corporation Service Company designated as its Indiana commercial registered agent. Brookfield Properties operates as an owner and/or manager of multifamily rental properties which, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **Origin** | Arlington, Virginia | (700 N Randolph St) |
| **8421 Broad** | Tysons, Virginia | (8421 Broad St) |
| **8th and Grand** | Los Angeles, California | (770 S Grand Ave) |

41. **C I M Group, L.P.** ("CIM Group") is a California limited partnership with a principal office address of 4700 Wilshire Blvd Los Angeles, CA 90010 and a registered office address of 2804 Gateway Oaks Dr., Sacramento, CA via 1505 Corporation Paracorp Incorporated. CIM Group operates as an owner and/or manager of multifamily rental properties which, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **Skyline Towers** | Falls Church, Virginia | (5599 Seminary Rd) |
| **Sherwood at Southern Towers** | Alexandria, Virginia | (5001 Seminary Rd) |
| **Stratford at Southern Towers** | Alexandria, Virginia | (4901 Seminary Rd) |
| **Graham at Southern Towers** | Alexandria, Virginia | (5021 Seminary Rd) |
| *Account No.  9099745* | *currently  unknown* | *currently unknown* |
| *Account No.  9152082* | *currently  unknown* | *currently unknown* |
| *Account No.  9214309* | *currently  unknown* | *currently unknown* |

42. **Country Village Gardens, LLC** ("Country Village") is a Maryland limited liability company with a principal office address of 11459 Cronhill Drive, Owings Mills, MD 21117 and a registered office address of 2405 York Road, Suite 201, Lutherville Timonium, MD 21093 via The Corporation Trust, Incorporated. During the relevant time period, upon reasonable belief, Country Village owned and/or managed the following or more implicated multifamily rental properties:

| | | |
|---|---|---|
| **Country Village** (*Belcove Place*) | Bel Air, Maryland | (11459 Cronhill Dr) |

43. **Cushman & Wakefield, U.S., Inc.** ("Cushman & Wakefield") is a Missouri corporation with a principal office address of 225 West Wacker Drive, Suite 3000, Chicago, IL, 60606, which is registered to do business in Indiana as a foreign corporation, with CT Corporation System as its Indiana commercial registered agent. Cushman & Wakefield is a property management company which, upon reasonable belief, owned and/or managed the following implicated rental properties:

| | | |
|---|---|---|
| **Braddock Lee** | Alexandria, Virginia | (2423 Menokin Dr) |

44. **Donaldson Group, LLC** ("Donaldson") is a Maryland limited liability company with a principal office address of 15245 Shady Grove Road, Suite 160, Rockville, MD 20850 and a registered office address of 1519 York Road, Lutherville, MD 21093 via Cogency Global, Inc. During the relevant time period, upon reasonable belief, Donaldson owned and/or managed the following or more implicated multifamily rental properties:

| | | |
|---|---|---|
| **Rollingwood Apartments** | Silver Spring, Maryland | (2535 Ross Rd) |
| **The Gallery Bethesda  I** | Bethesda, Maryland | (4800 Auburn Ave) |

45. **Drucker + Falk  LLC** ("Drucker") is a Virginia limited liability company with a principal office address of 11824 Fishing Point Drive, Suite A, Newport News, VA 23606, which is registered to do business in Indiana as a foreign limited liability company, with C T Corporation System designated as its Indiana commercial registered agent. Drucker operates as an owner and/or manager of multifamily rental properties which, upon reasonable belief, owned and/or managed the following or more implicated rental properties during the relevant underlying time period:

| | | |
|---|---|---|
| **Brookdale Apartment** | Henrico, Virginia | (9027-F Horrigan Court) |
| **Gallery on New Hampshire** | Adelphi, Maryland | (1809 Fox St) |

46.   **Dweck Property Management LLC** ("Dweck") is a Virginia limited liability company with a principal office address of 1200 17th St NW, Ste 200, Washington, DC 20036 and a registered office address of 100 Shockoe Slip, Fl. 2, Richmond, VA 23219 via Corporation Service Company. Dweck operates as an owner and/or manager of multifamily rental properties which, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **Crystal Square** | Arlington, Virginia | (1515 Richmond Hwy) |
| **Park at Arlington Ridge** | Arlington, Virginia | (1800 26th St South) |

47.   **Elme Communities** ("Elm Communities") is a Maryland business trust corporation with a principal office address of 7550 Wisconsin Ave, Ste. 900, Bethesda, MD 20814 and a registered office address of 100 Shockoe Slip, Fl. 2, Richmond, VA 23219 via Corporation Service Company. Upon reasonable belief, Elme Communities owned and/or operated the following or more implicated rental properties during the relevant underlying time period:

| | | |
|---|---|---|
| **Assembly / Elme Dulles** | Herndon, Virginia | (13690 Legacy Cir) |
| **Assembly / Elme Manassas** | Manassas, Virginia | (10519 Lariat Lane) |

48.   **Fairfield Property Management II, Inc.** ("Fairfield Management") is a Delaware corporation with a principal office address of 5355 Mira Sorrento Place, Suite 100, San Diego, CA 92121, which is also registered to do business in Indiana as a foreign corporation, with Corporation Service Company designated as its Indiana commercial registered agent. Fairfield operates as an owner and/or manager of multifamily rental properties which, upon reasonable belief, owned and/or managed the following or more implicated rental properties:

| | | |
|---|---|---|
| **17 Barkley** | Gaithersburg, Maryland | (17 Barkley Ln) |
| **The Montgomery** | Bethesda, Maryland | (6425 Rock Forest Dr) |
| **The Moxley** | Fairfax, Virginia | (4040 Gateway Dr) |

49.   **Gene B. Glick Company, INC.** ("Glick Management") is an Indiana corporation with a principal office address of 8801 River Crossing Boulevard, Suite #200, Indianapolis, IN 46240 and a registered commercial office address of 8801 River Crossing Boulevard, Suite #200, Indianapolis, IN 46240 via its commercial registered agent Adam J. Richter. Glick Management is an owner and/or manager of residential rental properties and, upon reasonable belief, owned and/or managed the following or more properties during the relevant time period:

| | | |
|---|---|---|
| **Woods of Fairfax** | Lorton, Virginia | (7630 Fairfield Woods Ct) |

50.   **Greystar Management Services LLC**, *doing business as* "Greystar" **(**or "Greystar—GMS**")**, is a Delaware limited liability company with a principal address location of 465 Meeting Street, Suite 500, Charleston, SC, 29403, which is licensed to do business in Indiana as a foreign limited liability company with C T Corporation System designated as its Indiana registered agent. Greystar is a multi-family rental property owner, developer, and manager and, as relevant here, owned and/or managed the following implicated rental properties:

| | | |
|---|---|---|
| **Ravens Crest** | Manassas, Virginia | (8098 Ravens Crest Ct) |

| | | |
|---|---|---|
| **Addison Row** | Capitol Heights, Maryland | (4800 Addison Rd) |
| **River Oaks** | Woodbridge, Virginia | (2940 Shumard Oak Dr) |
| **Juniper** | Columbia, Maryland | (6000 Merriweather Dr) |
| **Pallas—Pike + Rose** | North Bethesda, Maryland | (11550 Georgetown Rd) |
| **Persei—Pike + Rose** | North Bethesda, Maryland | (900 Persei Place) |
| **Upstairs, Bethesda Row** | Bethesda, Maryland | (7131 Arlington Rd) |

51. **Highmark Residential LLC** ("Highmark") is a Delaware limited liability company with a principal office address of 591 West Putnam Avenue, Greenwich, CT 06830 that is licensed to do business in Indiana via its foreign commercial registered agent C T Corporation System. Highmark, an owner and/or manager of residential rental properties, upon reasonable belief, managed the following or more Apartment rental properties during the relevant time period:

| | | |
|---|---|---|
| **Sawyer Flats** | Gaithersburg, Maryland | (9806 Mahogany Dr) |

52. **JLB Residential LLC** ("JLB") is a Texas limited liability company with a principal office address of 3890 W Northwest Hwy, Fl. 7, Dallas, TX 75220, which is also the same location as its registered office address via its commercial registered agent Bay Miltenberger. JLB operates as a manager of residential rental properties and, upon reasonable belief, managed the following or more Apartment rental property units during the relevant time period:

| | | |
|---|---|---|
| **Haden ***7172** | McLean, VA | (1575 Anderson Rd) |
| **Haden ***9929** | McLean, VA | (1575 Anderson Rd) |

53. **Klingbeil Capital Management, LTD** ("Klingbeil") is an Ohio limited liability company with a principal office address of 500 W. Wilson Bridge Rd., Suite 140, Worthington, OH 43085, which is registered to do business in Indiana as a foreign limited liability company via its Indiana registered agent, National Registered Agents, Inc., located at 334 North Senate Avenue, Indianapolis, IN 46204. Klingbeil, Upon reasonable belief, owned and/or managed the following or more residential rental properties during the relevant time period:

| | | |
|---|---|---|
| **Ashton Green** | Van Nuys, California | (15454 Sherman Way) |

54. **Laramar Communities LLC** ("Laramar") is an Illinois limited liability company with a principal office address of 1806 N Halsted St, Chicago, IL 60614 and a registered office address of 100 Shockoe Slip, Fl. 2, Richmond, VA 23219 via its Virginia commercial registered agent Corporation Service Company. Laramar, an owner and/or manager of residential rental properties, upon reasonable belief, owned and/or managed the following or more residential rental properties during the relevant time period underlying this action:

| | | |
|---|---|---|
| **Bridgeyard** | Alexandria, Virginia | (1204 S Washington St) |

55. **Legend Management Group LLC** ("Legend Management") is a Virginia limited liability company with a principal office address of 1355 Beverly Rd, Ste. 105, McLean, VA 22101 and a registered office address of 1355 Beverly Rd, Ste. 240, McLean, Virginia 22101 via its agent Nicholas Flanagan. Legend Management, a manager of residential properties, upon belief, owned and/or managed the following or more rental properties during the relevant time period:

| | | |
|---|---|---|
| **Elms at Signal Hill Station** | Manassas, Virginia | (8825 Peregrine Heights Rd) |

56. **Mission Rock Residential LLC** ("Mission Rock") is a Delaware limited liability company with a principal office address of 1355 S Colorado Blvd., Ste. C-710, Denver, CO 80222 and a registered office address of 4701 Cox Rd, Ste. 285, Glen Allen, VA 23060 via its commercial registered agent C T Corporation System. Mission Rock, a multifamily residential property management company, managed, controlled, and/or operated the following or more implicated Apartment properties during all times relevant to this underlying lawsuit:

    **Abbotts Run Apartments**      Alexandria, Virginia      (5711 Woodlawn Gable Dr)

57. **Morguard Fenestra Apartments LLC** ("Morguard") is a Delaware limited liability company with a principal office address of 160 Greentree Dr, Ste. 101, Dover, DE 19904 and a registered office address of 2405 York Road, Ste. 201, Lutherville Timonium, MD 21093 via its commercial registered agent National Registered Agents, Inc. of MD. Morguard, a residential rental property management company, upon reasonable belief, managed, controlled, and/or operated the following or more Apartment properties during the relevant underlying time period:

    **Fenestra at The Square**      Rockville, Maryland      (20 Maryland Ave)

58. **Pinnacle Property Management Services, LLC** ("Pinnacle") is a Delaware limited liability company with a principal office address of 2401 Internet Blvd., Suite 110, Frisco, TX 75034, which is registered to do business in Indiana as a foreign limited liability company, with C T Corporation System as its Indiana commercial registered agent. Pinnacle, an owner and/or manager of residential rental properties, upon reasonable belief, owned and/or managed the following or more rental properties during the relevant time period:

    **San Regis Apartment**      Van Nuys, California      (15454 Sherman Way)

59. **RedPeak Properties, LLC** ("RedPeak") is a Delaware limited liability company with a principal office address and a registered office address (*c/o* Mark Windhager) of 375 S Broadway, Ste. 200, Denver, CO 80209. RedPeak, an owner and/or manager of residential rental properties, owned and/or managed the following or more Apartments during the relevant time period preceding BROE Real Estate Group's management acquisition on or about July 21, 2023 (from RedPeak):

    **Seasons of Cherry Creek**      Denver, Colorado      (3498 E Ellsworth Ave)

60. **Signature Properties LLC** ("Signature") is a Maryland limited liability company with a principal office address of 1700 Reisterstown Road, Ste. 215, Baltimore, MD 21208 and a registered office address of 1700 Reisterstown Road, Ste. 209, Baltimore, MD 21208 via its agent Erez Seiferas LLC. Signature is an owner and/or manager of residential rental properties and, upon reasonable belief, owned and/or managed the following or more rental properties during the relevant time period (prior to the below Apartment property's acquisition by current operator M3 Management):

    **Elms at Laurel Park**      Laurel, Maryland      (3563 Laurel Fort Meade Rd)

61. **UDR, Inc.** ("UDR") is a Maryland corporation with a principal office address of 1745 Shea Center Dr, Ste. 200, Highlands Ranch, CO 80129 and a registered office address of 7 St. Paul Street, Ste. 820, Baltimore, MD 21202 via its domestic registered agent CSC-Lawyers Incorporating Service

Company. UDR, a manager of residential real estate properties, upon reasonable belief, owned and/or managed the following or more Apartment rental properties during the relevant time period:

| | | |
|---|---|---|
| **Calverts Walk** | Bel Air, Maryland | (200 Foxhall Dr) |
| **Crescent Falls Church** | Arlington, Virginia | (2121 N Westmoreland St) |
| **Quarters at Towson** | Towson, Maryland | (960 Southerly Road) |

62. **Willow Bridge Property Company National LLC** ("Willow Bridge") is a Delaware limited liability company with a principal office address of 2000 Mckinney Ave, Ste. 1000, Dallas, TX 75201, which is registered to do business in Indiana as a foreign limited liability company, with C T Corporation System designated as its Indiana commercial registered agent. Willow Bridge, an owner and/or manager of residential rental properties, upon reasonable belief, owned and/or managed the following or more Apartment rental properties during the relevant time period:

| | | |
|---|---|---|
| **Lincoln at Fair Oaks** | Fairfax, Virginia | (12167 Lincoln Lake Way) |

63. **Abbotts Run Asset Management LLC** (or "Abbotts Run") is a Delaware limited liability company with a principal office address of 37 Graham St, Ste 200b, San Francisco, CA 94129 and a registered office address of 4701 Cox Rd Ste 285, Glen Allen, VA 23060 via its commercial registered agent C T Corporation System, which owned and operated one or more subject Apartment properties, including one located at 5711 Woodlawn Gable Dr, Alexandria, VA 22309. Abbotts Run approved a submitted Falsified Application, opened a corresponding Fraudulent Account, charged the underlying delinquency to debt collection, reported that collection data to the CRAs directly as well as through Genesis, verified the disputed Tradeline as Plaintiff's, and then furnished the Tradeline in duplicate as a collection and as a header account to the CRAs.

64. **29SC Shelby Property Owner LLC** (or "The Shelby") is a Delaware limited liability company with a principal office address of 20 N Wacker Dr, Ste. 4120, Chicago, IL 60606 and a registered office address of 10 S Jefferson St, Ste. 1400, Roanoke, VA 24011 via its commercial registered agent Capitol Corporate Services, Inc., which owned and operated one or more subject Apartment properties, including one located at the address of 6200 North Kings Hwy, Alexandria, VA 22303. The Shelby approved a submitted Falsified Application, opened a corresponding Fraudulent Account, allowed the entered lease to incur seven-plus months of unpaid fees, and charged the underlying $21,513.39 delinquency to debt collection via Transworld Systems (TSI), who dunned Plaintiff for payment on the past-due Frauudlant Account balance that The Shelby itself originated.

## BACKGROUND ALLEGATIONS

65. The preceding Complaint paragraphs are hereby reincorporated by reference as if restated below.

<u>APARTMENT PRACTICES</u>

66. Property managers say, since the pandemic, fake IDs and documents have become too common.[1]

67. A Bozzuto representative acknowledged this "enormous uptick in all types of applicant fraud." *Id*.

68. As such, Bozzuto (and other Apartment companies) acknowledge needing to use a combination of "standard screening, ID verification software … and a manual review to cut down on fraud." *Id*.

---

[1] *How to Combat the Apartment Industry's Uptick in Fraud*, Rental Housing J. (Nov. 2, 2021).

69. Also according to Bozzuto, these "fraudsters … get into an apartment community [and] then skip out after a few months when it's apparent that they cannot pay[,] often with no repercussions." *Id*.

70. Greystar similarly acknowledges the commonality of rental scams, which may "come in many forms," according to Greystar's online published blog entitled "How To Avoid Rental Scams." [2]

71. As such, Greystar purportedly follows strict procedures, employs systems to protect renters, to conduct thorough background checks, and to ensure that lease transactions are legitimate. *Id*.

72. Before leasing a property, Greystar supposedly requires documentary proof of a lease applicant's identity and income through SSNs, bank statements, rental histories, and employment histories.[3]

73. Greystar also recognizes that "credit inquiries … stay on [a consumer's credit] report for up to two years" and that "several within a short period may negatively affect [one's] credit."[4]

74. Equifax's website blog, entitled "Understanding Hard Inquiries on Your Credit Report[5]," likewise recognizes that credit report inquiries "may be meaningful to … assessing creditworthiness." *Id*.

75. That blog also suggests that, while hard inquiries can adversely impact credit ratings, soft inquiries do not, which are generated from one's own credit checks or from promotional credit offers. *Id*.

76. Yet Equifax wrongly issued over fifty credit reports per unauthorized inquiries by LeasingDesk, SafeRent, and RentGrow on behalf of Apartments, including Bozzuto and Greystar managed ones.

77. These and other impermissible inquiry transactions correlate to the Tenant Screening Reports that recommended to the Apartments that they approve the underlying Falsified Applications at issue.

78. Because most to all Apartments accepted the Tenant Screening Reports' recommendations, those Apartments blindly accepted unverifiable and uncorroborated Falsified Applications.

79. In light of that, as well as the Apartments' corresponding failures to detect or address the Falsified Applications, opened and unpaid Fraudulent Accounts originated under Plaintiff's misused PII.

80. These Fraudulent Accounts encompassed unpaid application, insufficient fund, and lease charges, which the Apartments attributed to Plaintiff, despite that they are responsible for their originations.

81. To date, most of these Apartments have failed to mitigate the foreseeable ramifications that have resulted from the undetected Lease Fraud, which they themselves enabled and then left unrectified.

82. This happened despite the Apartments' respective representations of employing commercially reasonable systems and policies to protect one's PII from unauthorized access, use, and disclosure.

---

[2] https://www.greystar.com/blog/how-to-avoid-rental-scams  (accessed April 23, 2025).

[3] Proof of Income Documents: What You Need to Know | Greystar  (accessed April 23, 2025).

[4] Build Credit With Rent Payments: Smart Strategies for Renters | Greystar  (accessed April 24, 2025).

[5] Understanding Hard Inquiries on Your Credit Report | Equifax  (accessed April 24, 2025).

<u>INQUIRY / SCREENING  TRANSACTIONS</u>

83. Numerous Tenant Screening Reports were generated primarily by LeasingDesk, RentGrow, and SafeRent for differing property management companies and/or their Apartment communities.

84. The large majority of Tenant Screening Reports integrated multiple other consumer reports, with each integrated report representing a distinct instance of use, procurement, and/or redisclosure.

85. RentGrow's Tenant Screening Reports, as alleged below, integrated outsourced consumer reports from third parties, such as Equifax credit reports, Experian RentBureau reports, and OFAC reports.

86. SafeRent's Tenant Screening Reports integrated outsourced consumer reports from third parties, including Experian credit reports, CrimSAFE reports, as well as RegistryCHECK Plus reports.

87. LeasingDesk initiated credit report inquiries to Experian and Equifax and, from those inquiries, generated Tenant Screening Reports that LeasingDesk then sold to certain Apartment Defendants.

88. Experian RentBureau's rental history reports stated that "no prior rental history was found" but simultaneously and paradoxically concluded that the application "meets property requirements."

89. These Apartments' management companies, as alleged below, are vicariously liable for their respective agents' procurement and use of Plaintiff's consumer reports that are at current issue.

90. RentGrow and SafeRent, as subscriber corporations, are likewise liable for unauthorized actions of their respective agents in procuring and disclosing Plaintiff's consumer reports that are at issue.

91. The majority of consumer reports pulled pursuant to the below transactions indicated substantial address discrepancies, with warnings that the inquiry address(es) are not associated with Plaintiff.

92. Despite these repeating red flags, the Falsified Applications were blindly recommended for approval by the Tenant Screeners and subsequently approved by the respective Apartments.

93. This enabled the Lease Fraud that preceded the origination of Fraudulent Accounts under Plaintiff's PII, which gave way to unpaid balance delinquencies, some from $10,000 to $25,000.

94. The frequency and geographical spread of these Falsified Application submissions suggest a systematic attempt to misappropriate Plaintiff's PII and identity to serially commit Lease Fraud.

95. The aggregated statutory damages from the following screening transactions (assuming $1,000 FCRA statutory violation allocations) amounts to a collective monetary value above two million.

96. The following alleged inquiry and reporting transactions demonstrate how these Apartments (a) received and processed Falsified Applications, (b) failed to verify applicant identity or detect Lease Fraud, (c) relied on Tenant Screening Reports to approve Falsified Applications, (d) opened Fraudulent Accounts from these approved Falsified Applications and, in numerous instances, (e) assigned lease balances to Debt Collectors, as well as (f) furnished account Tradelines to the CRAs, which was in conscious disregard of Plaintiff's foreseeably incurred Lease Fraud-related damages.

### Underlying Transactions

97. On April 12, 2022, Experian generated a credit report derived from Plaintiff's credit file in response to a hard inquiry by Resident Verify on behalf of, and for redistribution to, The Shelby.

98. On April 13, 2022, Experian generated a credit report derived from Plaintiff's credit file in response to a recorded hard inquiry by FADV on behalf of, and for redistribution to, The Avalon.

99. On April 13, 2022, Equifax generated a credit report derived from Plaintiff's credit file in response to a soft-labelled tenant screening inquiry made by RentGrow on the behalf of Crystal Square.

100. On April 13, 2022, LeasingDesk—on behalf of Bethesda Row—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

101. On April 13, 2022, LeasingDesk—on behalf of Westwood Towers—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

102. On April 13, 2022, a LeasingDesk screening report was generated for Greystar on behalf of Upstairs at Bethesda Row Apartments located in Bethesda, Maryland (at 7131 Arlington Road).

103. On April 13, 2022, a LeasingDesk screening report was generated for CapREIT on behalf of Westwood Tower Apartments located in Bethesda, Maryland (at 5401 Westbard Avenue).

104. On April 13, 2022, a RentGrow screening report was generated for Dweck Properties on behalf of Crystal Square Apartments located in Arlington, Virginia (at 1515 Richmond Highway).

105. This RentGrow Report utilized by Crystal Square Apartments integrated an Equifax Credit Report that did not include a discrepant address warning, despite the mismatched input Huron Address.

106. This RentGrow Report utilized by Crystal Square integrated an Experian RentBureau consumer report stating that no prior rental history was found but yet that it meets property requirements.

107. This RentGrow Report utilized by Crystal Square integrated respective Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

108. On April 15, 2022, RentGrow —on behalf of BLVD Ansel—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

109. On April 15, 2022, RentGrow —on behalf of Park at Arlington Ridge—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

110. On April 15, 2022, a RentGrow screening report was generated for Dweck Properties on behalf of The Park at Arlington Ridge Apartments located in Arlington, Virginia (at 1800 26th Street South).

111. This RentGrow Report utilized by The Park at Arlington Ridge integrated an Equifax Credit Report with a discrepancy warning that the inquiry address is not associated with this consumer.

112. This RentGrow Report utilized by The Park at Arlington Ridge integrated an Experian RentBureau consumer report stating no prior rental history was found but yet meets property requirements.

113. This RentGrow Report utilized by Park at Arlington Ridge integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

114. On April 15, 2022, a RentGrow screening report was generated for Comstock, on behalf of BLVD Ansel located in Rockville, Maryland (at 33 Monroe Street).

115. This RentGrow Report utilized by BLVD Ansel Apartments integrated an Equifax Credit Report with a discrepancy warning stating that the inquiry address is not associated with this consumer.

116. This RentGrow Report utilized by BLVD Ansel Apartments integrated an Experian RentBureau consumer report stating that no prior rental history was found but yet meets property requirements.

117. This RentGrow Report utilized by BLVD Ansel Apartments integrated a Premium National Civil Court Records consumer report as well as an OFAC/SDN Search consumer report.

118. On April 18, 2022, FADV—on behalf of Lincoln at Fair Oaks—made a soft credit inquiry to Experian, who disclosed Plaintiff's credit report and file-recorded the soft inquiry transaction.

119. On April 20, 2022, RentGrow —on behalf of Abbotts Run—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

120. On April 20, 2022, a RentGrow screening report was generated for Mission Rock, on behalf of Abbotts Run Apartment Homes located in Alexandria, Virginia (at 5711 Woodlawn Gable Drive).

121. This RentGrow Report utilized by Abbotts Run integrated an Equifax Credit Report that did not include a discrepant address warning, notwithstanding the mismatched input Huron Address.

122. This RentGrow Report utilized by Abbotts Run Apartments integrated an Experian RentBureau consumer report stating that no prior rental history was found but yet meets property requirements.

123. This RentGrow Report utilized by Abbotts Run Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

124. On April 21, 2022, RentGrow —on behalf of Enclave at Box Hill—made a soft Credit Report inquiry to Equifax, who returned Plaintiff's credit report and file-recorded the inquiry transaction.

125. On April 21, 2022, a RentGrow screening report was generated for Bozzuto, on behalf of Enclave at Box Hill Apartments located in Abingdon, Maryland (at 3405 McCurley Drive).

126. This RentGrow Report utilized by Enclave at Box Hill integrated an Equifax Credit Report that did not include a discrepant address warning despite the mismatched input Huron Address.

127. This RentGrow Report utilized by Enclave at Box Hill integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

128. This RentGrow Report utilized by Enclave at Box Hill integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

129. On April 27, 2022, SafeRent—on behalf of Post Park Maryland—made a soft credit inquiry to Experian, who provided Plaintiff's credit report and file-recorded the inquiry transaction.

130. On April 27, 2022, SafeRent—on behalf of Woods of Fairfax—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

131. On April 27, 2022, RentGrow—on behalf of Park + Ford Apartments—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

132. On April 27, 2022, LeasingDesk—on behalf of Quarters at Towson—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

133. On April 27, 2022, LeasingDesk—on behalf of Calverts Walk—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

134. On April 27, 2022, a LeasingDesk screening report was generated for UDR, Inc. on behalf of Calverts Walk Apartments located in Bel Air, Maryland  (at 200 Foxhall Drive).

135. On April 27, 2022, a LeasingDesk screening report was generated for UDR, Inc. on behalf of The Quarters at Towson Town Center Apartments located in Towson, Maryland (960 Southerly Road).

136. On April 27, 2022, a SafeRent Report was prepared for ECIM Group on behalf of Southern Towers Apartments in Alexandria, Virginia, recommending approving the Falsified Application.

137. This SafeRent Report utilized by Southern Towers integrated an Experian credit report that showed satisfactory accounts with no adverse tradelines and left out a discrepant address (Huron) indicator.

138. This SafeRent Report utilized by Southern Towers Apartments integrated an Experian social search report that furnished Plaintiff's, as the purported applicant, reported address history.

139. This SafeRent Report utilized by Southern Towers Apartments integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records found.

140. This SafeRent Report, utilized by Southern Towers Apartments, integrated a RegistryCHECK Plus report that confirmed no associated court records found for Plaintiff, as the purported applicant.

141. On April 27, 2022, a SafeRent Report was prepared for Gene B. Glick Company, on behalf of Woods of Fairfax in Lorton, Virginia, which recommended accepting the Falsified Application.

142. This SafeRent Report utilized by Woods of Fairfax integrated an Equifax Credit Report that showed satisfactory accounts with no adverse tradelines and an address discrepancy indicator.

143. This SafeRent Report utilized by Woods of Fairfax integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records having been found.

144. This SafeRent Report utilized by Woods of Fairfax integrated a RegistryCHECK Plus consumer report that confirmed no court records being associated with Plaintiff as the purported applicant.

145.  On April 27, 2022, a RentGrow screening report was generated for Bozzuto on behalf of Park + Ford Apartments located in Alexandria, Virginia  (at 4401 Ford Avenue).

146.  This RentGrow Report utilized by Park + Ford Apartments integrated an Equifax Credit Report that did not include a discrepant address warning despite the mismatched input Huron Address.

147.  This RentGrow Report utilized by Park + Ford Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

148.  This RentGrow Report utilized by Park + Ford Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

149.  On April 28, 2022, LeasingDesk—on behalf of Aventon Crown—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

150.  On April 28, 2022, a LeasingDesk screening report was generated for JAG Management Company, on behalf of Aventon Crown, located in Gaithersburg, Maryland  (at 800 Rockwell Avenue).

151.  On May 1, 2022, Resident Verify—on behalf of Stonegate, Iron Ridge—made a hard credit inquiry to Experian, who provided Plaintiff's credit report and file-recorded the hard inquiry transaction.

152.  On May 4, 2022, RentGrow—on behalf of Sawyer Flats—made a soft credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

153.  On May 4, 2022, a RentGrow screening report was generated for Highmark Residential, on behalf of Sawyer Flats Apartments located in Gaithersburg, Maryland  (at 9806 Mahogany Drive).

154.  This RentGrow Report utilized by Sawyer Flats Apartments integrated an Equifax Credit Report with a discrepancy warning, stating 'inquiry address is not associated with this consumer name.'

155.  This RentGrow Report utilized by Sawyer Flats Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

156.  This RentGrow Report utilized by Sawyer Flats Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

157.  On May 9, 2022, SafeRent—again on behalf of Post Park Maryland Apartment—made another credit inquiry to Experian, who disclosed Plaintiff's credit report and file-recorded the inquiry.

158.  On May 9, 2022, a SafeRent Report was prepared for ECIM Group on behalf of Skyline Apartments in Falls Church, Virginia that recommended accepting the Falsified Application.

159.  This SafeRent Report utilized by Skyline Apartments integrated an Experian credit report showing satisfactory accounts with no adverse tradelines but no input address (Huron) discrepancy warning.

160.  This SafeRent Report utilized by Skyline Apartments integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records having been found.

161. This SafeRent Report utilized by Skyline Apartments integrated a RegistryCHECK Plus consumer report that confirmed no court records being associated with Plaintiff as the purported applicant.

162. On May 11, 2022, LeasingDesk—on behalf of Crystal Woods—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

163. On May 11, 2022, a LeasingDesk screening report was generated for Acento Real Estate on behalf of Crystal Woods Apartments located in Alexandria, Virginia (at 4905 Southland Avenue).

164. On May 12, 2022, Equifax recorded a soft LeasingDesk inquiry categorized as an "ID" inquiry.

165. On May 13, 2022, a fraudulent lease opened with Crystal Woods, managed by Acento Real Estate, eventuating a $10,096.08 past-due Fraudulent Account balance purportedly owed by Plaintiff.

166. On May 16, 2022, LeasingDesk—on behalf of 8421 Broad—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

167. On May 16, 2022, RentGrow—on behalf of West Broad—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry transaction.

168. On May 16, 2022, RentGrow—on behalf of View Ballston—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry transaction.

169. On May 16, 2022, a LeasingDesk screening report was generated for Brookfield Properties on behalf of 8421 Broad Apartments located in McLean, Virginia (at 8421 Broad Street).

170. On May 16, 2022, a RentGrow screening report was generated for Bozzuto on behalf of West Broad Apartments located in West Falls Church, Virginia (at 301 West Broad Street).

171. This RentGrow Report utilized by West Broad Apartments integrated a "Equifax Credit Report" with a discrepant address warning, stating 'inquiry address is not associated with this consumer.'

172. This RentGrow Report utilized by West Broad Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

173. This RentGrow Report utilized by West Broad Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

174. On May 16, 2022, a RentGrow screening report was generated for Bozzuto on behalf of View Ballston Apartments located in Arlington, Virginia (at 4000 Wilson Boulevard).

175. This RentGrow Report utilized by View Ballston integrated an "Equifax Credit Report" with a discrepant address warning, stating 'inquiry address is not associated with this consumer.'

176. This RentGrow Report utilized by View Ballston Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

177. This RentGrow Report utilized by View Ballston Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

178. On May 17, 2022, RentGrow—on behalf of Ovation at Park Crest— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

179. On May 17, 2022, a RentGrow screening report was generated for Bozzuto on behalf of Ovation at Park Crest Apartments located in McClean, Virginia  (at 8231 Crestwood Heights Drive).

180. This RentGrow Report utilized by Ovation at Park Crest integrated an "Equifax Credit Report" with a discrepant address warning stating that the inquiry address is not associated with [Plaintiff].

181. This RentGrow Report utilized by Ovation at Park Crest integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

182. This RentGrow Report utilized by Ovation at Park Crest integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

183. On May 18, 2022, SafeRent—on behalf of Country Village Apartments—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

184. On May 18, 2022, SafeRent—again on behalf of Country Village Apartments—made a credit report inquiry to Equifax, who allowed Country Village access to Plaintiff's credit report.

185. On May 18, 2022, a SafeRent Report was prepared for Country Village Gardens on behalf of Country Village Apartments in Bel Air, Maryland stating to accept the Falsified Application.

186. On May 18, 2022, another SafeRent Report was prepared for Country Village Gardens on behalf of Country Village Apartments in Bel Air, Maryland, stating to accept the Falsified Application.

187. Both SafeRent Reports utilized by Country Village integrated an "Equifax Credit Report" showing satisfactory accounts with no adverse tradelines and a substantial address discrepancy indicator.

188. Both of these SafeRent Reports used by Country Village integrated a CrimSAFE consumer report stating to accept the Falsified Application based on no associated criminal records being found.

189. Both SafeRent Reports utilized by Country Village integrated a RegistryCHECK Plus consumer report that confirmed no associated court records found for Plaintiff as the purported applicant.

190. On May 21, 2022, a fraudulent lease opened with 8421 Broad Apartments, managed by Brookfield Properties, eventuating a $25,117.35 Fraudulent Account balance purportedly owed by Plaintiff.

191. On May 23, 2022, LeasingDesk—on behalf of Crescent Falls Church—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

192. On May 23, 2022, LeasingDesk—on behalf of Gallery Bethesda I—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

193. On May 23, 2022, a LeasingDesk screening report was generated for Donaldson on behalf of The Gallery at Bethesda I Apartments located in Bethesda, Maryland  (at 4800 Auburn Avenue).

194. On May 23, 2022, a LeasingDesk screening report was generated for UDR on behalf of Crescent Falls Church Apartments located in Arlington, Virginia  (at 2121 North Westmoreland Street).

195. On May 24, 2022, LeasingDesk—on behalf of Ravens Crest— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

196. On May 24, 2022, LeasingDesk—on behalf of Elms, Signal Hill Station— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

197. On May 24, 2022, LeasingDesk—on behalf of Haden Apartments— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

198. On May 24, 2022, a LeasingDesk screening report was generated for Greystar on behalf of Ravens Crest Apartments in Manassas, Virginia  (at 8098 Ravens Crest Court).

199. On May 24, 2022, a LeasingDesk screening report was generated for Legend Management on behalf of Elms at Signal Hill Station in Manassas, Virginia  (at 8825 Peregrine Heights Road).

200. On May 24, 2022, a LeasingDesk screening report was generated for Bozzuto on behalf of Haden Apartments located in McLean, Virginia  (at 1575 Anderson Road).

201. On May 25, 2022, LeasingDesk—on behalf of Juniper Apartments— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

202. On May 25, 2022, RentGrow—on behalf of Bell at Stonebridge—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

203. On May 25, 2022, a LeasingDesk screening report was generated for Greystar on behalf of Juniper Apartments located in Columbia, Maryland  (at 6000 Merriweather Drive).

204. On May 25, 2022, a RentGrow screening report was generated for Bell Partners on behalf of Bell at Stonebridge Apartments located in Woodbridge, Virginia  (at14701 River Walkway).

205. This RentGrow Report utilized by Bell at Stonebridge Apartments integrated an "Equifax Credit Report" with the discrepancy warning  'inquiry address is not associated with this consumer name.'

206. This RentGrow Report utilized by Bell at Stonebridge integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

207. This RentGrow Report utilized by Bell at Stonebridge Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search reports.

208. On May 26, 2022, a fraudulent lease was opened with Ravens Crest Apartments, which is managed by Greystar, eventuating a $12,511.39 Fraudulent Account balance purportedly owed by Plaintiff.

209. On May 26, 2022, RentGrow—on behalf of Origin Apartments—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

210. On May 26, 2022, RentGrow—on behalf of The Seasons of Cherry Creek—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

211. Also on May 26, 2022, a Falsified Application and a $14.00 online submission fee, was submitted to RedPeak in connection with an applied-for Apartment lease with The Seasons of Cherry Creek.

212. As a result, RedPeak charged a $20.00 returned EFT fee to the Fraudulent Account that it itself opened, resulting in a $34.00 unpaid balance comprised of that and the Falsified Application fee.[6]

213. Separately on May 26, 2022, a LeasingDesk screening report generated for Brookfield Properties on behalf of Origin Apartments located in Arlington, Virginia (at 700 North Randolph Street).

214. On May 26, 2022, a RentGrow screening report was generated for Broe Real Estate Group on behalf of The Seasons of Cherry Creek located in Denver, Colorado (at 3498 E Ellsworth Avenue).

215. This RentGrow Report utilized by The Seasons of Cherry Creek Apartments integrated an "Equifax Credit Report" indicating 'inquiry address is not associated with this consumer name.'

216. This RentGrow Report used by The Seasons of Cherry Creek integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

217. This RentGrow Report utilized by The Seasons of Cherry Creek integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search reports.

218. On May 30, 2022, LeasingDesk—on behalf of River Oaks—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

219. On May 30, 2022, a LeasingDesk screening report was generated for Greystar on behalf of River Oaks Apartments located in Woodbridge, Virginia (at 2940 Shumard Oak Drive).

220. On May 31, 2022, LeasingDesk—on behalf of Addison Row— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

221. On May 31, 2022, a LeasingDesk screening report was generated for Greystar on behalf of Addison Row Apartments located in Capitol Heights, Maryland (at 4800 Addison Road).

222. On May 31, 2022, a LeasingDesk screening report was generated for Elme Communities on behalf of Assembly Manassas Apartments in Manassas, Virginia (at 10519 Lariat Lane).

223. On May 31, 2022, a LeasingDesk screening report was generated for Donaldson on behalf of Rollingwood Apartments located in Silver Spring, Maryland (at 2535 Ross Road).

224. On May 31, 2022, a LeasingDesk screening report was generated for Greystar on behalf of Pallas at Pike Rose Apartments in North Bethesda, Maryland (at 11550 Old Georgetown Road).

---

[6] On December 31, 2023, following BROE Real Estate Group's July 21, 2023 management acquisition of The Seasons of Cherry Creek, it appears that it wrote-off this unpaid Fraudulent Account balance initially procured by RedPeak.

225. On May 31, 2022, SafeRent—on behalf of Ashton Green Apartment—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

226. On May 31, 2022, a SafeRent Report was prepared for Klingbeil Capital Management on behalf of Ashton Green in Columbia, Maryland, recommending acceptance of the Falsified Application.

227. This SafeRent Report utilized by Ashton Green integrated an "Equifax Credit Report" showing satisfactory accounts with no adverse tradelines and a substantial address discrepancy indicator.

228. This SafeRent Report utilized by Ashton Green integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records having been found.

229. This SafeRent Report utilized by Ashton Green integrated a RegistryCHECK Plus consumer report that confirmed no court records being associated with Plaintiff as the purported applicant.

230. On June 2, 2022, SafeRent—on behalf of Sussex Gardens—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

231. On June 2, 2022, a SafeRent Report was prepared for Sussex Gardens LLC on behalf of Sussex Gardens Apartments in Alexandria, Virginia, recommending accepting the Falsified Application.

232. This SafeRent Report used by Sussex Gardens integrated an "Equifax Credit Report" with an address discrepancy saying a "substantial difference occurred" for the Huron and Whit Addresses.

233. This SafeRent Report utilized by Sussex Gardens integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records having been found.

234. This SafeRent Report utilized by Sussex Gardens integrated a RegistryCHECK Plus consumer report that confirmed no court records being associated with Plaintiff as the purported applicant.

235. On June 7, 2022, RentGrow—on behalf of Garfield Park—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry transaction.

236. On June 7, 2022, a RentGrow screening report was generated for Kettler Management on behalf of Garfield Park Apartments located in Arlington, Virginia (at 925 North Garfield Street).

237. This RentGrow Report utilized by Garfield Park Apartments integrated an "Equifax Credit Report" with a discrepant address warning, 'inquiry address is not associated with this consumer name.'

238. This RentGrow Report utilized by Garfield Park Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

239. This RentGrow Report utilized by Garfield Park Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

240. On June 9, 2022, SafeRent—on behalf of Woodway at Trinity Centre—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

241. On June 9, 2022, a SafeRent Report was prepared for Bozzuto on behalf of Woodway at Trinity Centre in Centreville, Virginia, recommending approval of the Falsified Application.

242. This SafeRent Report utilized by Woodway at Trinity Centre integrated an Equifax credit report showing satisfactory accounts with no adverse tradelines and a substantial address discrepancy.

243. This SafeRent Report utilized by Woodway at Trinity Centre integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records found.

244. This SafeRent Report utilized by Woodway at Trinity Centre integrated a RegistryCHECK Plus consumer report that confirmed no associated court records for Plaintiff as the purported applicant.

245. On June 13, 2022, LeasingDesk—on behalf of Flats at Shady Grove— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

246. On June 13, 2022, a LeasingDesk screening report was generated for Brick Lane on behalf of the Flats At Shady Grove Apartments located in Rockville, Maryland   (at 1380 Piccard Drive).

247. On June 13, 2022, LeasingDesk—on behalf of Centre at Silver Spring—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

248. On June 13, 2022, a LeasingDesk screening report was generated for Acento Real Estate on behalf of Centre at Silver Spring Apartments located in Silver Spring, Maryland (at 3310 Teagarden Cir.).

249. On June 20, 2022, LeasingDesk—on behalf of Persei at Pike + Rose—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

250. On June 20, 2022, a LeasingDesk screening report was generated for Greystar on behalf of Persei at Pike + Rose Apartments located in North Bethesda, Maryland  (at 900 Persei Place).

251. On June 20, 2022, LeasingDesk—on behalf of The Courts of Avalon—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

252. On June 20, 2022, a LeasingDesk screening report was generated for Avalon Bay on behalf of The Courts of Avalon located in Pikesville, Maryland  (at 9000 Iron Horse Lane).

253. On June 20, 2022, LeasingDesk—on behalf of Gallery on New Hampshire—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

254. On June 20, 2022, a LeasingDesk screening report was generated for Donaldson on behalf of The Gallery on New Hampshire Apartments located in Adelphi, Maryland  (at 1809 Fox Street).

255. On June 22, 2022, Clarity – on behalf of Acima Digital – made five (5) soft credit pulls to Experian, who provided Plaintiff's credit reports each time and recorded each of the soft inquiry transactions.

256. On June 22, 2022, SafeRent—on behalf of Braddock Lee—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

257. On June 22, 2022, a SafeRent Report was prepared for Harbor Group Mgmt. on behalf of Braddock Lee Apartments in Alexandria, Virginia, recommending accepting the Falsified Application.

258. This SafeRent Report utilized by Braddock Lee integrated an "Equifax Credit Report" showing satisfactory accounts with no adverse tradelines and a substantial address discrepancy indicator.

259. This SafeRent Report utilized by Braddock Lee integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records having been found.

260. This SafeRent Report utilized by Braddock Lee integrated a RegistryCHECK Plus consumer report that confirmed no court records being associated with Plaintiff as the purported applicant.

261. On June 27, 2022, a fraudulent lease opened with Centre at Silver Spring Apartments, managed by Acento, eventuating a $17,500.68 Fraudulent Account balance purportedly owed by Plaintiff.

262. On June 28, 2022, LeasingDesk—on behalf of Bainbridge Bethesda—made two separate credit report inquiries to Equifax, who twice disclosed Plaintiff's credit report pursuant to a soft inquiry.

263. On June 28, 2022, two LeasingDesk screening reports were generated for Bainbridge Company on behalf of Bainbridge Bethesda located in Bethesda, Maryland  (at 4918 Saint Elmo Ave.).

264. On June 28, 2022, a SafeRent Report was prepared for Bainbridge Company on behalf of Bethesda Place located in Bethesda, Maryland, recommending accepting the Falsified Application.

265. This SafeRent Report utilized by Bethesda Place integrated an Experian credit report that showed satisfactory accounts with no adverse tradelines and no inputted discrepant address indicator.

266. This SafeRent Report utilized by Bethesda Place integrated an Experian social search consumer report, which furnished a current and prior address history for Plaintiff as the purported applicant.

267. This SafeRent Report utilized by Bethesda Place integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records having been found.

268. This SafeRent Report utilized by Bethesda Place integrated a RegistryCHECK Plus consumer report that confirmed no court records being associated with Plaintiff as the purported applicant.

269. On June 28, 2022, RentGrow—on behalf of The Montgomery—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

270. On June 28, 2022, a RentGrow screening report was generated for Fairfield Residential on behalf of The Montgomery Apartments located in Bethesda, Maryland  (at 6425 Rock Forest Drive).

271. This RentGrow Report utilized by The Montgomery Apartments integrated an "Equifax Credit Report" with a discrepant address warning, the 'inquiry address is not associated with [Plaintiff].'

272. This RentGrow Report utilized by The Montgomery integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

273. This RentGrow Report utilized by The Montgomery integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

274. On June 30, 2022, a fraudulent lease opened with Bainbridge Bethesda, managed by Bainbridge Company, eventuating a $19,582.20 Fraudulent Account balance purportedly owed by Plaintiff.

275. On June 30, 2022, RentGrow—on behalf of Bell at Fair Oaks—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

276. On June 30, 2022, RentGrow—on behalf of 17 Barkley— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

277. On June 30, 2022, a RentGrow screening report was generated for Fairfield Residential on behalf of 17 Barkley Apartments located in Gaithersburg, Maryland  (at 17 Barkley Lane).

278. This RentGrow Report utilized by 17 Barkley Apartments integrated an "Equifax Credit Report" with a discrepant address indicator, warning the inquiry address is not associated with Plaintiff.

279. This RentGrow Report utilized by 17 Barkley Apartments integrated an Experian RentBureau consumer report stating, no prior rental history was found but yet meets property requirements.

280. This RentGrow Report utilized by 17 Barkley Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

281. On June 30, 2022, a RentGrow screening report was generated for Bell Partners on behalf of Bell at Fair Oaks –now Knoll At Fair Oaks– located in Fairfax, Virginia (at 12201 Pender Creek Circle).

282. This RentGrow Report utilized by Bell At Fair Oaks Apartments integrated an "Equifax Credit Report" with a discrepant address indicator, 'inquiry address is not associated with [Plaintiff].'

283. This RentGrow Report utilized by Bell At Fair Oaks integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

284. This RentGrow Report utilized by Bell At Fair Oaks integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

285. On July 14, 2022, LeasingDesk—on behalf of The Birches—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

286. On July 15, 2022, SafeRent—on behalf of The Birches—made two (2) credit report inquiries to Equifax, who disclosed Plaintiff's credit report and file-recorded one of them as a soft inquiry.

287. On July 15, 2022, a SafeRent Report was prepared for Harbor Group Management on behalf of The Birches in Silver Spring, Maryland, recommending accepting the Falsified Application.

288. This SafeRent Report utilized by The Birches integrated an "Equifax Credit Report" showing satisfactory accounts with no adverse tradelines and a substantial address discrepancy indicator.

289. This SafeRent Report utilized by The Birches integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records having been found.

290. This SafeRent Report utilized by the Birches integrated a RegistryCHECK Plus consumer report that confirmed no court records being associated with Plaintiff as the purported applicant.

291. On August 8, 2022, Resident Verify—on behalf of Fenestra at Rockville—made a hard credit inquiry to Experian, who disclosed Plaintiff's credit report as well as the recorded hard inquiry.

292. On August 8, 2022, Entrata / Resident Verify made a soft credit inquiry to Experian, who provided it access to Plaintiff's Experian credit report and file-recorded the inquiry transaction.

293. On August 8, 2022, LeasingDesk—on behalf of Argent Apartment Homes—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

294. On August 8, 2022, a LeasingDesk screening report was generated for CapREIT on behalf of Argent Apartment Homes located in Silver Spring, Maryland  (at 1200 Blair Mill Road).

295. On August 8, 2022, RentGrow—on behalf of Revel at Noma—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded one of them as a soft inquiry.

296. On August 8, 2022, a RentGrow screening report was generated for Bell Partners on behalf of Revel at Noma Centre Apartments located in Washington, DC  (at 1005 First Street NE).

297. This RentGrow Report utilized by Revel at Noma Centre Apartments integrated an "Equifax Credit Report" stating that the inquiry address ("925 w huron ST Apt."), the current residence state ("Prosper TX"), and the zip code ("60642") do not match the outputted current Whit Address.

298. This RentGrow Report utilized by Revel at Noma Centre integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

299. This RentGrow Report utilized by Revel at Noma Centre integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

300. On August 9, 2022, LeasingDesk—on behalf of Assembly Dulles—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft inquiry.

301. On August 9, 2022, a LeasingDesk screening report was generated for Elme Communities on behalf of Assembly Dulles Apartments located in Herndon, Virginia  (at 13690 Legacy Circle).

302. On August 9, 2022, LeasingDesk—on behalf of Trevors Run—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

303. On August 9, 2022, a LeasingDesk screening report was generated for Allen & Rocks on behalf of Trevors Run Apartments located in Herndon, Virginia  (at 2411 Little Current Drive).

304. On August 10, 2022, Resident Verify made a soft inquiry to Experian, who provided access to Plaintiff's Experian credit report and recorded the inquiry transaction as "Resident Verify/MAST."

305. On August 11ᵗʰ and August 12ᵗʰ 2022, RentGrow—on behalf of The Elms at Laural Park—made two (2) credit report inquiries to Equifax, who disclosed Plaintiff's credit reports in response.

306. On August 11ᵗʰ and August 12ᵗʰ 2022, respective RentGrow reports were generated for Signature Properties on behalf of The Elms at Laurel Park Apartments located in Laurel, Maryland.

307. These RentGrow Reports utilized by Elms At Laurel Park Apartments integrated an "Equifax Credit Report" with a discrepancy warning,  the 'inquiry address is not associated with [Plaintiff].'

308. These RentGrow Report utilized by Elms At Laurel Park integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

309. These RentGrow Report utilized by Elms At Laurel Park integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

310. On August 16, 2022, LeasingDesk—on behalf of Haden Apartments—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

311. On August 16, 2022, a LeasingDesk screening report was generated for Bozzuto on behalf of another Haden Apartment unit also located in McClean, Virginia  (at 1575Anderson Road).

312. On August 27, 2022, SafeRent—on behalf of Post Park Maryland—made a third credit inquiry to Experian, who disclosed Plaintiff's credit report and recorded the transaction as a soft inquiry.

313. On August 27, 2022, a SafeRent Report was prepared for Allegiant-Carter on behalf of Post-Park Maryland Apartment in Hyattsville, Maryland, recommending accepting the Falsified Application.

314. This SafeRent Report utilized by Post-Park Maryland integrated an Experian credit report that showed satisfactory accounts and no past due debt tradelines, but no address discrepancy indicator.

315. This SafeRent Report utilized by Post-Park Maryland integrated an Experian social search report that furnished current and prior address history associated with Plaintiff as the purported applicant.

316. This SafeRent Report utilized by Post-Park Maryland integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records being found.

317. This SafeRent Report utilized by Post-Park Maryland integrated a RegistryCHECK Plus consumer report that confirmed no associated court records being found in connection with Plaintiff.

318. On August 30, 2022, Potamic Electric Power made two (2) soft credit pulls to Experian, who twice provided it access to Plaintiff's credit report information and recorded both inquiry transactions.

319. On August 30, 2022, LeasingDesk—on behalf of Bainbridge at Shady Grove Metro—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report, which was file recorded.

320. On August 30, 2022, a LeasingDesk screening report was generated for Bainbridge Company on behalf of Bainbridge at Shady Grove Metro located in Rockville, Maryland (15955 Frederick Rd).

321. On August 30, 2022, RentGrow—on behalf of San Regis Apartments— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft-labelled inquiry.

322. On August 30, 2022, a RentGrow screening report was generated for Pinnacle Properties on behalf of San Regis Apartments located in Van Nuys, California (at 15454 Sherman Way).

323. This RentGrow Report utilized by San Regis Apartments integrated an "Equifax Credit Report" with an address discrepancy warning, stating 'inquiry address is not associated with [Plaintiff].'

324. This RentGrow Report utilized by San Regis Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

325. This RentGrow Report utilized by San Regis Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

326. On August 31, 2022, FADV—on behalf of Lincoln at Fair Oaks—made three (3) more credit inquiries to Experian, who provided Plaintiff's credit reports and recorded them as soft inquiries.

327. On August 31, 2022, RentGrow—on behalf of The Moxley—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

328. On August 31, 2022, a RentGrow screening report was generated for Fairfield Residential on behalf of The Moxley Apartments located in Fairfax, Virginia (at 4040 Gateway Drive).

329. This RentGrow Report utilized by The Moxley Apartments integrated an "Equifax Credit Report" with an address discrepancy warning, stating 'inquiry address is not associated with [Plaintiff]."

330. This RentGrow Report utilized by The Moxley Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

331. This RentGrow Report utilized by The Moxley Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

332. On September 1, 2022, RentGrow—on behalf of Bridgeyard Apartments—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft-labelled inquiry.

333. On September 1, 2022, a RentGrow screening report was generated for Laramar Communities on behalf of Bridgeyard Apartments located in Alexandria, Virginia (at 1204 S. Washington Street).

334. This RentGrow Report utilized by Bridgeyard Apartments integrated an Equifax credit report with an address discrepancy warning, stating 'inquiry address is not associated with [Plaintiff]."

335. This RentGrow Report utilized by Bridgeyard Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

336. This RentGrow Report utilized by Bridgeyard Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

337. On September 1, 2022, RentGrow—on behalf of Brookdale Apartments—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft-labelled inquiry.

338. On September 1, 2022, a RentGrow screening report was generated for Drucker & Falk on behalf of Brookdale Apartments located in Richmond, Virginia (at 9027 Horrigan Court).

339. This RentGrow Report utilized by Brookdale Apartments integrated an Equifax credit report with an address discrepancy warning, stating 'inquiry address is not associated with [Plaintiff].'

340. This RentGrow Report utilized by Brookdale Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

341. This RentGrow Report utilized by Brookdale Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

342. On September 1, 2022, RentGrow—on behalf of Springwoods at Lake Ridge—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft inquiry.

343. On September 1, 2022, a RentGrow screening report was generated for Allegiant-Carter on behalf of Springwoods at Lake Ridge located in Woodbridge, Virginia (at 12395 Midsummer Lane).

344. This RentGrow Report utilized by Springwoods at Lake Ridge integrated an Equifax credit report with an address discrepancy warning, stating 'inquiry address is not associated with [Plaintiff].'

345. This RentGrow Report utilized by Springwoods at Lake Ridge integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

346. This RentGrow Report utilized by Springwoods at Lake Ridge integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

347. On September 7, 2022, RentGrow—on behalf of Verde at Greenbelt—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft-labelled inquiry.

348. On September 7, 2022, a RentGrow screening report was generated for Dolben Management on behalf of Verde at Greenbelt Station located in Greenbelt, Maryland (at 8010 Greenbelt St. Pkwy.)

349. This RentGrow Report utilized by Verde at Greenbelt Station integrated an Equifax credit report with an address discrepancy warning, stating 'inquiry address is not associated with [Plaintiff].'

350. This RentGrow Report utilized by Verde at Greenbelt Station integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.

351. This RentGrow Report utilized by Verde at Greenbelt Station integrated Premium National Sex Offender Registry, Premium National Criminal Record, and OFAC/SDN Search consumer reports.

352. On September 8, 2022, SafeRent—on behalf of Cinnamon Run—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft-labelled inquiry.

353.  On September 8, 2022, a SafeRent Report was prepared for Harbor Group Management on behalf of Cinnamon Run located in Aspen Hill, Maryland, suggesting to accept the Falsified Application.

354.  This SafeRent Report utilized by Cinnamon Run integrated an "Equifax Credit Report" showing satisfactory accounts with no adverse tradelines and a substantial address discrepancy indicator.

355.  This SafeRent Report utilized by Cinnamon Run integrated a CrimSAFE consumer report that recommended application approval based on no associated criminal records having been found.

356.  This SafeRent Report utilized by Cinnamon Run integrated a RegistryCHECK Plus consumer report that confirmed no court records being associated with Plaintiff as the purported applicant.

357.  On September 26, 2022, LeasingDesk—on behalf of 8th and Grand—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and file-recorded it as a soft-labelled inquiry.

358.  On September 26, 2022, a LeasingDesk screening report was generated for Brookfield Properties on behalf of 8th and Grand Apartments located in Los Angeles, California  (at 770 S Grand Ave).

359.  On September 26, 2022, RentGrow—on behalf of Brookdale Apartments—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft-labelled inquiry.

360.  On September 26, 2022, a RentGrow screening report was generated for Bell Partners on behalf of Bell Warner Center located in Canoga Park, California  (at 21050 Kittridge Street).

361.  This RentGrow Report utilized by Bell Warner Center Apartments integrated an "Equifax Credit Report" with an address discrepancy warning, 'inquiry address is not associated with [Plaintiff].'

362.  This RentGrow Report utilized by Bell Warner Center integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

363.  This RentGrow Report utilized by Bell Warner Center integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

364.  On October 5, 2022, RentGrow—on behalf of Forrest Street— made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft-labelled inquiry.

365.  On October 5, 2022, a RentGrow screening report was generated for Kettler Management on behalf of Forrest Street Apartments located in Baltimore, Maryland  (at 100 Orleans Street).

366.  This RentGrow Report utilized by Forrest Street Apartments integrated an Equifax credit report with an address discrepancy warning,  stating 'inquiry address is not associated with [Plaintiff].'

367.  This RentGrow Report utilized by Forrest Street Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

368.  This RentGrow Report utilized by Forrest Street Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

369. On October 5, 2022, RentGrow—on behalf of The Gunther—made a credit report inquiry to Equifax, who disclosed Plaintiff's credit report and recorded it as a soft-labelled inquiry.

370. On October 5, 2022, a RentGrow screening report was generated for Kettler Management on behalf of The Gunther Apartments located in Baltimore, Maryland (at 1200 South Conkling Street).

371. This RentGrow Report utilized by The Gunther Apartments integrated an Equifax credit report with an address discrepancy warning, stating 'inquiry address is not associated with [Plaintiff].'

372. This RentGrow Report utilized by The Gunther Apartments integrated an Experian RentBureau consumer report stating, 'no prior rental history was found' but yet 'meets property requirements.'

373. This RentGrow Report utilized by The Gunther Apartments integrated Premium National Civil Court Records, Premium National Criminal Records, and OFAC/SDN Search consumer reports.

374. On October 4, 2022, the Whit received an email from Dolben Management (*c/o* Verde at Greenbelt Station), attaching a Rental History Verification Form for the Whit and "Seth Virgil" to execute.

375. This communication from Verde at Greenbelt Station arose from the above-described RentGrow screening report and integrated credit report disclosures, procurements, and resale transactions.

376. On October 11, 2022, Plaintiff emailed Dolben Management stating that he neither applied for nor authorized the Falsified Application, which was invalidated and marked as fraudulently submitted.

<u>DEBT COLLECTION</u>

377. Plaintiff initially answered a debt collection telephone call from an agent of non-defendant Hunter Warfield who attempted to collect one or more of the following delinquent Fraudulent Accounts:

| | | |
|---|---|---|
| **Bell Warner Center** | then managed by | BELL PARTNERS |
| **The Flats at Shady Grove** | then managed by | BRICK LANE |
| **Crystal Square** | then managed by | DWECK PROPERTIES |
| **Haden \*\*\*7172** | then managed by | JLB RESIDENTIAL |
| **Haden \*\*\*9929** | then managed by | JLB RESIDENTIAL |
| **The Montgomery** | then managed by | FAIRFIELD RESIDENTIAL |
| **The Moxley** | then managed by | FAIRFIELD RESIDENTIAL |
| **17 Barkley** | then managed by | FAIRFIELD RESIDENTIAL |
| **Post-Park Maryland** | then managed by | ECIM GROUP |
| **Skyline Towers** | then managed by | ECIM GROUP |
| **Sherwood Towers** | then managed by | ECIM GROUP |
| **Stratford Towers** | then managed by | ECIM GROUP |
| **The Graham** | then managed by | ECIM GROUP |
| ***[Account No. 9099745]*** | believed managed by | ECIM GROUP |
| ***[Account No. 9152802]*** | believed managed by | ECIM GROUP |
| ***[Account No. 9214309]*** | believed managed by | ECIM GROUP |

### Hunter Warfield–Related

378. On November 7, 2022, Plaintiff prepared, signed, and sent a Fraudulent Account dispute and appended Identity Theft Affidavit to Hunter Warfield who, upon information and belief, forwarded that received dispute to the original Apartment creditors that are listed above.

379. However, a protracted series of initiated collection activity was defiantly commenced by these Apartment Defendants through Hunter Warfield's directed attempted debt collection activities.

380. On May 31, 2023, on behalf of *Haden Apartment (802)*, Plaintiff received "a limited time" debt collection offer to resolve a purportedly owed $150.00 Fraudulent Account debt for 'only' $75.00.

381. On June 2, 2023, on behalf of *The Moxley Apartment*, Plaintiff received "a limited time" debt collection offer to resolve a purportedly owed $135.00 Fraudulent Account debt for 'only' $67.50.

382. On June 14, 2023, per a phone call with a Hunter Warfield agent, Plaintiff learned that the first of two Fraudulent Account Debts with the Haden was closed "for a lack of documented ownership."

383. On June 15, 2023, on behalf of *17 Barkley Apartment*, Plaintiff received a "Dispute Acknowledgement Letter" confirming (a) the receipt of Plaintiff's "claim of fraudulent activity."

384. This Dispute Acknowledgement Letter on behalf of 17 Barkley Apartment also explicitly confirmed (b) the understanding that Plaintiff may well be an Identity Theft and Fraud victim.

385. This same Dispute Acknowledgement Letter, in addition, confirmed (c) the initiation and completion of a fraud investigation within 30 days "based on the information currently available."

386. This Dispute Acknowledgement Letter requested (d) the provision of a filed police report that 'can easily be obtained from a local PD station' on top of an (already-provided) identity theft affidavit.

387. On June 15, 2023, on behalf of *Bell Warner Center*, Plaintiff received a Dispute Acknowledgement Letter regarding a $207.79 Fraudulent Account debt purportedly owed by him to that Apartment.

388. On June 15, 2023, on behalf of *Skyline Towers Apartment*, Plaintiff received a Dispute Acknowledgement Letter for an unknown $21,705.48 purportedly owed Fraudulent Account debt.

389. On June 15, 2023, on behalf of *Haden Apartment (802)*, Plaintiff received a Dispute Acknowledgement Letter regarding a $150.00 purportedly owed Fraudulent Account debt.

390. On June 15, 2023, on behalf of *The Montgomery Apartment*, Plaintiff received a Dispute Acknowledgement Letter regarding a $60.00 purportedly owed Fraudulent Account debt.

391. On June 15, 2023, on behalf of *The Moxley Apartment*, Plaintiff received a Dispute Acknowledgement Letter regarding a $135.00 purportedly owed Fraudulent Account debt.

392. On June 15, 2023, on behalf of *Post Park Maryland Apartment*, Plaintiff received a Dispute Acknowledgement Letter regarding a $362.54 purportedly owed Fraudulent Account debt.

393. On June 15, 2023, on behalf of *The Graham Apartment*, Plaintiff received a Dispute Acknowledgement Letter regarding a $350.00 purportedly owed Fraudulent Account debt.

394. On June 15, 2023, on behalf of *Crystal Square Apartment*, Plaintiff received another Dispute Acknowledgement Letter for a $207.79 Fraudulent Account Debt that had already been disputed.

395. On June 15, 2023, on behalf of *Flats at Shady Grove*, Plaintiff received a Dispute Acknowledgement Letter regarding a $372.16 purportedly owed Fraudulent Account debt.

396. On July 17, 2023, on behalf of *Flats at Shady Grove*, Plaintiff received a Debt Verification Letter on a $374.02 debt for an online amenity fee ($250), application fee ($35), and two NSF fees ($70).

397. On August 21, 2023, on behalf of *Flats at Shady Grove*, Plaintiff received a Debt Resolution Offer attempting to settle a $376.07 purportedly owed Fraudulent Account debt for $188.04.

398. On September 30, 2023, on behalf of *Flats at Shady Grove*, Plaintiff received another Debt Resolution Offer attempting to settle a purported $378.40 Fraudulent Account debt for $189.20.

399. On November 11, 2023, on behalf of *Flats at Shady Grove*, Plaintiff received another Debt Resolution Offer attempting to settle a purported $380.85 Fraudulent Account debt for $190.43.

400. On January 26, 2024, on behalf of *Flats at Shady Grove*, Plaintiff received another Debt Resolution Offer attempting to settle a purported $385.29 Fraudulent Account debt for $192.62.

401. And on February 28, 2024, on behalf of *Flats at Shady Grove*, Plaintiff received another Debt Resolution Offer attempting to settle a purported $387.21 Fraudulent Account debt for $192.62.

402. To date, Plaintiff has not received requested debt verification records on behalf of a Fraudulent Account Debt sourced by *Post Park Maryland Apartment*, which is managed by C I M Group.

403. Also to date, Plaintiff has not received requested debt verification records on behalf of a Fraudulent Account Debt sourced by *The Graham Apartment*, which is managed by C I M Group.

404. Furthermore, Plaintiff has not received requested debt verification records on behalf of a Fraudulent Account Debt sourced by *Skyline Towers Apartment*, managed by C I M Group.

405. In addition, Plaintiff has not received requested debt verification records on behalf of a Fraudulent Account Debt sourced by *Sherwood Towers Apartment*, managed by C I M Group.

406. Moreover, upon information and belief, there is an undisclosed Fraudulent Account Debt for an account sourced by C I M Group which was identified by reference to account number—9099745.

407. Upon further belief, there exists a second undisclosed Fraudulent Account Debt for an account sourced by C I M Group which was identified by reference to account number—9152802.

408. Also upon belief, there exists a third undisclosed Fraudulent Account Debt for an account sourced by C I M Group which was identified by reference to account number—9214305.

409. Despite this debt collection activity and the representations made in connection with these Fraudulent Accounts, there is no real indication of any having been closed let alone investigated.

### Transworld Systems

410. In or around October 2023, Plaintiff received an unexpected mailing dated May 1, 2023 addressed to his correct Indianapolis, Indiana Whit Apartment Address from Transworld Systems (or "TSI").

411. That May 1ˢᵗ letter enclosed debt verification records for a previously unknown Fraudulent Account debt purportedly owed to THE SHELBY, at 6200 North Kings Hwy., Alexandria, VA.

412. The enclosed debt verification records included a "Summary of Move Out Charges" incurred between April and November of 2022, equating to an outstanding $21,513.39 debt obligation and, also critically, evidencing an ongoing lease by someone fraudulently posturizing as Plaintiff.

413. On October 9, 2023, after Plaintiff saw TSI's debt collection mailing, his intervened counsel tendered a cure letter to TSI that appended proof of Plaintiff's identity and relevant residency along with a notarized FTC Identity Theft Affidavit, which was escalated to TSI's outsourced counsel.

414. Thereafter, Plaintiff's counsel reiterated to TSI's counsel what the cure letter had articulated, namely that Plaintiff did not know about or authorize the purported $21,513.39 debt to The Shelby.

415. Plaintiff's counsel also reiterated the cure letter's request for debt verification and account origination records of how the Fraudulent Account debt originated, including the apartment lease application and the lease agreement executed between The Shelby and the presumed imposture.

416. No other responsive account records were provided to Plaintiff or his counsel beyond the "Summary of Move Out Charges," which was insufficient documentation and, as such, Plaintiff remains unaware of how The Shelby debt derived and whether it has been closed and disassociated.

### Fair Collections & Outsourcing

417. On October 24, 2022, Plaintiff received and answered a collection call from FCO in which he learned of, disputed, and requested verification records for FCO's sourced Fraudulent Accounts.

418. FCO emailed Plaintiff back a final account statement (dated 8-14-22) purportedly verifying an *Assembly Dulles* Apartment debt marked as cancelled on 8-12-22 for 'Application Falsification.'



| Lease information - Unit 663-B | |
| --- | --- |
| Cancel/Deny date | 08/12/2022 |
| Lease expires | 08/12/2023 |
| Cancel/Deny reason | Falsification of Application |

419. This debt 'verification' provided by FCO verified only that FCO was on notice that the underlying application was cancelled due to falsification as of 8-12-22 yet continued collection after this date.

420. FCO also forwarded a final account statement (dated 6-08-22) purporting to verify an *Assembly Manassas* Apartment debt, which FCO furnished to the nationwide CRAs as 'seriously past due.'

421. FCO's furnishing of the Assembly Manassas Fraudulent Account Tradeline was active as of 10-31-22, months after the Assembly Dulles account was canceled as falsified (ascertained on 8/1/24).

422. On November 7, 2022, Plaintiff prepared, signed, and sent an FTC Identity Theft Affidavit to FCO in support of his verbal disputes of the Fraudulent Assembly Dulles and Assembly Manassas debts.

423. In initial response, FCO acknowledged that it would "investigate th[e] matter with the creditor[s]" — who Plaintiff understood at that time to be limited to Assembly Dulles and Assembly Manassas.

424. Referencing Plaintiff's appended Whit Lease, FCO's investigations determined that both Assembly Dulles ***7018 and Assembly Manassas ***1421 "appear to be the result of fraud …".

425. On November 9, 2022, FCO directed suppression of the Fraudulent Account Tradeline on behalf of Assembly Manassas from credit reporting by the nationwide CRAs (as recently ascertained).

426. On November 11, 2022, a credit report was generated by Experian, showing a FICO Score of 800, $12,019 in credit card and credit line debt, and an overall credit usage of 15%.

427. But on December 19, 2022, Plaintiff received a mailed collection notice from FCO (dated 11/07/2022) as to a third apparent Fraudulent Account debt for *Lincoln at Fair Oaks Apartment*.

428. On December 22, 2022, Plaintiff therefore emailed FCO a similar dispute, now of the Fraudulent Lincoln at Fair Oaks Apartment Account, which included a request for records 'verifying' the debt.

429. On December 27, 2022, FCO responded to Plaintiff's new lodged dispute but only to confirm that "all four accounts under [Plaintiff's] name and [SSN] were closed," purportedly.

430. FCO's response to Plaintiff's December 2nd dispute and verification request undermined Plaintiff's FDCPA rights and further muddied the waters by noting, but not disclosing, a fourth sourced debt.

431. Therefore, in October 2023, Plaintiff tendered a pre-litigation cure request to FCO, requesting preservation of responsive evidence, cessation of all prior and future debt collection and credit reporting, and prompt disclosure of all applicable debt verification and account origination records.

432. In response, FCO re-provided debt verification and origination account records for the Assembly Manassas account, but did not do so for the Assembly Dulles account, Lincoln at Fair Oaks account, and a referenced but undisclosed account, rendering Plaintiff's demand an uncured one.

<u>CREDIT REPORTING</u>

433. On October 31, 2022, Plaintiff's Experian credit report reflected a 676-credit score and Fraudulent Account Tradelines by FCO (via Assembly Manassas) and Hunter Warfield (via Crystal Square).

434. On November 11, 2022, Plaintiff's Experian credit report showed an 800-credit score, no collection tradelines, three hard inquiries by Resident Verify, and one by FADV/Resident Data.

435. On December 20, 2022, Plaintiff's Equifax credit report showed an erroneously reported Huron Address as his former address as of October 1, 2022 and as "925 W Huron, Chicago, IL, 60642."

436. On January 2, 2023, Plaintiff noticed unfamiliar addresses and credit inquiries reported by Experian including, but not limited to, First Advantage, Resident Verify, and SafeRent Solutions.

437. So on January 2nd, Plaintiff called and spoke with Experian's fraud department, requested a fraud alert placement, and asked for deletion of the unfamiliar addresses and inquiries.

438. During that call, Plaintiff asked Experian's agent to suppress its reporting of Plaintiff's prior "925 W Huron St, Apt 224, Chicago, IL" address as it seemed compromised, but Experian refused.

439. On January 2nd, Experian added an Initial Security Alert on Plaintiff's file, which warned that *fraudulent applications may be submitted in his name … to fraudulently obtain services*.

440. Experian's Initial Security Alert was conveyed to TransUnion and Equifax around this same time.

441. On January 3rd, Trans Union placed an Initial Fraud Alert on its file for Plaintiff to notify those requesting his credit reports moving forward *to first take appropriate protective security measures*.

442. TransUnion's Initial Fraud Alert was conveyed to Experian and Equifax around this same time.

443. On January 6th, Experian generated reinvestigation results in response to the January 2nd phone call, which showed an added fraud alert to Plaintiff's credit file and deletion of the Huron Address.

444. Experian's reinvestigation results also showed the deletion of the unrecognized inquiries, except for the ones by SafeRent (on behalf of Bethesda Place) and by Clarity (on behalf of Acima Digital).

445. On February 2nd, Plaintiff's Equifax credit disclosure reflected an erroneously misattributed former address of 5017 Caryn Ct., Apt. 302, Alexandria Virginia, reported as of February 1, 2023.

446. By or before February 19th, Experian was reporting a 686-credit score and Fraudulent Account Tradelines by Hunter Warfield (Haden—for $150.00), NCS (Crystal Square—for $10,096), and two by Genesis (via Abbotts Run xxx7368—for $14,661 and Rollingwood xxx8928—for $61.00).

447. TransUnion was reporting Fraudulent Account Tradelines by Hunter Warfield (Haden—for $150.00), NCS (Crystal Square—for $10,096), and Genesis (Rollingwood xxx8928—for $61.00).

448. Equifax was reporting Fraudulent Account Tradelines by Hunter Warfield (Haden—for $150.00), NCS (Crystal Square—for $10,096), and Genesis (Abbotts Run xxx7368—for $14,66).

449. On March 1, 2023, Plaintiff certified mailed fraud block requests and corresponding identity theft disputes ("Fraud Block Dispute") to the respective fraud departments on behalf of TransUnion (received March 4th), Experian (received March 5th), and Equifax (received March 6th).

450. Plaintiff's Fraud Block Disputes and alternative requests for reinvestigation specified the following furnished Fraudulent Account Tradelines and sourced addresses as the result of Fraud:

| Hunter Warfield | No. 8941436 — $110.00<br>No. 9027172 — $150.00 | Crystal Square<br>The Haden | 1515 Richmond Hwy., Arlington, VA<br>1575 Anderson Rd, McClean, VA |
|---|---|---|---|
| National Credit Systems | No. 4970657 — $10,096<br>No. 509772* — $17,500 | Crystal Woods<br>Centre at Silver Spring | 5017 Caryn Ct., Alexandria, VA<br>3310 Teagarden Cir., Silver Spring, MD |
| Columbia Debt Recovery<br>*dba* Genesis Credit Mgmt. | No. ***7366 — $14,661<br>No. ***8928 — $60.00<br>No. 4138388 — $16,436 | Abbotts Run<br>Rollingwood<br>Quarters at Towson | 5808 Woodlawn Green, Alexandria, VA<br>2535 Ross Rd., Silver Spring, MD<br>960 Southerly Rd., Towson, MD |

451. At the time of these Fraud Block Disputes, Plaintiff was not aware of the full extent of Fraud-related credit reporting activity, like FCO's furnished Fraudulent Account via Assembly Manassas.

452. Plaintiff's Fraud Block Disputes appended a sworn and notarized FTC Identity Theft Affidavit which, among other pertinent things, expressed that his "SSN, as well as name, birthdate, and stale 2016 Chicago apartment address … was used to falsify apartment applications [and] leases."

453. Each FTC Identity Theft Affidavit attested that Plaintiff 'attempted to submit an Identity Theft Report, but was limited to disputing only five reported items,' so he 'called the FTC's assistance line and spoke with an agent who recommended instead submitting a notarized FTC Affidavit.'

454. Each FTC Identity Theft Affidavit appended Plaintiff's Driver's License and then active Whit Lease, which corroborated Plaintiff's active Indianapolis Whit residency starting in April of 2021.

455. Each FTC Identity Theft Affidavit also appended credit reports highlighting aspects such as the status of Fraudulent Account Tradelines at that time, Experian's prior placed Fraud Alert, and Plaintiff's verified employment with Baldwin Capital Partners via TransUnion as of June 30, 2022.

456. Each FTC Identity Theft Affidavit further appended debt collection correspondences, some which confirmed Apartment account closures per investigated Fraud determinations and one of which confirmed a lease cancellation for having received a Falsified Application on August 12, 2022.

**Experian**

457. Plaintiff's mailed dispute to Experian noted the prior placed fraud alert, twenty-two previously deleted inquiries, two outstanding inquiries, and Fraudulent Account Tradelines reported on behalf of The Haden (for $150.00), Crystal Woods (for $10,096), and Abbotts Run—7368 (for $14,628).

458. This dispute to Experian, that appended a notarized FTC Identity Theft Affidavit, also appended prior inquiry reinvestigation results, annotated credit reports, fraudulent Debt Collection accounts, an FCO "falsified application" record on behalf of Assembly Dulles, suppressed Fraudulent Account results, and Plaintiff's Driver's License and confirmed active Whit Apartment lease.

459. On March 11, 2023, Experian returned "Dispute Results" reflecting the ongoing reporting of each disputed Fraudulent Account Tradeline, including Genesis / Abbotts Run—7368, NCS / Crystal Woods—0657, and Hunter Warfield / The Haden—7172, in addition to the reporting of a second $61.00 Fraudulent Account Tradeline furnished by Genesis on behalf of "Rollingwood"—8928.

460. On April 3, 2023, Experian returned additional "Dispute Results" to confirm its blind reliance on Genesis' ownership verification of the Abbotts Run—7368 Fraudulent Account Tradeline and with a $14,728 balance as well as ongoing reporting of the underlying sourced Alexandria, VA address.

461. These Experian Dispute Results also showed ongoing reporting of the Caryn Ct. Virginia address sourced from the otherwise deleted NCS / Crystal Woods Fraudulent Account Tradeline.

462. Experian's March 25th credit report reflected a 692-credit score, which was impacted by the Genesis / Abbotts Run—7368 Tradeline that also showed a "seriously past due" $14,697 balance.

463. Experian's failures to generated address discrepancy notifications responsive to conflicting reported addresses tied to Plaintiff's PII enabled the recurring Lease Fraud and exacerbated Plaintiff's foreseeable sustained damages, which also undermined his afforded statutory rights.

464. Experian impermissibly allowed unauthorized access to Plaintiff's credit reports in response to *three hard* and *two soft* recorded inquiries by *Resident Verify*, who then resold the procured reports to Apartments  for supposed tenant screening purposes in connection with Falsified Applications.

465. Experian impermissibly allowed unauthorized access to Plaintiff's credit reports in response to *one hard* and *six soft* recorded inquiries by *FADV*, who resold the procured reports to Apartments, six of which went to Lincoln at Fair Oaks,  in connection with respective Falsified Applications.

466. Experian impermissibly allowed unauthorized access to Plaintiff's credit reports in response to *six soft* recorded inquiries by *SafeRent Solutions*, who procured, reintegrated, and resold those consumer reports into its Tenant Screening Reports purchased by the respective Apartments.

467. Experian impermissibly allowed unauthorized access to Plaintiff's credit reports in response to *five soft* recorded inquiries on the same day by *Clarity Services*, each on behalf of Acima Digital.

468. Experian impermissibly allowed unauthorized access to Plaintiff's credit reports in response to *three soft* recorded inquiries on the same day by housing utility provider *Potamic Electric Power*.

469. Experian misreported, failed to block, and/or unreasonably reinvestigated, numerous Fraudulent Account Tradelines, including, upon reasonable belief, The Haden–802 (via Hunter Warfield); Crystal Square (via Hunter Warfield); Assembly Manassas (via FCO); Crystal Woods (via NCS), Centre at Silver Spring (via NCS); Quarters at Towsend (via Genesis); Rollingwood (via Genesis); Abbotts Run – in duplicate (Genesis); Ravens Crest – in duplicate (Genesis); Addison Row – in duplicate (Genesis); Persei at Pike + Rose (Genesis); and Pallas at Pike + Rose (via Genesis).

470. Experian also misreported and failed to block and/or suppress various misattributed addresses sourced from certain Frauudlant Account Tradelines, including, upon reasonable belief, 5017 Caryn Ct, Apt 302, Alexandria, VA (via Crystal Woods / NCS); 3310 Teagarden Cir., Silver Spring, MD (via Centre at Silver Spring / NCS); 5808 Woodlawn Green Ct, Alexandria, VA (via Abbotts Run / Genesis); and 11035 Edgepark Cir., Manassas, VA (via Ravens Crest / Genesis).

**TransUnion**

471. Plaintiff's mailed dispute to TransUnion noted a prior placed fraud alert via Experian, Fraudulent Account Tradelines reported on behalf of The Haden (for $150.00), Crystal Woods (for $10,096), and Abbotts Run—7368 (for $14,628), and nineteen "soft" recorded inquiries, including five from Hunter Warfield, three from FCO, and one from Columbia Debt Recovery (Genesis Credit Mgmt.).

472. This dispute to TransUnion similarly appended a notarized FTC Identity Theft Affidavit, annotated credit reports, the Hunter Warfield accounts, FCO's 'falsified' Assembly Dulles account, FCO's fraud deletion results, and copies of Plaintiff's current Driver's License and then active Whit lease.

473. On March 9, 2023, TransUnion mailed Plaintiff a notice letter stating that it is unable to block the disputed information because "the [notarized FTC Identity Theft Affidavit] does not appear to be a copy of an official, valid law enforcement report that [it] can accept as an Identity Theft Report."

474. On March 9th, Trans Union returned reinvestigation results that showed deletions of the Haden Tradeline furnished by Hunter Warfield and of the Crystal Woods Tradeline furnished by NCS.

475. TransUnion's March 9th dispute results did not, however, show any reinvestigations into Plaintiff's disputes of the Abbotts Run and Rollingwood Tradelines, both which were furnished by Genesis.

476. TransUnion's March 25th credit report showed a 694-credit score impacted by three furnished Genesis Tradelines, one for $61.00 'owed' to Rollingwood and two duplicated Tradelines affiliated with Abbotts Run, under account numbers ending in ***7366 and ***7368, respectively.

### Equifax

477. Equifax, who is not a named defendant, but whose conduct necessarily implicates the alleged conduct of numerous other named Defendants, allowed impermissible access to fifty-eight or more credit reports, *29* or more of which were procured and resold by *RentGrow*, *8* or more of which were procured and resold by *SafeRent*, and *21* or more of which were procured by *LeasingDesk*.

478. Plaintiff's mailed dispute to Equifax – who is not a party to this litigation – appended largely the same corroborating records and disputed the same Fraudulent Account Tradelines in addition to fifty-three (53) collective "credit report" inquiries by SafeRent, LeasingDesk, and RentGrow.

479. By or before March 13th, while Equifax's reinvestigation remained pending, its report on Plaintiff showed misattributed addresses from the NCS / Crystal Woods Tradeline (Caryn Ct., Alexandria, Virginia) and the Genesis / Abbotts Run Tradeline (Woodlawn Green Ct., Alexandria, Virginia).

480. On March 14th, Genesis wrongly verified to Equifax Plaintiff's ownership affiliation with regard to the Abbotts Run—7368 Tradeline based solely on a matched Social-Security number and date-of-birth, both indicative items of which Plaintiff clearly disputed as fraudulently compromised.

481. On March 16th, before closing its reinvestigation, Equifax was reporting the Genesis Abbotts Run—7368 Tradeline with an original $14,513 balance and a then outstanding $14,697 balance.

482. On March 21st, Genesis again blindly verified to Equifax Plaintiff's ownership affiliation of the Abbotts Run—7368 Tradeline based on the same insufficiently matched indicative information, let alone the same stolen PII, that Plaintiff's Fraud Block Dispute conveyed was misappropriated.

483. On March 25th, Equifax returned reinvestigation results confirming Genesis' circular verification of the Abbotts Run—7368 Tradeline, which collaterally caused a separate misattribution of the underlying fraudulent derived Apartment address of Woodlawn Green Ct., Alexandria, Virginia.

484. On March 28th, Genesis verified to Equifax a separate Tradeline on behalf of Abbotts Run bearing the same original balance as the "xxx7368" Tradeline but ending in "7366", evidencing an apparent duplication of the original Abbotts Run Tradeline furnished by Genesis to Equifax.

485. These logicless investigations by Genesis caused Plaintiff's March 25th Equifax disclosure to display duplicated Abbotts Run Tradelines as well as a misapplied fraudulently derived address.

### National Credit System

486. On October 4, 2023, Plaintiff's intervened counsel issued a Fraud dispute and cure request to NCS regarding the Fraudulent Accounts it procured from Crystal Square and Centre at Silver Spring.

487. In response, NCS suppressed its misattributed furnishing of a second Centre at Silver Spring $17,500 Tradeline that was being actively reported by one or more Nationwide CRA at that time.

488.    This Center at Silver Spring account was placed for collection and credit reported after NCS had suppressed the initial furnished Crystal Woods Tradeline pursuant to a Fraud complaint referral from Experian in March of 2023 and, as such, after having already received notice of the Fraud.

489.    While NCS's furnished Crystal Woods and Centre at Silver Spring Tradelines were suppressed from Plaintiff's credit reports, their underlying sourced addresses were not and therefore continued to be misattributed to Plaintiff's CRA credit files despite deletion of the corresponding Tradelines.

490.    While the cure request demand received by NCS asked for disclosures of underlying debt verification and Fraudulent Account origination records tied to the procured Crystal Woods and Centre at Silver Spring Fraudulent Accounts, no records to this effect were provided in response.

**Genesis Credit Management**

491.    On March 31st, Plaintiff lodged a dispute directly to Genesis supported by a notarized FTC Identity Theft Affidavit, relevant proofs of identity and residency, and other substantiating records to address its wrongly verified, duplicated, and ongoingly furnished Fraudulent Account Tradelines.

492.    That same day, Genesis received Plaintiff's March 31st direct dispute, including Plaintiff's corresponding requests for verification of the debts underlying each sourced Fraudulent Account.

493.    In response, Genesis returned letters on April 3rd and 6th addressed to Plaintiff's Whit Address, properly indicated as "307 N. PENNSYLVANIA ST[,] APT 902[,] INDIANAPOLIS[,] IN 46204.

494.    On April 3rd, Genesis emailed Plaintiff a letter regarding an "Original Creditor: Header Account" with a $16,738.56 balance for account number 0004144148 tied to address "960 Southerly Rd # J-155, Towson, MD" stating that it "understands [his underlying] claim … of fraudulent activity."

495.    This April 3rd letter stated that "this is an attempt to collect a debt" and, to investigate the Fraud, requested (a) "proof of resid[ency] during the alleged fraudulent lease," (b) front and back driver's license copy, (c) filed police report, and a (d) notarized "FTC complaint" witnessed by a notary.

496.    On April 6th, Genesis emailed Plaintiff a letter regarding an "Original Creditor: Quarters at Towson" with a $16,685.10 balance for account 0004138388, stating as a result of its investigation, "we have ceased credit reporting and have updated all [CRAs by way of] AUD 113027790."

497.    Neither the April 3rd nor the April 6th letter received by Plaintiff from Genesis addressed the disputed Abbotts Run or Rollingwood-related Fraudulent Accounts and, instead, confirmed its sourcing and credit reporting of separate, previously unaware-of Fraudulent Accounts.

498.    On April 25, 2023, Experian issued a high-risk level "SSN trace" warning that the address affiliated with the Genesis / Abbotts Run Tradeline – 5808 Woodlawn Green Ct Apt F, Alexandria, VA 22309 – was traced and found to be associated with Plaintiff's Social-Security number.

499.    By May 20th, Genesis was furnishing the Abbotts Run Fraudulent Account Tradeline in duplicate, with one showing a $14,842 balance (xxx7368) and the other with a $14,661 balance (xxx7366).

500.    As of June 21st, Experian was reporting the Genesis / Abbotts Run—7368 Tradeline with a $14,909 outstanding balance on behalf of "Columbia Debt Recovery" as the "Agency Client."

501. As of June 21st, TransUnion was reporting the Genesis / Abbotts Run—7368 Tradeline with a $14,909 outstanding balance on behalf of "GENESIS CRDT" as the "Agency Client."

502. As of June 21st, Equifax was reporting the Genesis / Abbotts Run—7368 Tradeline with an $14,909 outstanding balance on behalf of ABBOTTS RUN APA as the "Agency Client," which was also reporting as a duplicated Tradeline (ending in xxx7366) with a $14,661 outstanding balance.

503. By June 27, 2023, Genesis was furnishing, and one or more CRAs were misreporting, the $14,909 Fraudulent Account Tradeline as a collection account on behalf of Abbotts Run as the original creditor with the comment "Account previously in dispute" and without an end account number.

504. By June 28, 2023, NCS was furnishing, and one or more CRAs began reporting, a second Fraudulent Account Tradeline on behalf of "The Centre at Silver Spring AP" as the original creditor with a "seriously past due" balance of $17,500.00 (and as opened as of April 18, 2023).

505. On or before August 20, 2023, Experian was reporting the NCS / Centre at Silver Spring Tradeline with a "seriously past due" balance of $17,500 under the partial account number 509772X.

506. Experian was also reporting the Genesis / Abbotts Run—7368 Tradeline with a "seriously past due" $15,076 balance and with a 'previously disputed and resolved by grantor' remark at this time.

507. At this same time, TransUnion was also reporting the NCS / Centre at Silver Spring Tradeline with a $17,500 past-due balance in addition to the re-reported Genesis/Abbotts Run—7368 Tradeline.

508. On September 23, 2023, Experian issued a high-risk level "SSN trace" warning that the address affiliated with the NCS / Centre at Silver Spring Tradeline – 3329 Teagarden Cir Apt 402, Silver Spring, MD 20904 – was traced and found associated with Plaintiff's Social-Security number.

509. On October 6th, Plaintiff tendered a pre-litigation cure request to Genesis that appended its prior credit reporting and responsive dispute mishandlings at issue and that reiterated, among other things, that the sourced Fraudulent Account Tradelines should be blocked as resulting from Fraud.

510. This October 6th dispute and cure request to Genesis also requested that Genesis preserve the relevant evidence, cease all current and future debt collection and credit reporting, and disclose all underlying debt verification and account origination records, as well as consider a monetary cure.

511. Genesis did not respond to or otherwise acknowledge this October 6th pre-litigation correspondence and thus did not attempt to cure the protracted problems that it itself had caused.

512. Yet on October 9th, Genesis transmitted another AUD notice (AUD-3094652) to the Nationwide CRAs for the Abbotts Run—7368 Tradeline, directing deletion "due to fraud," which notably reflected Plaintiff's current address as being "*307 w penn st apt 902, Indianapolis, Washington*."

513. By submitting AUD-3094652, Genesis thereby "certifie[d] that it verified the completeness and accuracy of the information in compliance with all [applicable] legal requirements."

514. On or about October 15th, Plaintiff received notice that his Experian credit score increased by 103 points to an 812-point score, reflecting a credit status change from "good" back to "exceptional."

515. On October 19th, Genesis forwarded Plaintiff another notification that it again investigated a Fraud claim and ceased credit reporting of the Fraudulent Account Tradeline for Quarters at Towson.

516. This fraud determination notification as to Quarters at Towson reflected a higher outstanding balance – of $17,214.68 – relative to the $16,685.10 balance previously reported around April 6th.

517. On or about November 1, 2023, Plaintiff received notice that his Equifax credit score increased by 138 points to an 828-point score, reflecting another credit status change back to "exceptional."

518. On March 10, 2024, Experian reported an "exceptional" 841 FICO Score on behalf of Plaintiff.

519. On or about March 11, 2024, Genesis re-furnished its prior suppression of the Abbotts Run—7368 Tradeline and reported it with a balance of $15,610 and a remark 'dispute resolved by grantor.'

520. On March 12, 2024, a fraudulently attributed address of 11035 Edgepark Cir Apt 204, Manassas, Virginia was reported as a former address to at least  Plaintiff's Equifax credit file.

521. On or about that time, Plaintiff's Experian FICO Score also decreased by 130 points, diminishing his "Exceptional" credit standing to "Good" and restricting his earned ability to procure credit.

522. By or before that time, Genesis had been furnishing another new Fraudulent Account Tradeline, this time reflecting an outstanding balance of $12,511.00 'owed' to Ravens Crest Apartment.

523. In or around this time, Experian and Equifax began misattributing the 11035 Edgepark Cir., Apt 204, Manassas, Virginia address derived from the Ravens Crest Tradeline as Plaintiff's address.

524. On April 17th and June 27th 2024, Plaintiff requested his consumer disclosure from Experian but was unable to electronically review either based on a prompted but unspecified access restriction.

525. By May 2nd, Genesis was furnishing four separately duplicated Fraudulent Account Tradelines to Experian and TransUnion, who reported them as such, reflecting eight total Tradelines as follows:

   a  duplicate Tradeline with initial $12,511 balance 'owed' to Ravens Crest;

   a  duplicate Tradeline with initial $98.00 balance 'owed' to Persei –Pike Rose;

   a  duplicate Tradeline with initial  $98.00 balance 'owed' to Pallas–Pike Rose; and

   a  duplicate Tradeline with an initial $156.00 balance 'owed' to Addison Row.

526. On May 30, 2024, Experian issued a high-risk level "SSN trace" notification, warning that the address tied to the Genesis / Ravens Crest Tradeline (11035 Edgepark Cir Apt 204, Manassas, VA 20109) was found searched and found to be associated with Plaintiff's Social-Security number.

527. By suppressing certain misreported Fraudulent Account Tradelines, verifying multiple others, and duplicating and/or rereporting prior suppressed Tradeline items following Plaintiff's respective disputes, Genesis acknowledged the Fraud but continued to misreport the misattributed credit data.

528. Genesis' ongoing reporting of furnished Tradelines, despite having knowledge that the underlying Fraudulent Accounts derived from Identity Theft in conjunction with Lease Fraud, constitutes reckless disregard for the FCRA, Plaintiff's violated statutory rights, and other applicable laws.

**RentGrow**

529. On October 10, 2023, Plaintiff requested his full consumer file and, on that same day, RentGrow responded that "[a]fter a diligent search of RentGrow's available business records, we have been unable to locate any information or report for you using the [PII and dispute documents] provided."

530. On June 21, 2024, RentGrow disclosed to Plaintiff the consumer file affiliated with his PII, which encompassed Tenant Screening Reports prepared in response to Falsified Applications, which RentGrow recommended to the respective Apartments that they approve for purposes of leasing.

531. On or about this same day, Plaintiff initiated a dispute directly to RentGrow of its then known fraudulently derived Tenant Screening Reports, which was corroborated by his signed and notarized FTC Fraud Affidavit as well as other records corroborating the underlying Lease Fraud.

532. On June 25, 2024, in response to Plaintiff's Fraud block request / dispute of each then known RentGrow Tenant Screening Report, RentGrow stated that his "dispute could not be forwarded for an investigation or otherwise processed by it" because it was purportedly unclear, but it was clear.

533. The Equifax credit reports that RentGrow procured, reintegrated, and resold to respective Apartments displayed warnings that the "Inquiry address is not associated with" Plaintiff.

534. These Equifax-generated address discrepancy warnings occurred each time that Equifax *was not* then reporting Plaintiff's prior Huron Address as "925 W Huron St APT 226 Chicago IL" at the times of RentGrow's preceding "soft" credit report inquiries made to, and recorded by, Equifax.

535. When, for example, RentGrow made a "soft" inquiry for Plaintiff's Equifax-credit report, on behalf of Revel at NoMa CNTR, Equifax returned Plaintiff's "Equifax Credit Report" despite a discrepancy input address of "925 w huron ST Apt , Prosper , TX" from the Falsified Application.

536. This caused Equifax to generate a credit report warning notification that—the "[i]nquiry address is not associated with [Plaintiff's] name" and that "[a] substantially different address was entered."

537. Despite these warned-of discrepancies, RentGrow integrated Plaintiff's Equifax-credit report within its scored RentGrow Report sold to Revel at NoMa CNTR, who thereby approved the predicate Falsified Application in reliance on the RentGrow Report's provided recommendation.

538. In addition to credit reports, RentGrow's Tenant Screening Reports known to be at issue integrated outsourced consumer reports from Experian RentBureau, Premium Civil Court Records, Premium National Criminal Records, Custom Criminal Records, as well as OFAC / SDN Searches.

539. The RentGrow Reports' discrepant address warnings, Experian RentBureau's suggestions that "Plaintiff's" prior rental history meets leasing requirements, when there was no such history reported, cast doubt on the reliability of these Tenant Screening Furnishers as well as their reports.

540. These Tenant Screening Report contained discrepancies and facial indicators of Lease Fraud also cast doubt as to the reliability of RentGrow's own underlying policies, procedures, and practices.

541. RentGrow's repeated failures to detect or address presented Falsified Applications lead to its selling of Tenant Screening Reports to Bell Partners on respective behalf of Bell Warner Center, Bell – Stonebridge, Bell – Fair Oaks, and Revel at Noma Centre—the Bell Partner Apartments.

542. RentGrow and its Apartments' respective conduct are probative of reckless conduct and underlying implemented tenant screening, applicant indicative data verification, fraud detection, and other reporting practices, including its Fraud dispute processing and handling procedures.[7]

543. RentGrow, and those that it transacted with, intentionally or purposefully blindly disregarded an unjustifiably high risk of violating Plaintiff's statutory, privacy, and Fraud victim rights, including in conducting the below Apartment—Tenant Screening Report-related transactions:

| | | |
|---|---|---|
| Comstock | On behalf of | BLDV Ansel |
| Dweck | On behalf of | Park at Arlington Ridge |
| Dweck | On behalf of | Crystal Square |
| Highmark | On behalf of | Sawyer Flats |
| Bozzuto | On behalf of | West Broad |
| Bozzuto | On behalf of | View Ballston |
| Bozzuto | On behalf of | Ovation at Park Crest |
| Bozzuto | On behalf of | Enclave at Box Hill |
| Bozzuto | On behalf of | Park + Ford |
| Bell Partners | On behalf of | Bell Stonebridge |
| Bell Partners | On behalf of | Bell Warner Center |
| Bell Partners | On behalf of | Bell at Fair Oaks |
| Bell Partners | On behalf of | Revel at NoMa Centre |
| Kettler | On behalf of | Garfield Park |
| Kettler | On behalf of | The Gunther |
| Kettler | On behalf of | Forrest Street |
| Fairfield | On behalf of | The Montgomery |
| Fairfield | On behalf of | 17 Barkley |
| Fairfield | On behalf of | The Moxley |
| Signature | On behalf of | Elms at Laurel Park  (1) |
| Signature | On behalf of | Elms at Laurel Park  (2) |
| Pinnacle | On behalf of | San Regis |
| Allegiant Carter | On behalf of | Springwoods at Lakeridge |
| Drucker + Falk | On behalf of | Brookdale |

---

[7] The **RentGrow Screening Reports** require whomever the user is to "acknowledge and agree that … this information is strictly subject to the terms of … the FCRA … and all other applicable laws and regulations." The Tenant Screening Reports further that RentGrow is a reseller CRA and "follows all applicable rules and regulations, and obtains information only from … reputable third-party data providers, but cannot guarantee the accuracy, completeness, or truthfulness of the information provided by a consumer, third-party, or contained in any public record …".

| Laramar Communities | On behalf of | Bridgeyard |
| Dolben | On behalf of | Verde at Greenbelt Station |
| Mission Rock | On behalf of | Abbotts Run Apartment Homes |
| Seasons, Cherry Creek | On behalf of | itself |

**SafeRent**

544. On December 19, 2023, Plaintiff submitted a Manual Authentication Form and consumer file disclosure request to SafeRent to ascertain any underlying signs of Identity Theft or Lease Fraud.

545. On December 28th, Plaintiff received his SafeRent consumer disclosures that, as an initial matter, included WELCOME LETTER references in connection with the respective Fraudulent Accounts.

546. SafeRent's Tenant Screening Reports also included Experian and Equifax credit reports, RegistryCHECK report, and CrimeSAFE reports containing MSSO and Multi-state Plus reports.

547. SafeRent's Tenant Screening Reports also included its own algorithmically generated consumer report products, including generated "SafeRent Identify" and "SafeRent Score" report products.

548. SafeRent's numerous integrated Equifax "Credit Reports" largely included substantial address discrepancy indicator warnings that had been received by the following underlying Apartments:

| 4-27-2022 welcomed | Woods of Fairfax Apartments *Lorton, Virginia* | 6-09-2022 welcomed | Woodway, Trinity Apartments *Centreville, Virginia* |
| 5-18-2022 welcomed | Country Village Apartments *Bel Air, Maryland* | 6-22-2022 welcomed | Braddock Lee Apartments *Alexandria, Virginia* |
| 5-31-2022 welcomed | Ashton Green Apartments *Columbia, Maryland* | 7-15-2022 welcomed | The Birches Apartments *Silver Spring, Maryland* |
| 6-02-2022 welcomed | Sussex Garden Apartments *Alexandria, Virginia* | 9-08-2022 welcomed | Cinnamon Run Apartment *Silver Spring, Maryland* |

549. But SafeRent's integrated Experian credit reports did not contain any such address discrepancy indicators, but they should have, since each report also contained substantial address discrepancies.

550. After reviewing SafeRent's consumer disclosure, Plaintiff initiated a Fraud Block / dispute to it of each included Tenant Screening Report, which was supported by a copy of his earlier mailed Fraud Block Dispute packet to Equifax that was responsive to SafeRent's recorded soft inquiries.

551. However, SafeRent neither initiated a reinvestigation nor acknowledged receipt of Plaintiff's Fraud Block Dispute, as no responsive dispute reinvestigation result correspondence was received.

552. SafeRent, and those that it transacted with, intentionally or purposefully blindly disregarded an unjustifiably high risk of violating Plaintiff's statutory, privacy, and Fraud victim rights, including in connection with the below Apartment—Tenant Screening-related transactions:

| Ashton Green | located | in Columbia, MD |
| Braddock Lee | located | in Alexandria, VA |

| | | |
|---|---|---|
| Braddock Lee | located | in Alexandria, VA |
| Cinnamon Run | located | in Silver Spring, MD |
| Country Village | located | in Bel Air, MD |
| Sussex Gardens | located | in Alexandria, VA |
| The Birches | located | in Silver Spring, MD |
| Woods of Fairfax | located | in Lorton, VA |
| Woodway–Trinity | located | in Centreville, VA |

## LeasingDesk

553. On June 18, 2024, to monitor and mitigate the Lease Fraud, Plaintiff's file disclosure was requested from LeasingDesk Screening, who disclosed a copy of one on June 20th (the "LeasingDesk File").

554. The LeasingDesk File referenced, but excluded access to, "Criminal & Other Records Searched" for under the National: Criminal Database, Wanted Terrorist Database, and Sex Offender Registry.

555. The LeasingDesk File referenced, but excluded access to, a hyperlinked "Criminal Disclosure" and "Eviction Report" as also indicated by an unselected option to "Display [those] Disclosures."

556. The LeasingDesk File was instead limited to a maintained Rental History Report and a compiled Consumer Inquiry Report of screening inquiries to LeasingDesk within the preceding 12 months.

557. Except for a recorded inquiry on January 1, 2022 – for the Whit application – the remaining LeasingDesk File derived from Falsified Applications predicated by the underlying Lease Fraud.

558. Upon reviewing the Rental History Report, Plaintiff distressingly grasped the magnitude of the Lease Fraud and derived Fraudulent Account debts purportedly owed by him , which included:

| | | | | | |
|---|---|---|---|---|---|
| $19,582.20 | owed | to | Bainbridge Bethesda | for | seven lease payments |
| $17,500.68 | owed | to | Centre–Silver Spring | for | nine lease payments; |
| $12,511.39 | owed | to | Ravens Crest Apt. | for | three lease payment |
| $10,096.08 | owed | to | Crystal Woods Apt. | for | six lease payments |
| $25,117.35 | owed | to | 8421 Broad Apt. | for | six lease payments |

559. This prompted Plaintiff's June 12, 2024 Fraud Block Dispute to LeasingDesk, which appended his FTC Identity Theft Affidavit, proof of identity, and confirmed Whit residence, and which specifically disputed each recorded inquiry item and each reported Fraudulent Lease Account.

560. This Fraud Block Dispute prompted unilateral deletions by LeasingDesk of the five reported Fraudulent Lease Accounts that Bainbridge Bethesda, Crystal Woods, Centre-Silver Spring, 8421 Broad, and Ravens Crest respectively charged to Plaintiff, despite receipt of Falsified Applications.

561. On July 8th, LeasingDesk's purported Fraud Block Dispute reinvestigation determined that the Fraudulent Account opened by Bainbridge Bethesda "should be removed due to the furnisher's failure to acknowledge the dispute notice within the required seventy-two- hour timeframe."

562. On July 10th, LeasingDesk's related Fraud Block Dispute reinvestigation concluded the same results for 8421 Broad, Centre at Silver Spring, Crystal Woods, and Ravens Crest Apartments "due to the furnisher's failure to acknowledge the dispute notice" by within a seventy-two-hour period.

563. These positive dispute outcomes did not, however, precede from undertook (re)investigations but from a lapsed seventy-two-hour time period in which responsive action was required to be taken and, so, no investigatory or rectification efforts had been taken to Plaintiff's relied-on detriment.

564. This lack of required investigatory effort is also established by LeasingDesk's dispute result notices sent to Plaintiff, which again represent that "the furnisher[s] ha[d] not acknowledged [Plaintiff's] notice of [a] consumer dispute" within seventy-two-hours, as seemingly mandated.

565. Regarding LeasingDesk's Consumer Inquiry Report, in which Plaintiff asked that each inquiry, except for the Whit inquiry, be deleted and any corresponding Fraudulent Accounts be closed for Fraud, no investigatory action was taken at all, neither by LeasingDesk nor any subject Apartment.

566. Thus, no investigations or suppressions occurred with regard to the correlating inquiries that preceded the openings of the Fraudulent Accounts suppressed from the LeasingDesk's Rental History Report, despite that those (and almost all) inquiries actuated the actualized Lease Fraud.

567. This does not comport with LeasingDesk's representations that it "investigates the accuracy and completeness of the data" and that it implements a dispute handling process that ensures that the information in the Inquiry Report and Rental History Report reflects accurate and verified data.

568. This representation by LeasingDesk is also undermined by its stated dispute response policy that, when the "furnisher has not acknowledged the notice of consumer dispute … LeasingDesk will update the record in accordance with the dispute solely due to th[is] lack of acknowledgement."

569. Accordingly, LeasingDesk and the respective Apartments identified in the Inquiry Report, as well as the Rental History Report, failed in one way or another to investigate this Lease Fraud dispute.

570. LeasingDesk, and those that it transacted with, intentionally or purposefully blindly disregarded an unjustifiably high risk of violating Plaintiff's statutory, privacy, and Fraud victim rights, including in making the following unauthorized inquiries on behalf of the below Apartments:

| | |
|---|---|
| Bethesda Row | (Bethesda, MD) |
| Calverts Walk | (Bel Air, MD) |
| Aventon Crown | (Gaithersburg, MD) |
| Crystal Woods | (Alexandria, VA) |
| 8421 Broad | (McClean, VA) |
| Crescent Falls Church | (Arlington, VA) |
| Gallery Bethesda  I | (Bethesda, MD) |

| | |
|---|---|
| Haden (Unit 1) | (McClean, VA) |
| Haden (Unit 2) | (McClean, VA) |
| Juniper | (Columbia, MD) |
| Origin | (Arlington, VA) |
| River Oaks | (Woodbridge, VA) |
| Assembly Manassas | (Manassas, VA) |
| Centre at Silver Spring | (Silver Spring, MD) |
| The Courts of Avalon | (Pikesville, MD) |
| Gallery On New Hampshire | (Adelphi, MD) |
| Bainbridge Bethesda | (Bethesda, MD) (2) |
| Argent Apt Homes | (Silver Spring, MD) |
| Trevors Run | (Herndon, VA) |
| Assembly Dulles | (Herndon, VA) |
| 8th and Grand | (Los Angeles, CA) |

CREDCO INSTANT - MERGE REPORT

571.  On July 17, 2024, Plaintiff requested his consumer file from CoreLogic Credco to ascertain the reporting sources that adversely impacted his February 2023 pre-approved mortgage application.

572.  On July 18th, CoreLogic disclosed Plaintiff's "Credco Consumer Report," which was an Instant Merge Credit Report per a hard inquiry by Bank of America, the preemptive loan term originator.

573.  The Credco Consumer Report lists Experian, Equifax, and TransUnion as the credit data furnishers and includes a security alert of potentially fraudulent activity associated with the report's contents.

574.  It lists Plaintiff's Whit Address as current and as prior addresses, a fraudulently derived Alexandria, Virginia address as well as the Huron Address, neither should have been reporting.

575.  It lists a warning notification associated with Experian that indicates an existing "variation between the inquiry and on-file address" in reference to the fraudulent derived Alexandria, Virginia address.

576.  It lists a $150 Hunter Warfield Tradeline in connection with an approved Falsified Application by the Haden Apartment, the original creditor and underlying Fraudulent Account originator.

577.  It also lists a $10,096 NCS Tradeline in connection with an approved Falsified Application by Crystal Woods Apartment, the original creditor and underlying Fraudulent Account originator.

578.  This Fraudulent Account Tradeline information enabled negatively impacted the preapproved mortgage applications by lowering Plaintiff's then 800 + credit score by more than 100 points.

XACTUS IN-FILE MERGE REPORTS

579.  On July 24, 2024, Plaintiff received a requested File Disclosure from Xactus, LLC in connection with subsequent pre-approved mortgage applications submitted in or around March of 2023.

580. The "Xactus Reports" contained three separate consumer reports based on fraudulent derived data furnished by Genesis, Abbotts Run, Rollingwood and reported by Experian, Equifax, Trans Union.

581. The Xactus Reports flag discrepant addresses as possibly tied to commercial or fraudulent activity, the current address as "commercial," and a previous address as associated with a "bar/nightclub."

582. They include Plaintiff's Whit Address as the current one, the prior disputed Huron Address, and a fraudulent derived 5808 Woodlawn Green, Alexandria, VA associated with Abbotts Run.

583. An Experian ID Fraud Victim Alert is present, stating that credit should not be extended without first verifying Plaintiff's [detectably compromised and misappropriated identifying] information."

584. They each explicitly identify factors that adversely affected the credit score as "DEROGATORY … COLLECTION FILED … [AND] TOO MANY INQUIRIES [WITHIN THE] LAST 12 MONTHS."

585. They list three Fraudulent Account Tradelines furnished by Genesis, including two duplicated Tradelines (each for $14,513) opened by Abbotts Run and another by Rollingwood (for $60.00).

586. This reported Fraudulent Account and Tradeline information arose from Experian, Equifax, TransUnion, and The Haden Apartment, which negatively impacted the preapproved mortgage application by critically lowering Plaintiff's 800 + credit score and diminishing his credit record.

REITERATED BLOCK REQUEST

587. On July 29, 2024, Plaintiff submitted an FTC Identity Theft Report (*FTC Report No. 175501821*), which identified Genesis' Tradelines on behalf of Abbotts Run, Ravens Crest, Addison Row, Persei at Pike-Rose, and Pallas at Pike-Rose as the exacerbated result of Apartment Lease Fraud.

588. By August 20th, Genesis continued to furnish Fraudulent Account Tradelines on respective behalf of Ravens Crest, Addison Row, Persei at Pike-Rose, and Pallas at Pike-Rose Apartments.

589. On August 28th, Plaintiff mailed reiterated Fraud Block Dispute to Experian and TransUnion, with the FTC-filed Identity Theft Report included, to address the ongoingly furnished Genesis / Ravens Crest, Addison Row, Persei at Pike-Rose, and Pallas at Pike-Rose Fraudulent Account Tradelines.

590. In addition to those Tradelines, the Fraud Block Dispute reiterated Plaintiff's past disputes of fraudulently-derived Apartment addresses that Genesis and NCS continued to misattribute as affiliated with his address history and which the CRAs permitted to be attached to his credit files:

| Fair Colls. Outsourcing | No. 4561421 — $450.00 | Assembly Manassas | 13690 Legacy Cir., Herndon, VA |
|---|---|---|---|
| Hunter Warfield | No. 8941436 — $110.00 | Crystal Square | 1515 Richmond Hwy., Arlington, VA |
| | No. 9027172 — $150.00 | The Haden | 1575 Anderson Rd, McClean, VA |
| National Credit Systems | No. 4970657 — $10,096 | Crystal Woods | 5017 Caryn Ct., Alexandria, VA |
| | No. 509772* — $17,500 | Centre at Silver Spring | 3310 Teagarden Cir., Silver Spring, MD |
| Columbia Debt Recovery | No. ***7366 — $14,661 | Abbotts Run | 5808 Woodlawn Green, Alexandria, VA |
| *dba* Genesis Credit Mgmt. | No. ***8928 — $60.00 | Rollingwood | 2535 Ross Rd., Silver Spring, MD |
| | No. 4138388 — $16,436 | Quarters at Townson | 960 Southerly Rd., Towson, MD |

591. Upon receipt of Plaintiff's reiterated Fraud Block Dispute, Experian and TransUnion suppressed the Fraudulent Account Tradelines and notified Genesis of the same, who presumably notified the Apartment creditors that originally directed controlled the respective Credit Furnishers' conduct.

## STATUTORY CAUSES OF ACTION
### FAIR CREDIT REPORTING ACT

592.  The preceding Complaint paragraphs are hereby reincorporated by reference as if restated below.

593.  Under the FCRA, a "consumer" is "an individual," see *id*. § 1681a(c), notwithstanding whether that individual is 'involved' in a consumer transaction, such as in cases of underlying identity theft.

594.  A consumer reporting agency (CRA) is "any person" that monetizes from "regularly engag[ing] in … assembling or evaluating consumer credit information … for purpose[s] of furnishing consumer reports to third parties" via interstate [or online] commerce."  See  Section 1681a(f).

595.  A reseller CRA: (1) "assembles and merges information [from other] …  CRAs concerning any consumer for purposes of furnishing such information to any third party. . ."; and that (2) "does not maintain a database of the assembled or merged information ...".  See  Section 1681a(u).

596.  CRA Defendants are "persons" under Section 1681a(b) and many are also "resellers" under § 1681a(u) by virtue of assembling and merging consumer reports purchased from other CRAs.

597.  A "consumer report" is any written, oral, or other communication of any information bearing on credit worthiness, standing, capacity, or character, as well as general reputation. *Id*. at § 1681a(d).

598.  A "user" of one includes anyone that receives a consumer report and applies that report to a particular consumer, thereby triggering the FCRA. See *Rvtewicz*, 888 F.2d 1175 (7th Cir. 1989).

599.  A credit score constitutes a "consumer report" under Section 1681a(d)(1) in that it is a communication of any information by a CRA on consumer credit worthiness, standing, and so on.

600.  If information is collected for a purpose covered by the FCRA, a report containing that information remains a consumer report even if it is later used for a purpose not covered by the FCRA.

601.  If information from a consumer file enters a business file, or if information from a business file is put to a consumer purpose, all future information from the business file will be consumer reports.

602.  The existence of a fraud alert in a consumer's file is the primary way to alert a credit report user to the possibility of identity theft.  See  *Heim*, 2020 U.S. Dist. LEXIS 253041.

603.  FCRA damages include pecuniary harms like lost time and income, out-of-pocket expenses, and lost or denied credit, as well as nonpecuniary harms, such as reputational and informational loss.[8]

604.  Any person who willfully violates the FCRA may be liable for actual damages, alternative statutory damages between $100 and $1,000 for each violation, and punitive damages *Id*. § 1681n.

605.  For willfulness, 'knowing' conduct can equate to creating "an unjustifiably high risk of harm that is either known or so obvious that it should be known. *Redman*, 768 F.3d 622, 638 (7th Cir. 2014).

---

[8] Also recoverable is "time and effort spent protecting against and mitigating the risks created by data [theft]," *Johnson*, 736 F. Supp. 3d 639, 643 (S.D. Ind. 2024) (citing *Remijas*, 794 F.3d at 694 (lost time remedying materialized fraud harm and increased risk of fraud)); see also *Persinger*, 20 F.4th at 1193 (7th Cir. 2021) (unauthorized invasion).

606. Recklessness can be deduced from an erroneous statutory reading that runs a risk of violating the law substantially greater than that associated with a careless reading. *Murray*, 523 F.3d at 726.

607. Prior knowledge of the FCRA's violated requirements can also support willfulness or recklessness.

FIRST CAUSE OF ACTION **| 15 USC §§ 1681b and 1681q**

608. The FCRA creates a substantive right to privacy and corresponding recourse for statutory violations arising from the impermissible procurement and/or use of consumer report information.

609. A person seeking to access and/or use a consumer report must (1) have an FCRA-authorized permissible purpose for doing so and also must (2) certify to the issuing CRA the specific statutory purpose for which the underlying consumer report will permissibly be used. 15 U.S.C. § 1681b(f).

610. When a third-party obtains a consumer report for an impermissible purpose, standing exists under the FCRA to pursue separate recourse for each impermissibly furnished, procured, and used report.

611. The consumer report uses authorized under FCRA Section 1681b(a) are the same purposes for which a CRA may furnish a consumer report to a consumer report user under FCRA Section 1681e.

612. The FCRA requires that CRAs have a reasonable basis to believe that a requested consumer report is authorized under 1681b(a)(3)(A) or 1681b(a)(3)(E) prior to disclosing one to a subscribed user.

613. Plaintiff's consumer reports were issued by CRAs to Tenant Screeners without his authorization, which caused misattributed Tenant Screening Reports to be impermissibly disclosed as a direct result of the CRAs' and Tenant Screeners' failures to verify the legitimacy of the fraudulently induced applicant screening transactions, which should have reasonably been detected beforehand.

614. Under FCRA Section 1681b, a CRA is only permitted to disclose a consumer report without authorization of the consumer under the following limited circumstances:

*Credit Transactions*:   A CRA can furnish a report if it has reason to believe that the information will be used in connection with a credit transaction involving the consumer, such as the extension of credit, or the review or collection of an account;

*Firm Offers of Credit or Insurance*: A CRA can provide a report to a credit or insurance provider that is extending a "firm offer of credit or insurance" to the consumer;

*Employment Purposes*: A CRA can furnish a report for employment purposes if the employer provided a clear / conspicuous disclosure to the consumer and obtained his written authorization;

*Legitimate Business Need*: A CRA can provide a report to a person with a legitimate business need for the information in connection with a business transaction initiated by the consumer or to review an account to determine whether the consumer continues to meet the terms of the account;

*Compliance with Legal Orders*: A CRA can furnish a report in response to a court order, a subpoena connected to a federal grand jury, or a subpoena by a federal agency; and the

*Written Instructions of the Consumer*: A CRA can provide a consumer report in accordance with the written instructions of the consumer to whom that consumer report relates.

615. In this case predicated by unsafeguarded Identity Theft and Lease Fraud, Plaintiff, the victim:

    a.   did not initiate or authorize any credit transaction as provided under § 1681b(a)(3)(A);

    b.   was not involved in any credit transaction involving the extension of credit to, or review or collection of an account of, the consumer as provided under § 1681b(a)(3)(A);

    c.   had no payment liability on any legitimate collection accounts, including any purchased or acquired one that would allow access of his consumer reports per § 1681b(a)(3)(A);

    d.   had no existing credit accounts that are or were subject to collection efforts by any Debt Collector or original Apartment creditor as provided pursuant to § 1681b(a)(3)(A);

    e.   did not engage any Defendant for any employment-related matter per § 1681b(a)(3)(B);

    f.   did not engage any Defendant for any insurance-related matter per § 1681b(a)(3)(C);

    g.   did not apply for any government license or other type of benefit per § 1681b(a)(3)(D);

    h.   had no credit obligation to enable access of his credit reports per § 1681b(a)(3)(E); and

    i.   did not otherwise conduct any type of business transaction or incur any type of financial obligation with any Defendant pursuant to and as contemplated by § 1681b(a)(3)(F).

616. Because Plaintiff did not have any prior or ongoing relationship and did not initiate any transaction with any Apartment, Plaintiff did not have an existing credit obligation, *id*. § 1681b(a)(3)(A), did not initiate a credit transaction, *id*. § 1681b(a)(3)(E), and did not establish any underlying authorized account beyond the involved Fraudulent Accounts. See *id*. § 1681b(a)(3)(F)(ii).

617. Because an unauthorized tenant screening transaction is not considered to be a "credit transaction" contemplated by Section 1681b(a)(3)(A), this FCRA subsection does not apply here in any event.

618. Because none of the authorized permissible purposes were for employment, *id*. § 1681b(a)(3)(B), insurance underwriting, *id*. § 1681b(a)(3)(C), evaluating licensure or benefit eligibility, *id*. § 1681b(a)(3)(D), or "issuance of a government sponsored … charge card," *id*. § 1681b(a)(3)(F), no authorized permissible purposes existed under these inapplicable contexts.

619. Because Plaintiff "at no point … initiated any [such] transaction" nor "agree[d] to" authorize any [such] transaction, no user Defendant possessed "a legitimate business need for [his consumer report] information … in connection with a business transaction involving" him and, as such, lacked a reasonable basis to believe in a permissible purpose for accessing, obtaining, using, and/or reselling Plaintiff's consumer report information under statutory subsection 1681b(a)(3)(F)(i).

620. Because debt collection is not a permissible purpose under Section 1681b if the debt is not attributed to a transaction that the purported debtor directly and voluntarily participated in, such as in identity theft, the Debt Collectors and the involved Apartments lacked a permissible purpose predicating these transactions. See *Marion v. Transworld Sys. Inc*., 2024 U.S. Dist. LEXIS 168154.

621.  Because each Defendant that had used a consumer report concerning Plaintiff knew or should have known that such were not in connection with a credit transaction involving him or his authorization, each such Defendant obtained and/or used Plaintiff's consumer reports with knowledge or reckless ignorance that such conduct was in violation of FCRA Section 1681b(f).

622.  As each report user Defendant violated Section 1681b(f) with knowledge or reckless ignorance, each Defendant is alleged to be concurrently liable for impermissibly furnishing, procuring, and using Plaintiff's consumer reports in violation of Section 1681b as well as under false pretenses.

623.  The required elements to state a claim for obtaining or using a consumer report absent a permissible purpose are (1) the procurement of a consumer report (2) from a CRA (3) without a permissible purpose (4) predicated by knowing, intentional, reckless, or negligent underlying conduct.

624.  Here, Tenant Screening Reports were furnished pursuant to Falsified Applications which were neither reviewed for authenticity nor for identity verification purposes by the involved Apartments who therefore failed to verify whether their requests for accessing and using Plaintiff's consumer report access were predicated by a permissible purpose, in violation of Section 1681b(a).

625.  By affirmatively failing to vet the Falsified Applications before blindly accepting them as legitimate, the Apartments knowingly or recklessly certified having a "reason to believe" in a legitimate business need for the reports in contravention of Section 1681b(a)(3)(F)(i), which also renders the Tenant Screeners' liable for obtaining Plaintiff's reports on their respective behalf.[9]

626.  Each Defendant that furnished, obtained, refurnished, or used a consumer report concerning Plaintiff in this context did so with a perceptible awareness or in reckless disregard that such violated Section 1681b of the FCRA as well as Plaintiff's applicable afforded statutory rights.

627.  This respective awareness is further enlightened by the underlying Tenant Screening Reports' incorporated warnings that highlight against violating the FCRA's impermissible use provisions.

628.  This awareness is also supported by end-use agreements by and between the CRAs and Tenant Screeners, pursuant to which the obligation to obtain and use consumer reports only for permissible FCRA statutory purposes is expressly acknowledged, understood, agreed upon, and memorialized.

629.  The tenant screening inquiry transactions involve Tenant Screening Reports prepared by LeasingDesk, RentGrow, and SafeRent on behalf of the respective underlying Apartments.

630.  Each Apartment is directly liable, or vicariously liable per its management company, for each impermissibly procured and/or used consumer report, including those procured by false pretenses.

631.  LeasingDesk is liable for each of its conducted soft credit inquiries, as well as each of its generated tenant screening reports sold by it to multiple underlying Apartment Defendants.

632.  RentGrow is liable for its Tenant Screening Reports, as well as for each integrated consumer report, including Equifax credit reports, Experian RentBureau reports, Premium National Civil Court Records, Premium National Criminal Records, and an OFAC/SDN Search report products.

---

[9] See, *i.e.*, *Brown v. Vivint Solar, Inc.*, 2020 WL 1332010, at *6 (M.D. Fla. Mar. 23, 2020) (where fact issues existed as to whether defendant knew or should have known plaintiffs did not submit underlying credit applications).

633. SafeRent is likewise liable for each of its underlying Tenant Screening Reports, as well as for each of their integrated consumer reports, including SafeRent Score reports, Experian and Equifax credit reports, RegistryCHECK reports, and CrimeSAFE report products.

634. The Tenant Screening Furnishers whose respective consumer reports were integrated within each respective Tenant Screening Report are also liable for each instance of disclosing their integrated consumer report product to the Tenant Screeners, such as RentGrow, SafeRent, and LeasingDesk.

635. Each of these integrated consumer reports constitutes exposes separate FCRA statutory liability.

636. The RentGrow Tenant Screening Report transaction for Crystal Square Apartments, for example, involved five integrated reports, resulting in approximated statutory damages liability near $5,000.

637. Similarly, the SafeRent Tenant Screening Report for Southern Towers Apartments involved five integrated reports, exposing up to around $5,000 in FCRA statutory damages for that transaction.

638. This repeated conduct is indicative of reckless disregards of the FCRA (Section 1681b(f)), which subjects each involved Defendant to concurrent statutory liability under §§ 1681n and/or 1681o.

639. As a direct and proximate result of the respective Defendants' violations of FCRA Section 1681b(f) and/or 1681q, Plaintiff suffered damages, including credit rating damage, credit expectancy loss, invasions of privacy, reputational harms, lost time, and psychological distresses.

640. As a result of these respective violations, Plaintiff seeks: (1) actual damages under § 1681o(a)(1); (2) statutory damages of up to $1,000 per violation under § 1681n(a)(1)(A); (3) punitive damages under § 1681n(a)(2); (4) attorney's fees and costs under §§ 1681n and 1681o; (5) appropriate equitable relief; and (6) any other warranted relief that may be determined proper.

<u>SECOND CAUSE OF ACTION</u> ‖ 15 USC §§ 1681e(a) and 1681e(e)

641. Section 1681e(a) requires that CRAs have adequate procedures to ensure that assembled credit file information disclosed to third parties pertains to the correct consumer.

642. Section 1681e(a) also requires that CRAs utilize procedures that enable recording and retention of input and output data linked to subscribers' inquiries for obtaining or accessing consumer reports.

643. Section 1681e(a) further requires that CRA's obtain a subscriber's general certified promise that it will obey permissible purposes when requesting, obtaining, and using consumer reports.

644. CRAs must also have a system to verify that, in each instance, they are responding to users' requests to access a consumer's report that are predicated by an ascertainable permissible purpose.

645. It is therefore improper for a CRA to rely on a user's permissible purpose certification where there is a perceived risk that related subsequent reports will not be utilized for a permissible purpose.

646. Section 1681e(e)(1) directs that a reseller CRA may not procure a consumer report for purposes of reselling the report, or any information in the report, unless it discloses to the original furnishing CRA (**A**) the identity of the report's end-user and (**B**) each of the authorized permissible purposes under Section 1681b for which that report is to be furnished to the end-user of the consumer report.

647. In turn, the CRA that originally furnished the consumer report to the reseller CRA must ensure that the consumer report is resold only for permissible purposes and, in addition, must verify the identity of the consumer report's end-user to be in proper compliance with Section 1681e(e).

648. Section 1681e(e)(2)(A) further requires that CRA resellers establish and comply with reasonable procedures designed to ensure that consumer report information is resold by the person only for an authorized purpose under Section 1681b. And Section 1681e(e)(2) also requires that a reseller:

    (i)    identifies each end user of the resold report (or information);

    (ii)    certifies each purpose for which the report (or information) will be used; and

    (iii)    certifies that the report (or information) will be used for no other purpose; and

    (B)    before reselling the report, make reasonable efforts to verify the identifications and certifications made under subparagraph (A).

649. By thus failing to maintain reasonable procedures to ensure that consumer reports are disclosed only for permissible purposes, CRAs risk exposure to liability under Section 1681e(a).

650. The same is true for a CRA that does not verify the identity of a consumer report user and/or the intended use of the involved consumer report, which also exposes that CRA to FCRA liability. *Id.*

651. If a CRA allows a consumer report to be resold without disclosing the identity of the end-user to the original CRA, this omission also contravenes FCRA Section 1681e(e). *Chaitoff*, 79 F.4th 800.

652. In this case, the CRA Defendants violated § 1681e by failing to use and implement reasonable procedures to limit furnishings of Plaintiff's impermissibly disclosed consumer reports to requests with a proper certified permissible purpose where, in this case, there was no permissible purposes.

653. No permissible purposes existed to release Plaintiff's consumer report information because the FCRA does not authorize releasing consumer reports in response to Falsified Applications, which the respective CRA Defendants knowingly or intentionally blindly failed to safeguard against here.

654. For each impermissibly disclosed consumer report concerning Plaintiff, no CRA Defendant possessed a reasonable basis to believe that Plaintiff's PII and connected consumer reports were being procured, reintegrated, resold, and/or used per a permissible purpose under Section 1681b.

655. These Section 1681e violations by the CRA Defendants were perceptibly predicated by willful and/or willfully blind conduct or, alternatively, negligence. See FCRA Sections 1681n and 1681o.

656. As a result of these respective violations, Plaintiff seeks: (1) actual damages under § 1681o(a)(1); (2) statutory damages of up to $1,000 per violation under § 1681n(a)(1)(A); (3) punitive damages under § 1681n(a)(2); (4) attorney's fees and costs under §§ 1681n and 1681o; (5) appropriate equitable relief, and (6) any other properly warranted relief.

<u>THIRD CAUSE OF ACTION</u> ‖ **15 U.S.C. § 1681e(b)**

657. The FCRA obligates CRAs to maintain reasonable procedures to ensure they compile and disburse consumer credit information with maximal accuracy. 15 U.S.C. § 1681e(b).

658. When a CRA prepares a consumer report, it must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates," 15 U.S.C. § 1681e(b), which applies to all CRAs, including CRAs that are report resellers.

659. A CRA violates § 1681e(b) if, for one, the consumer report contains inaccurate information and, secondly, the CRA did not follow reasonable procedures to assure maximum possible accuracy.

660. As to the first, "[m]aintaining credit information for a person other than Plaintiff in Plaintiff's credit report is one … obvious inaccurac[y] …" *Pasternak*, 2008 U.S. Dist. LEXIS 143750 at *24.

661. As to the latter, reasonably employed reporting procedures must sufficiently "match consumers with their files" … commensurate with an identifiable risk of … misidentifying the consumer."

662. It is not a reasonable procedure to accept information that reasonably appears facially inaccurate or is otherwise inconsistent in comparison with the CRA's file. See *Lopez v. Experian Info. Sols., Inc*., 2022 U.S. Dist. LEXIS 89552, at *12-13 (N.D. Cal. May 18, 2022).

663. It is similarly not reasonable for a CRA to record logical and/or facial inconsistencies within a single credit file or a consumer report, which can be circumstantially probative of FCRA liability.

664. And information furnished to a CRA is not presumptively reliable where it is otherwise "inherently implausible or internally inconsistent." *McKeown*, 335 F. Supp. 2d 917, 930 (W.D. Wis. 2004).

665. In this case, the CRA Defendants violated Section 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation, maintenance, and dissemination of Plaintiff's consumer reports.

666. These CRA Defendants had been alerted to information that would cast doubt on the accuracy of its procedures, along with calling into question its evaluation of requests from creditors to furnish consumer reports, which was in reckless disregard of the FCRA.

667. These CRA Defendants had direct notice from Plaintiff that their procedures were unreasonable, deficient, and inadequately implemented as applied to him in this protracted Lease Fraud case.

668. It was unreasonable for these CRA Defendants to continue to report and disseminate Tradelines derived from ascertainably Fraudulent Accounts, particularly after receipt of Plaintiff's multiple Identity Theft and Lease Fraud disputes that indisputably established the merit of those disputes.

669. Those disputes that these CRA Defendants received from Plaintiff provided undoubtable information and corroborated documentation to determine, conclusively, that the Tradelines being misattributed to Plaintiff's CRA credit files originated from the Identity Theft and/or Lease Fraud.

670. Rather than employing reasonable procedures, these CRA Defendants blindly collected Plaintiff's misappropriated PII in a fly-by-night manner from unreliable sources and without verifying the information they collected, including the unreliable Screening Furnishers and Credit Furnishers.

671. These CRA Defendants thus failed to implement or maintain reasonable procedures to assure the maximum possible accuracy of the information furnished to the Apartment Defendants.

672. On-Site, for example, failed to flag or reject certain electronically stored Falsified Applications misusing Plaintiff's identity where LeasingDesk issued Tenant Screening Reports pursuant to those applications and without verifying the source of the inquiry or confirming the authorization.

673. That conduct was not accidental nor a result of negligence but predicated by deliberate disregard of adequately designed and/or implemented policies and procedures and, thus, the FCRA as well.

674. Each of these CRA Defendant's actions represent a separate breach of their statutory duty under § 1681e(b), which resulted in the opening of unauthorized leases in Plaintiff's name, causing material and lasting harm to Plaintiff's credit file, rental history, emotional wellbeing, and more.

675. These CRA Defendants' respective FCRA Section 1681e(b) violations were willful or negligent.

676. As such, Plaintiff is believed to be entitled to respective: (1) actual damages under § 1681o(a)(1); (2) statutory damages of up to $1,000 per violation under § 1681n(a)(1)(A); (3) punitive damages under § 1681n(a)(2); (4) attorney's fees and costs under §§ 1681n and 1681o; (5) appropriate equitable relief; and (6) any other justifiably warranted relief.

FOURTH CAUSE OF ACTION ‖ 15 USC § 1681g

677. Under FCRA Section 1681g, CRAs must clearly and accurately disclose all of the information in a consumer's file, including the sources of that information and identification of each person that procured a consumer report on the consumer during the previous year. See *id*. § 1681g(a)(1)-(3).

678. These consumer file disclosures must be, but here were not, made in a manner sufficient to allow Plaintiff to compare the disclosed credit file data against his personal identifying information.

679. Section 1681g(a) requires that, when consumers request the information in their file, the CRA must disclose, among other things and with certain exceptions: (i) all information in the consumer's file at the time of the request, (ii) the sources of that information, (iii) the identities of the persons who previously obtained a consumer report on the consumer, as well as (iv) information on any checks used as the basis for an adverse characterization of the consumer.

680. Because this disclosure requirement applies to the sources of the information making up the contents of a consumer's CRA credit file, id. § 1681g(a)(2), a CRA is required by the FCRA to disclose the identity of each furnisher of reported information in order to be in compliance with it.

681. This requirement encompasses the identities of each consumer report recipient to which the CRA furnished a consumer report within the one-year preceding the consumer's disclosure request, which applies whether or not the consumer's request is generally stated. Id. § 1681g(a)(3).

682. Thus, where a CRA provides a consumer report to an end-user at the request of a CRA acting in the capacity of a reseller, the FCRA requires that the ultimate report recipient also be identified, which is in addition to identifying the reseller who first procured the report. Id. § 1681g(a)(3)(A).

683. Where multiple entities provide information to a CRA, the FCRA thus requires that each such source of information be disclosed by that CRA in order to comply with Section 1681g(a).

684.  If a CRA does not disclose a data vendor, or discloses only the vendor and not the original source of the information, that restricts a consumer's awareness of those sources of often sensitive credit file information and, as such, the ability to dispute and prevent further disclosure of any inaccurate credit-related information.  See  CFPB Advisory Opinion at 12 CFR Part 1022.

685.  Separately, per Section 1681g(e)(11), an identity theft *victim* means a consumer whose means of identification or financial information has allegedly been used or transferred without the authority of that consumer, "with the intent to commit, or to aid or abet, an identity theft or a similar crime."

686.  To that end, Section 1681g(e)(1) obligates businesses that have transacted with an identity thief to provide the victim, within thirty days of a request, all application and transactional records controlled by that business that is the claimed result of identity theft. See FCRA § 1681g(e)(1).

687.  Here, Plaintiff requested a full file disclosure from the applicable CRA Defendants per Section 1681g(a), seeking to understand what reports were furnished, to whom, and based on what input.

688.  Multiple or more Defendants failed to provide full and accurate file disclosures, failed to identify the application records in question, and failed to specifically identify the report's' end users.

689.  These violation, in turn, deprived Plaintiff of the ability to identify the scope of the Identity Theft and Lease Fraud , dispute inaccuracies, and protect his federal statutory rights.

690.  The CRA Defendants, including Experian, TransUnion, RentGrow, LeasingDesk, SafeRent, Experian RentBureau, Resident Verify, and First Advantage, upon belief, did not disclose Plaintiff's requested file disclosures as required by Section 1681g(a), which prevented him from rectifying the issues and from obtaining a fair and accurate reporting of  his credit information.

691.  This respective conduct frustrates Congress' aim toward empowering Plaintiff to "correct[] inaccurate information" in his credit files and caused him to be further "unjustly damaged because of [the Fraudulent Account] information in [his consumer] report[s]."  See *Cortez*, 617 F.3d at 706.

692.  Regarding Experian, it intentionally implemented and employed an automated online disclosure policy that, against the grain of the FCRA, restricted Plaintiff's right to access his requested consumer file disclosures and thus his ability to rectify the issues, which occurred at least on: *February 2, 2023; October 18, 2023;  November 13, 2023; November 18, 2023; April 17, 2024; June 27, 2024; November 20, 2024; December 2, 2024;  December 20, 2024.*

693.  In those regards, Experian knowingly and thus willfully mandated a policy to deny Plaintiff, an Identity Theft victim, rights to statutorily entitled information, which restricted Plaintiff's ability to access his consumer disclosures to check for further and ongoing Fraud-related inaccuracies.

694.  In addition, Genesis and Abbotts Run, as well as LeasingDesk, RentGrow, and SafeRent, failed to comply with Section 1681g(e) by failing to provide application and business transaction records within 30 days of receiving Plaintiff's requests for the same, which hindered Plaintiff's ability to ascertain and determine the scope  and extent of the Fraud and the derived reporting issues.

695.  As a result of these respective violations, Plaintiff seeks recovery of actual sustained damages or up to $1,000 in statutory damages for each instance Plaintiff was denied the ability to obtain and access his entitled consumer file disclosures as required pursuant to Section 1681g(a) of the FCRA.

FIFTH  CAUSE  OF  ACTION ‖ **15 USC § 1681c-2**

696. The FCRA requires that consumer reporting agencies block the reporting of "any information" in the file of a consumer identified as resulting from alleged identity theft. 15 U.S.C. § 1681c-2(a).

697. These CRA fraud block dispute obligations apply equally to CRA resellers. Section 1681c-2(d)(3).

698. Section 1681c-2(a) mandates that a CRA must block the reporting of information identified by the consumer as resulting from identity theft within four business days of receiving: (1) appropriate proof of the consumer's identity; (2) a copy of an identity theft report; (3) identification of the information to be blocked; and (4) a statement that the information does not relate to any transaction by the consumer. See *Collins v. Experian Credit Reporting Serv.*, 494 F. Supp. 2d 127.

699. These fraud blocking duties supplement a CRA's more typical duty to 'reasonably reinvestigate' and determine the accuracy or completeness of its reporting under § 1681i(a)(1)(A) of the FCRA.

700. To trigger these fraud blocking obligations, the consumer must therefore provide proof of identity, a copy of an acceptable identity theft report, identification of the disputed information, and a statement affirming that the information does not relate to any transaction involving the consumer.

701. The FCRA and related regulations allow submission of a signed Federal Trade Commission (FTC) identity theft affidavit (FTC "Fraud Affidavit"), which is recognized as sufficient for purposes of triggering a CRA's statutory fraud block handling obligations, particularly when it is notarized.

702. A CRA may reasonably request additional documents to determine the validity of the alleged identity theft, if such requests are made within fifteen (15) days of receiving an underlying fraud block dispute / request. *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330.

703. Under Section 1681c-2(c)(1), CRAs are not permitted to reject a consumer's fraud block request unless they "reasonably determine" that the consumer: (a) wrongly requested it; (b) made a material misrepresentation; or (c) benefited from the disputed transaction.

704. Within four business days of receiving a consumer's valid block request, a CRA must permanently block the disputed items of information, as well as notify the subject furnisher. *Id.* § 1681c-2(b).

705. The CRA must also notify the other nationwide CRAs of the identity theft complaint under Section 1681f(s) (requiring CRAs to maintain reasonable fraud block referral handling procedures).

706. If the CRA decides to decline to block disputed items, the CRA must notify the consumer of both this decision and the specific reason for this decision within five business days. § 1681c-2(c)(2).

707. Plaintiff here provided all required information, including proof of identity, a signed and notarized FTC Fraud Affidavit (qualifying as a valid identity theft report), identification of each disputed item of information, and a statement that such did not relate to any transaction authorized by him.

708. Plaintiff also provided more corroborating documents, including an Assembly Dulles Apartment final account statement from FCO explicitly stating "falsified application," which more so satisfies the statutory requirements for triggering a CRA's fraud blocking duty. See *Osada*, 290 F.R.D. 485.

709. Despite receiving this required documentation, certain CRA Defendants, including Experian and the Tenant Screeners, failed to block on or more Fraudulent Account Tradelines, unauthorized inquiries, and misattributed prior addresses, all items of which had been specifically disputed.

710. Instead, the applicable CRA Defendants, including Experian, illogically verified ownership of the disputed tradelines, disregarding clearly presented evidence of Identity Theft and Lease Fraud, which violated Section 1681c-2's mandate to protect victims by blocking fraudulent information.

711. These CRA Defendants thus violated Section 1681c-2 by failing to block all items of information specifically identified as having derived from the Fraudulent Accounts per Plaintiff's respective disputes, which unequivocally substantiated that the information was the result of Identity Theft.

712. These respective FCRA Section 1681c-2 violations by the applicable CRA Defendants remained largely or fully unaddressed until Plaintiff's reiterated Fraud dispute submitted in August of 2024, which is also when the statute of limitations began to run for this particular FCRA cause of action.

713. These CRA Defendants also violated Section 1681c-2 by failing to notify one or more underlying Credit Furnishers of the Identity Theft complaint, so to prevent reinsertions or further misreporting.

714. These CRA Defendants additionally failed to send Plaintiff a required fraud block rejection notice within five business days of receiving Plaintiff's FTC Fraud Affidavit per Section 1681c-2(c)(2).

715. Regarding the unauthorized recorded inquiries, these investigable items of information were neither deleted pursuant to the CRAs' blocking procedures nor their reinvestigation procedures.

716. As for the misattributed addresses that derived from certain Fraudulent Account Tradelines, while they also are investigable items of information, none were suppressed by one or more of the CRAs.

717. The CRA Defendants knew or should have known of their Fraud blocking obligations, that Plaintiff's FTC Fraud Affidavit and appended dispute documents triggered their Section 1681c-2 duties, and that they thus violated the FCRA in failing to block the disputed items of information.

718. The CRA Defendants' respective violations of Section 1681c-2 were knowing or in reckless disregard of Plaintiff and the FCRA, and thus willful, or, alternatively, negligent. §§ 1681n, 1681o.

719. By failing to implement Fraud blocking protocols pursuant to Plaintiff's validly submitted FTC Fraud Affidavit disputes, the respective CRAs disregarded the responsibility to adopt reasonable procedures to ensure the accuracy of consumer information and to protect valid victims of Fraud.

720. As a result of these respective violations, Plaintiff seeks: (1) actual damages under § 1681o(a)(1); (2) statutory damages of up to $1,000 per violation under § 1681n(a)(1)(A); (3) punitive damages under § 1681n(a)(2); (4) attorney's fees and costs under §§ 1681n and 1681o; (5) equitable relief; and (6) any other justifiably proper relief.

SIXTH CAUSE OF ACTION ‖ **15 USC § 1681i**

721. If a consumer contacts a CRA to dispute "any item of information contained in [the] consumer's file," the CRA shall "conduct a reasonable reinvestigation" of the disputed information. § 1681i(a).

722. For purposes of reinvestigations, "any item of information in a consumer's file" encompasses recorded credit history inquiries as well as recorded current and prior addresses. See *id*. § 1681i(a).

723. If a consumer's identifying information is inaccurate, that can lead to CRAs attributing furnished information to the wrong person. See Name-Only Matching, 86 Fed. Reg. 62468 (Nov. 10, 2021).

724. This misattribution can then also lead to users of consumer reports attributing incorrect information to a particular consumer, just as what has happened in the case here.

725. For related reasons, as to disputes alleging identity theft, CRAs' reliance on standard automated reinvestigation procedures undermines the reasonableness of their dispute handling practices.

726. To be reasonable, a CRA's dispute reinvestigation must consider "[a]ll relevant information submitted by the consumer." *Chaitoff v. Experian Info. Sols.*, 79 F.4th 800, 809 (7th Cir. 2023).

727. Following a CRA's receipt of a consumer's dispute, it must transmit "all relevant information regarding the dispute" to the furnisher of the disputed information. *Id*. § 1681i(a)(2)(A).

728. In turn, that furnisher must (1) conduct an investigation; including a (2) review of all relevant provided information; and then (3) report the results back to the CRA. *Id*. § 1681s-2(b)(1)(A)-(C).

729. When the CRA's reinvestigation concludes, information in a consumer's file that is "found to be inaccurate … or cannot be verified" must be modified or "promptly" deleted. *Id*. § 1681i(a)(5).

730. In addition to notifying the furnisher of the reinvestigation outcome, see *id*., the CRA must provide the consumer with "written notice . . . of the results of the reinvestigation." *Id*. § 1681i(a)(6).

731. Because identity theft and fraud-related disputes do not relate to whether the CRA, a furnisher, or other data furnisher has identified the correct consumer, just verifying the consumer's Social Security number is unresponsive to disputes arising from misattributions of a consumer's identity, which renders the operative dispute handling policy a directive to not conduct no (re)investigation.

732. To that end, simply deleting a reported debt tradeline does not constitute a reasonable dispute (re)investigation for disputes involving claimed identity theft and/or fraud, which runs a risk of the disputed account or item of information from later becoming re-reported.

733. Because a CRA's mere deletion of a disputed item of information does not address the substance of an identity theft or fraud-related dispute, it disallows subsequent notice by that CRA to the other implicated entities who otherwise would receive such notice and thus take corrective action.

734. Here, Plaintiff disputed each known inaccurate item of information with each respective CRA, Credit Furnisher, Tenant Screener, and Screening Furnisher Defendants, directly or indirectly.

735.  In response, despite the FCRA's applicable directives, most CRA Defendants failed to reasonably reinvestigate Plaintiff's dispute, failed to conduct a reinvestigation into Plaintiff's dispute(s), and/or failed to provide notice of the Lease Fraud dispute(s) to the involved CRAs and furnishers.

736.  Where disputes were reinvestigated, such were reinvestigated in violation of FCRA Section 1681i, such as by verifying Plaintiff's affiliation with the Fraudulent Account Tradelines as well as by failing to block and/or failing to suppress these disputed items of misreported information.

737.  A reasonable inference from this is that the CRAs' dispute reinvestigation handling policies do not involve a comparative corroboration  of  the dispute documents and the furnisher's own records.

738.  Otherwise, the CRA Defendants followed inadequate policies, such as comparing Plaintiff's misappropriated PII with the involved Tenant Screening and Credit Furnishers' Fraudulent Account records, which would logically result in verifications of the disputed items of information.

739.  The CRA Defendants knowingly relied on inadequate procedures and unreliable Tenant Screening and Credit Furnishers in their dispute reinvestigations and despite having awareness that those procedures were not adequate in light of the nature and contents of Plaintiff's disputes, which the CRA Defendants recklessly processed by failing to afford proper weight to the appended supporting documents that conclusively established Plaintiff's Identity Theft and Fraud assertions.

740.  The CRA Defendants violated Section 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the information disputed by Plaintiff was inaccurate.

741.  The CRA Defendants further violated Section 1681i(a)(1)(A) by avoiding reinvestigating Plaintiff's  valid disputes of numerous misattributed Fraudulent Account-related addresses.

742.  The CRA Defendants also violated Section 1681i(a)(5)(A) by failing to delete or else correct the disputed information from Plaintiff's credit file upon reinvestigation of Plaintiff's disputes.

743.  The CRA Defendants knew or should have known of their obligation to adhere to these FCRA obligations, which are enlightened by the text of the FCRA, case law interpreting its provisions, and promulgations by the Federal Trade Commission and Consumer Financial Protection Bureau.

744.  The CRA Defendants acted consciously indifferent to the FCRA's applicable requirements and also as to Plaintiff's statutorily protected privacy and Identity Theft and Fraud victim  rights.

745.  The CRA Defendants' violations were willful and, alternatively, negligent. §§ 1681n  and  1681o.

746.  As a result of these respective violations, Plaintiff seeks: (1) actual damages under § 1681o(a)(1); (2) statutory damages of up to $1,000 per violation under § 1681n(a)(1)(A); (3) punitive damages under § 1681n(a)(2); (4) attorney's fees and costs under §§ 1681n and 1681o; (5) appropriate equitable relief; and (6) any other justifiably warranted relief.

SEVENTH  CAUSE  OF  ACTION ❘ **15 USC § 1681s-2(b)**

747. At all times relevant, the Furnisher Defendants were each a "person" as that term is defined by Section 168la(b) as well as a "furnisher of information" to the underlying CRAs.

748. The Furnisher Defendants cannot furnish information to a CRA if any one of them "knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A).

749. After a CRA notifies it of a dispute as to information that it provides, a furnisher must (1) conduct an investigation, (2) review any information provided by the CRA, (3) report the results of the investigation to the CRA, (4) report any inaccuracies to all CRAs that may have received the inaccurate information, and (5) correct any inaccuracies in the provided information. § 1681s-2(b).

750. The duties imposed on furnishers upon receipt of a notice of a dispute from a CRA are to:

   (1) conduct an investigation, pursuant to § 1681s-2(b)(1)(A);

   (2) review all relevant information provided by the CRA, pursuant to § 1681s-2(b)(1)(B);

   (3) report the results of the investigation to the CRA, pursuant to § 1681s-2(b)(1)(C);

   (4) report inaccurate information "to all" implicated nationwide CRAs. § 1681s-2(b)(1)(D);

   (5) delete or permanently block the reporting of unverifiable information. § 1681s-2(b)(1)(E);

   (6) permanently prevent rereporting of prior deleted unverifiable information. *Id*. at § (E)(iii).

751. Where furnished information is disputed on the basis of identity theft, a rubber stamp investigation that merely verifies the information on file is insufficient for purposes of FCRA § 1681s-2(b).

752. A cursory review for data conformity, rather than a substantive investigation into identity theft, thus does not satisfy Section 1681s-2(b)'s reasonable indirect dispute investigatory requirement.

753. In the Seventh Circuit, furnishers must ensure that their investigations are reasonable and also that the information that they report to CRAs is neither patently incorrect nor materially misleading.

754. Whether or not documents are submitted to confirm the disputer's identity, a furnisher that receives an ACDV must investigate the dispute  per its own records and review of those documents.[10]

755. A Furnisher can only forgo an investigation of a dispute based on a failure to provide documentation when the dispute is directly sent to the furnisher. See *id*. § 1681s-2(a)(8)(D), (F)(i).

756. A furnisher can decline to investigate indirect disputes from CRAs only where they have determined that the dispute is redundant of an already investigated and direct-received dispute.

757. A policy requiring a consumer to file a fraud affidavit before the furnisher will conduct an investigation into a dispute "does not resolve the inquiry into the reasonableness of its investigation." See *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 619 (6th Cir. 2012).

---

[10] A prior circular published by the CFPB confirms the Court's understanding of the FCRA's text: "furnishers must reasonably investigate all indirect disputes received from [CRAs] – even if such disputes do not include the entity's preferred format, preferred intake forms, or preferred documentation or forms." Consumer Financial Protection Bureau Circular 2022-07, Reasonable investigation of consumer reporting disputes, https://perma.cc/5NRB-SMDJ.

758. The duty to correct inaccurate furnished information extends to preventing it from being refurnished in the future, particularly in relation to previously blocked or deleted information.

759. Thus, rereporting of inaccurate information could be held unreasonable and therefore actionable under Section 1681s-2(b).  See  *Taylor v. Screening Reports, Inc*., 2015 U.S. Dist. LEXIS 86262.

760. A furnisher may face this same liability if it reports a new tradeline related to the same source from which a fraudulent debt derived, even if it only received notice of dispute for a separate account.

761. If that case, where a furnisher particularly re-reports fraudulent information, such can constitute a new FCRA violation, regardless of whether the consumer submitted a new dispute to the CRA.

762. This is supported by caselaw findings that each instance of re-reporting inaccurate, and particularly fraudulent, information triggers the furnisher's duties under Section 1681s-2(b), suggesting that its investigation duty is ongoing and thus not limited to an initial dispute response.

763. As such, a furnisher's subsequent reporting of a tradeline originating from a fraudulent transaction connected to a prior fraud dispute of a separate related tradeline may expose it to FCRA liability.

764. Similarly, if a fraudulent address is sourced from a furnished account tradeline, that tradeline furnisher has a corresponding duty to address that disputed address too under Section 1681s-2.

765. Otherwise, failing to delete a fraudulent address can lead to persistent adverse effects on credit ratings and lead to further consumer identity misuse.  See  *Mirabile*, 2024 U.S. Dist. LEXIS 51304.

766. As such, if a furnisher fails to delete a fraudulent-derived address, liability may result under Section 1681s-2(b), particularly where, like here, a fraudulent tradeline is deleted but the sourced address is not deleted and continues to be reported.  *Denan v. Trans Union LLC*, 959 F.3d 290.

767. Where a furnisher – like the applicable Apartments here – thus fails to comply with Section 1681s-2(b), such as by not conducting a proper investigation, failing to correct inaccurate information, or re-reporting previously deleted information, that furnisher subjects itself to private FCRA liability.

768. To state a negligence claim under Section 1681s-2(b), a plaintiff must show that the furnisher provided inaccurate or incomplete information and that the inaccuracy resulted from an unreasonable investigation.  *Fickel v. Clearwater Credit Union*, 2023 U.S. Dist. LEXIS 41162.

769. For negligent statutory violations of the FCRA, a furnisher may be liable to the consumer for actual damages, costs of litigation, and attorney's fees under Section 1681n.

770. For a willfulness claim, an (1) inaccuracy and a (2) failure to follow reasonable procedures that (3) is "knowing or reckless" must be demonstrated. *Wenning,* 2016 U.S. Dist. LEXIS 81126 at *8.

771. For willful statutory violations of the FCRA, a furnisher may also face statutory damages ranging from $100 to $1,000, punitive damages, as well as attorney's fees.

772. In this case, one or more CRA Defendant forwarded one or more of Plaintiff's received Lease Fraud disputes to the respective underlying Credit and Tenant Screening Furnisher Defendants.

773. Upon information and belief, and without limitation, those Furnisher Defendants violated Section 1681 s-2(b)(1)(E) when they each failed to delete and/or permanently block the disputed items of information from continuing to be furnished to, and thus reported by, the implicated CRAs.

774. The Furnisher Defendants violated Section 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiff's disputes after notice of their reported existence by one or more CRAs.

775. The Furnisher Defendants failed to review all relevant information while investigating Plaintiff's disputes, which violated Section 1681s-2(b)(1)(B).

776. Upon information and belief, the Furnisher Defendants' procedures only require them to complete a cursory review of consumer disputes, regardless of their content, magnitude, or frequency.

777. Upon information and belief, the Furnisher Defendants' procedures only require them to respond to disputes with basic consumer information without conducting a reasonable investigation.

778. Upon information and belief, the Furnisher Defendants' procedures do not require them to investigate disputed inquiries furnished by them to the CRAs, whether labeled as hard or soft.

779. To the extent that the Furnisher Defendants investigate hard-recorded inquiries furnished to CRAs, upon information and belief, they do not otherwise investigate disputed soft-labeled inquiries.

780. Each of the Furnisher Defendants' conduct in this case violated Section 1681s-2(b) of the FCRA.

781. The CRA Defendants knew or should have known of their obligation to adhere to these FCRA obligations, which are enlightened by the text of the FCRA, case law interpreting its provisions, and promulgations by the Federal Trade Commission and Consumer Financial Protection Bureau.

782. This alleged conduct by the Furnisher Defendants was in conscious disregard of the FCRA and, therefore, willful or, alternatively, negligent.  See  15 U.S.C. § 1681n and 1681o.

783. As a result of these respective violations, Plaintiff seeks: (1) actual damages under § 1681o(a)(1); (2) statutory damages of up to $1,000 per violation under § 1681n(a)(1)(A); (3) punitive damages under § 1681n(a)(2); (4) attorney's fees and costs under §§ 1681n and 1681o; (5) any appropriate equitable relief; and (6) any other justifiably proper relief.

## EIGHTH STATUTORY CAUSE OF ACTION
### FAIR DEBT COLLECTION PRACTICES ACT

784. Each preceding complaint paragraph asserted is reincorporated as if restated and realleged below.

**Underlying Liability**

785. The named Debt Collector(s) are "debt collectors" under the FDCPA and thus are subject to alleged strict liability for violating the statute's applicable underlying provisions.

786. An agent who commits a tort in Indiana is equally liable with the principal for that act. *Hill*, 812 N.E.2d 1060 at 1064. Thus, the Apartments who engaged, directed, and/or authorized the alleged conduct of the respective Debt Collectors may be subject to imputed liability for that conduct.

787. As the original creditors, the applicable Apartments are also imputatively liable for the conduct of their hired Debt Collectors and, as such, those respective Apartment Defendants are liable for engaging, directing, controlling, and/or authorizing the underlying debt collection conduct at issue.

788. The assignment of delinquent Fraudulent Account debts to Debt Collectors by the respective Apartment Defendants without proper identity verification, Fraud screening, and due diligence measures demonstrates a reckless disregard for the truth and Plaintiff's foreseeably caused harms.

789. This proximately caused harm includes, but is not limited to, protracted financial, reputational, informational, psychological, and encroached privacy-related damages.

**Statutory Liability**

790. The FDCPA is a strict-liability statute and, therefore, subjects a debt collector to liability for unintentional violations of its provisions, and is contextually construed in favor of the consumer.

791. "A debt collector who fails to comply with any provision of the FDCPA is liable to a debtor in amount equal to the sum of any actual damage sustained" …, additional [statutory] damages … [up to] $1,000, … costs … [and] a reasonable attorney's fee." 15 U.S.C. § 1692k.

792. It also allows for attorneys' fees, which the Seventh Circuit says is mandatory where a violation of "any [FDCPA] provision" is established.  See *Zagorski*, 128 F.3d 1164, 1166 (7th Cir. 1997).

793. In that regard, remunerated attorney fees are seen as a form of a bounty for representing a plaintiff who proves a violation and assists deterring future ones. *Crabill*, 259 F.3d 662, 666 (7th Cir. 2001).

**15 USC §§ 1692e, 1692f, 1692d, and 1692g**

794. Section 1692d of the FDCPA states that a debt collector may not harass or abuse any person in connection with the collection of a debt.

795. Section 1692e of the FDCPA states that a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of a debt by providing a false representation of character, amount, or legal status of any debt.

796. Subsection 1692e(2) of the FDCPA specifically prohibits a debt collector from making false representations regarding the character, the amount, or the legal status of a debt.

797. Subsection 1692e(5) of the FDCPA specifically prohibits a debt collector from threatening to take action that cannot legally be taken or that is not otherwise intended to be taken.

798. Subsection 1692e(8) of the FDCPA specifically prohibits a debt collector from communicating to any person credit information that is known to be false or that should be known to be false.

799. Subsection 1692e(10) of the FDCPA specifically prohibits a debt collector from making a false representation or otherwise using deceptive means to collect a debt.

800. Section 1692f of the FDCPA states that a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.

801. Section 1692g requires that debt collectors provide written notice of the debt and the consumer's right to dispute it within five days of the initially received debt collection communication.

802. If a consumer requests verification of a debt, the debt collector must seize collection efforts until it provides documents purporting to verify the debt's validity in relation to the subject consumer.

803. If there exists knowledge that a debt is the result of fraud or identity theft, debt collectors must cease collection efforts as well as notify underlying creditors that the debt illegitimately originated.

**Collection Conduct**

804. To state a claim, a plaintiff needs to show that (1) he has been the object of collection activity arising from a consumer debt; (2) the defendant attempting to collect a debt is a "debt collector" under the FDCPA; and that (3) the defendant engaged in a prohibited act imposed by the FDCPA.

805. The Debt Collector's, as well as their Apartments', debt collection correspondences and conveyances received by Plaintiff each misrepresented the legal status of the respective Fraudulent Account debts, which Plaintiff did not owe, and which violated the FDCPA (*as well as the DCSA*).

806. In that regard, the alleged FDCPA (*and DCSA*) violations are attributable, but not limited, to Debt Collectors Genesis, FCO, and Hunter Warfield (who is not a named Defendant in this litigation).

807. The same FDCPA (and DCSA) allegations are likewise attributable to the underlying Apartments, including, but not limited to, Shelby, Abbotts Run, Rollingwood, Assembly Manassas, Assembly Dulles, Lincoln at Fair Oaks, 17 Barkley, the Hadan, Bell Warner Centre, the Moxley, the Montgomery, Crystal Square, Post-Park Maryland, Skyline Towers, the Graham, as well as others.

808. The Apartment Defendants also violated the FDCPA but purporting to verify the underlying debts as Plaintiff's obligation in response to his respective debt verification requests, which facially evidenced that the Fraudulent Accounts ascertainably originated from Lease Fraud.

809. Numerous of these Apartment Defendants failed to provide sufficient debt verification records in response to Plaintiff's document requests, leaving him underinformed, in violation of the FDCPA.

810. Multiple other Apartment Defendants, including Abbotts Run, Rollingwood, Lincoln at Fair Oaks, the Graham, Skyline Towers, Sherwood Towers, and Stratford Towers, never provided Plaintiff with any debt verification records per his request for the same made through their Debt Collectors.

811. Other alleged FDCPA violations occurred by and through: contacting Plaintiff without his permission while knowing he had an attorney, in violation of Section 1692c(a)(2); falsely representing the character, amount, or legal status of the sourced Fraudulent Account debts in violation of Section 1692e(2)(A); communicating credit information to the CRAs that was known or should have been known to be false and failing to communicate to CRAs that he disputed Fraudulent Account Tradelines in violation of Section 1692e(8); as well as falsely representing permissible purposes to obtain Plaintiff's credit data in violation of Section 1692e(10).

812. This conduct constitutes separate violations of the FDCPA, entitling Plaintiff to respective recoverable damages, remunerated attorney fees, and up to $1,000 in FDCPA statutory damages.

813. As the above-alleged FDCPA violations may serve to establish concurrent liability under the DCSA, Plaintiff hereby reincorporates the applicable FDCPA allegations of this cause of action to the Indiana Deceptive Consumer Sales Act cause of action pleaded below.

## NINTH  STATUTORY  CAUSE  OF  ACTION
### INDIANA DECEPTIVE  CONSUMER  SALES  ACT

814. The preceding paragraph allegations are reincorporated and realleged under this cause of action.

815. The DCSA defines a "supplier" as a seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions, which encompasses debt collectors. Ind. Code § 24-5-0.5-2.

816. A person is a supplier "whether or not th[at] person deals directly with the consumer," including debt collectors, which are specifically delineated as "suppliers." *Id*. at 24-5-0.5-2(a)(3).

817. For a supplier to be liable, it must have committed an act that was either *incurable* (predicated by intent to defraud or mislead) or *uncured* (uncured for over thirty days). *Id*. §§ 24-5-0.5-2(7)-(8).

818. The DCSA defines a "consumer transaction" as the "sale, [solicitation], lease, assignment, … or other disposition of an item of personal property, … service, or intangible." *Id*. § 24-5-0.5-2(a)(1).

819. Accordingly, a consumer transaction encompasses transactions involving intangible personal property, and it specifically includes the collection of or attempt to collect a consumer debt. *Id*.

820. A consumer transaction is not limited to just an "exchange for money." *State v. TikTok Inc.*, 245 N.E.3d 681, 693 (Ind. Ct. App. 2024) (finding the term applicable to end-user personal data").

821. The term "sale" within the meaning of a "consumer transaction" therefore includes any type of consideration to affect the transfer of any type of "property." See *TikTok Inc.*, 245 N.E.3d at 693.

822. The DCSA defines a "subject" of a consumer transaction as "the personal property, real property, services, or intangibles offered or furnished in a consumer transaction." *Id*. § 24-5-0.5-2(a)(4).

823. The ban of "unfair, abusive, or deceptive act[s], omission[s], or practice[s] is forward and backward looking, reaching conduct "before, during, or after" a transaction. *Id*. § 24-5-0.5-3(a).

824. Representations, either expressly or by implication, that are false, misleading, or are otherwise deceptive qualify as deceptive acts under this loosely construed statute. See *Id*. § 24-5-0.5-3.

825. Thus, suppliers may be separately liable for "both implicit and explicit misrepresentations." *Id*.

826. In addition, the DCSA delineates specific conduct constituting deceptive acts, which are actionable whether occurring before, during, or after the transaction, whether implicit or explicit, and whether oral, typographic, or electronic, *id*. § 24-5-0.5-3(b), including representations that:

(1)   the subject of a consumer transaction  has  approval, characteristics, or benefits it does not have, which the supplier knows or should reasonably know it does not;

(6)   a specific price advantage exists as to the subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not;

(8)   the consumer transaction does or does not involve rights, remedies, or obligations, if the representation is false and the supplier knows or should reasonably know it;

(10)    the supplier is able to deliver or complete the subject of the consumer transaction within a stated time period, when the supplier knows or should know otherwise;

(20)    violations of the Fair Debt Collection Practices Act

(25)    violations of Indiana Code § 24-5-12-23 (relevant telephone solicitations);

(31)    violations of Indiana Code 24-5-19-11 (deceptive commercial solicitations);

(34)    violations of Indiana Code 24-5-26-3 (enabling and facilitating Identity Deception ).

827.    The DCSA also has a "catch-all" provision making non-disclosures or omissions deceptive acts.

828.    A person harmed in reliance on an uncured or incurable deceptive act may seek the greater of actual damages from that deceptive act or five hundred dollars per each act. *Id*. § 24-5-0.5-4(a)(1).

829.    Where a transaction "is solicited and the solicitation results in a sale," the detrimentally impacted consumer "can sue on either transaction, or both." *Classic Pool & Patio*, 777  N.E.2d  at 1166.

830.    For willful violations, the DCSA enhances liability by trebling actual damages and increasing the presumptive statutory damages to $1,000 for each statutory violation.  *Id*.  § 24-5-0.5-4(a)(2). [11]

831.    Attorney fee recoverability is also statutorily authorized, whether as reimbursement to the prevailing party, § 24-5-0.5-4(a), or as compensatory damages in connection with a violative act.

832.    A court may also void or limit the application of contracts or clauses resulting from deceptive acts and order restitution to be paid over to the consumer.  Ind. Code § 24-5-0.5-4(d).

833.    The IDCSA also provides "other recourse as may be appropriate under the circumstances," such as equitable recovery. *Captain & Co., Inc. v. Stenberg*, 505 N.E.2d 88, 98  (Ind. Ct. App. 1987).

**Apartments**

834.    Under the DCSA, suppliers include lessors and persons who regularly engage in consumer transactions, including landlords and property managers, like the Apartment Defendants. See  Ind. Code 24-5-0.5-2(a)(3);  see also *Horizon Bank v. Huizar*, 178 N.E.3d 326.

835.    The Apartments' actions and inactions in approving the respective Falsified Applications and opening Fraudulent Account fit within the scope of consumer transactions regulated by the DCSA, which explicitly applies to conduct occurring before, during, or after a consumer transaction.

836.    Their respective approvals of the Falsified Applications, without adequate verification, constitutes implicit misrepresentations as to the legitimacy of the lease transactions in violation of the DCSA.

837.    Their failure to acknowledge the fraudulent nature of the procured Fraudulent Accounts, continued explicit and implicit assertions of their validity and collectability, and the assignments of various underlying debts to Debt Collectors, constitutes deceptive misrepresentations violating the DCSA.

---

[11] **Genesis has been held liable for trebled damages for its debt collection conduct**. See *Johnson v. Columbia Debt Recovery, LLC*, 2021 U.S. Dist. LEXIS 113806, at *2 (W.D. Wash. June 17, 2021) (WA Collection Agency Act).

838.   The Apartments' respective failures to detect and subsequently cure the ramifications foreseeably arising from the Fraudulent Account debts constitute uncured deceptive acts per the DCSA.

839.   The respective Apartments and associated Debt Collectors continued pursuit of the Fraudulent Account delinquencies, despite knowledge and/or circumstantial evidence of the underlying Lease Fraud, is probative of an intent to mislead, which are also incurable deceptive acts per the DCSA.

840.   The Apartments' respective failures to implement adequate safeguards to prevent the facility Lease Fraud constitutes unfair practices under the DCSA, which placed an undue burden on Plaintiff to ongoingly dispute the Fraudulent Accounts and mitigate his detrimentally incurred damages.

841.   This conduct and these representations, implicit or explicit, constituted an unfair, abusive, and/or deceptive act and/or business practices in separate violation of the DCSA, which Plaintiff reasonably relied on to his foreseeable detriment.  See  Ind. Code § 24-4.9-3-3.5.

842.   Plaintiff may recover actual damages or $500 per statutory violation from each Apartment and, in the case of intentional, knowing, or reckless violations, Plaintiff may recover respective trebled actual damages or $1,000 in statutory damages in accordance with each separate DCSA violation.

843.   The Apartments intentionally violated the DCSA because they were each aware, should have been aware, and/or acted consciously ignorant toward the fact that they allowed Fraudulent Accounts to be misattributed to a foreseeably and protractedly damaged Identity Theft and Fraud victim.

**Debt Collectors / Apartments**

844.   A violation by a supplier of the FDCPA serves to establish a deceptive act under the DCSA, whether the representation or act is oral, written, or electronic. Ind. Code § 24-5-0.5-3(b)(20).

845.   In *Rock Creek Cap., LLC v. Tibbett,* the court found that a debt collector violated the DCSA by sending multiple inaccurate communications with wrongly conflicting amounts of indebtedness.

846.   Because violations of the FDCPA are deemed deceptive acts and practices under the DCSA, debt collectors who engage in conduct and practices that violate the FDCPA are subject to concurrent liability under the DCSA, and separate acts and practices are each separate violations.

847.   The Debt Collectors, such a Genesis, NCS, FCO, TSI, and Hunter Warfield, as well as each of their Apartment agents, sought to collect invalid Fraudulent Account debts, some of which were also adversely credit reported and all acts of which knowingly or negligently damaged Plaintiff.

848.   Each Hunter Warfield, Genesis, FCO, and TSI-affiliated debt collection letter misrepresented the legal status of the Fraudulent Account debts, as none were enforceable against Plaintiff. Under the DCSA, each of these misrepresentations constitute deceptive acts in violation of the statute.

849.   Sending repeated collection letters to a known or reasonably apparent Identity Theft victim, and despite being informed of the predicate Lease Fraud, constitutes harassment under the FDCPA and thus violates the DCSA's prohibitions of abusive acts and practices in such consumer transactions.

850.   This includes, but is not limited to, sending settlement offers and purported debt verification letters to Plaintiff that misrepresent the enforceability of the Fraudulent Account debts.

851. Assuming $1,000 per statutory violation, the below Apartments who engaged Hunter Warfield for debt collection are alleged liable for each transmitted debt collection correspondence as follows:

$6,000 to the Moxley   (6 or more letters received and relied upon by Plaintiff);

$6,000 to Crystal Square   (6 or more letters received and relied upon by Plaintiff);

$4,000 to the Haden   (4 or more letters received and relied upon by Plaintiff);

$4,000 to Flats at Shady Grove   (4 or more letters received and relied upon by Plaintiff);

$3,000 to Bell Warner Centre   (3 or more letters received and relied upon by Plaintiff);

$2,000 to 17 Barkley   (2 or more letters received and relied upon by Plaintiff);

$2,000 to the Montgomery   (2 or more letters received and relied upon by Plaintiff);

$1,000 to Post-Park Maryland   (1 or more letters received and relied upon by Plaintiff);

$1,000 to the Graham   (1 or more letters received and relied upon by Plaintiff);  and

$1,000 to Skyline Towers   (1 or more letters received and relied upon by Plaintiff).

852. The Apartments' and Debt Collectors' liability also attaches to their furnishing of derived adverse Tradelines to the CRAs, as well as those CRAs' reporting of the furnished Tradelines, which damaged Plaintiff by misrepresenting him as liable for the fraudulently procured debts.

**CRAs / Tenant Screeners**

853. Governed consumer transactions under the DCSA include the underlying credit furnishing, credit reporting, consumer report procurement, and, thus, the tenant screening transactions at issue.

854. Violations of federal statutes may supplement or serve as supporting evidence of deceptive practices under state law if they reflect conduct that aligns with the DCSA's prohibitions.

855. The required obligations imposed by the FCRA generally align with those mandated by the DCSA, both of which are designed to ensure commercial fairness and cultivate consumer protections.

856. Accordingly, fair and accurate furnishing and reporting standards imposed on the CRAs, including Tenant Screeners and data furnishers, including Tenant Screening Furnishers Credit Furnishers, can be indicative of deceptive practices and thus establish non-preempted DCSA liability.

857. If a claim under the DCSA does not conflict with or duplicate a statutory duty imposed by the FCRA, and a CRA engages in conduct that is deceptive under the IDCSA and not explicitly regulated by the FCRA, a viable, non-preempted DCSA claim can be established.

858. Here, Plaintiff's DCSA claims neither sound in nor implicate the FCRA but state separate claims regarding conduct distinct from conduct regulated by the FCRA.

859. Plaintiff claims violations of his statutory rights, such as protection from invasions of privacy and denied access to statutorily afforded credit and account information, which the DCSA governs.

860. The CRAs, Credit Furnishers, Tenant Screeners, and the Tenant Screening Furnishers, as suppliers under the DCSA, committed respective deceptive acts and unfair practices, including  by making and recording unauthorized inquiries, impermissibly using consumer report data, reporting

Fraudulent Account Tradelines, and failing to reasonably (re)investigate the disputed items of information, which misrepresented Plaintiff's credit records, credit history, and creditworthiness.

861. The Apartment Defendants, by impermissibly procuring and/or using consumer reports, holding responsibility for establishing the underlying criteria for screening rental applications, blindly relying on Tenant Screening Reports to approve the Falsified Applications, procuring Fraudulent Accounts from those applications, and/or furnishing the underlying unpaid debt information to the applicable CRAs through enlisted Debt Collectors, are alleged liable under the DCSA for each of their respective deceptive, unfair, and possible unconscionable actions, omissions, and practices.

862. These "supplier" Defendants also did not reasonably [re]investigate Plaintiff's Lease Fraud disputes, cannot arbitrarily require dispute investigation-facilitating documents, did not rely on reliable sources of information, and did not follow the FCRA, in processing and handling Plaintiff's Lease Fraud disputes, which is alleged to have respectively violated the DCSA.

**Interrelated Conduct**

863. For those Defendants that responded to Plaintiff's Lease Fraud disputes, as a general matter, each acknowledged that: (a) it will [re]investigate the disputes in accordance with applicable law; (b) the furnishers of information are reliable sources of information; (c) a locally filed law enforcement or submitted FTC report is needed to block and suppress the disputed information; and/or (d) that protecting against fraud and safeguarding Plaintiff's privacy and information is important to them.

864. These Defendants' respective representations related to their respective dispute handling conduct and practices were misrepresented and/or falsely stated because what was represented by them did not occur, sub-standardly occurred, and/or was an inadequate implemented practice in and of itself.

865. These Defendants that received notice of and responded to Plaintiff's Lease Fraud disputes therefore made false, and/or deceptive, and unfair representations regarding their dispute handling conduct and practices, which Plaintiff detrimentally relied upon by largely fruitlessly preparing and issuing Fraud disputes as well as by enlisting counsel intervention to rectify the caused harms.

866. By acting inconsistent with their statutory obligations and their own data privacy assurances, the respective Defendants committed deceptive acts and unfair practices, which injured Plaintiff, who detrimentally relied on them acting in accordance with what the law required. See *Lamarr v. Goshen Health Sys., Inc.*, 2024 Ind. Super. LEXIS 107, *26-27 (that defendant made PII protection assurances but disclosed PII to third parties sufficiently states a DCSA claim).

867. These failures by the respective Defendants to adhere to mandated procedures aimed at ensuring confidentiality, privacy protection, fairness, and informational transparency in consumer transactions contravened the DCSA's prohibitions against abusive conduct and unfair practices.

868. As a proximate result of the Defendants' deceptive, unfair, and/or unconscionable acts, omissions, and practices, Plaintiff incurred divisible actual and pecuniary loss arising from his detrimental reliance on each Defendant's explicit and/or implicit misrepresentations that they would protect his identity, safeguard against fraud, and rectify is diminished and misattributed credit records.

869. Defendants' deceptive and unfair acts and practices thus "[left] [Plaintiff] worse off than he would have been [if not for the IDCSA violations]." See *Hoosier Contractors*, 212 N.E.3d at 1242, entitling him to statutory and actual damage recovery under the DCSA. See *id*. § 24-5-0.5-2(a)(6).

## TENTH STATUTORY CAUSE OF ACTION
### INDIANA CRIME VICTIM'S RELIEF ACT

870. The preceding Complaint paragraph asserts are hereby reincorporated as if fully realleged below.

**Property Loss**

871. "Property" is defined as "anything of value," including but not limited to, personal property, intangibles, digital data, contract rights, and signatures. Ind. Code § 35-31.5-2-253.

872. "Personal identifying information" is defined as information that, in combination with other non-personally identifying information, would identify an individual. *Id*. § 35-37-6-2.5.

873. Indiana law recognizes Plaintiff's PII as utilizable digitized property in which Plaintiff has a non-physical, valuable property interests and rights.

874. Indiana law also recognizes a protected privacy interest in Plaintiff's credit history and score. See Ind. Code § 23-2.5-1-26 ("personal information" includes credit histories and credit scores).

875. Plaintiff therefore possesses a property right and interest in his underlying PII and credit-related data , both of which possess intangible proprietary value (collectively, the "Misused Property").

876. Plaintiff incurred proximate pecuniary loss from Defendants' respective conduct, which deprived him of and diminished his underlying Misused Property.

**Aiding / Abetting**

877. "A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense." See Ind. Code § 35-41-2-4 (aiding, inducing, or causing an offense).

878. Aiding and abetting liability may attach to a person who knowingly participates in or permits itself to be used in a fraudulent scheme. *Lei Shi v. Yi*, 921 N.E.2d 31.

879. An accomplice can be charged as a principal even if the evidence only establishes that he or she was an accomplice. *Marshall v. State*, 621 N.E.2d 308, 1993 Ind. LEXIS 116 (Ind. 1993).[12]

880. Imputed liability can be inferred from a lack of resistance to an act in conjunction with the course of conduct before, during, and after its commission. *Echols*, 722 N.E.2d 805, 2000 Ind. LEXIS 12.

881. Aiding, inducing, or causing an offense is a basis for asserting liability as to the underlying offense.

882. This liability extends to the failed detection of the Falsified Applications, misuse of consumer reports generated from those applications, ignorant reliance on Tenant Screening Reports to approve those applications, and failure to verify the mismatched data before furnishing it to CRAs.

**Predicate Liability**

883. The Apartment Defendants, by failing to verify the legitimacy of the Falsified Applications, blindly approving the them, opening Fraudulent Accounts in relation to them, assigning delinquent debts from them to Debt Collectors, and not rectifying the foreseeable problem, such as by alerting Plaintiff as the victim, thereby enabled and/or aided the below statutory predicate acts.

---

[12] An accomplice "who acts in concert with another" who commits acts constituting the elements of a crime is as liable as a principal for all acts that are a natural and probable consequence of the conduct. *Tynes v. State*, 650 N.E.2d 685.

884. Other applicable Defendants, by making unauthorized inquiries for Plaintiff's credit reports, impermissibly disclosing and benefiting from Plaintiff's consumer reports, effecting Tenant Screening Report transactions under Plaintiff's PII, and thus substantially contributed to the opened Fraudulent Accounts and connected lease activity, also are aiders and/or enablers.

**Receipt of Stolen Property** (Ind. Code § 35-43-4-2)

885. A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive any part of its value or use, commits theft. Ind. Code § 35-43-4-2.

886. Intent to deprive the use or benefit of property may be inferred from unauthorized possession and under the totality of the circumstances. *Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 2011 U.S. Dist. Lexis 4591 (S.D. Ind. 2011) (addressing conversion of emails from a laptop).

887. Theft, or receipt of stolen property, is not limited to an actual "taking" as receiving stolen property is sufficient to impose liability. See *Atkins*, 499 N.E.2d 1180, 1986 Ind. App. LEXIS 3157.

888. The receipt and use of Plaintiff's misappropriated PII constitutes receiving stolen property under Indiana Code § 35-43-4-2 and therefore establishes predicate act liability under the CVRA.

**Statutory Conversion** (Ind. Code § 35-43-4-3)

889. A person who knowingly or intentionally exerts unauthorized control over property of another person commits statutory conversion. Ind. Code § 35-43-4-3.[13]

890. A person engages in conduct *intentionally* when it is a conscious objective to do so" and engages in conduct *knowingly* when aware of a high probability of doing so. *Id*. § 35-41-2-2(a) and 2(b).

891. Unauthorized control can thus be exerted by enabling or overseeing the activity at underlying issue.

892. The unauthorized control of Plaintiff's PII and exclusive control over his compromised credit data was predicated by perceived awareness of a high probability that he was an Identity Theft or Fraud victim, which constitutes statutory conversion to the extent shown by a preponderance of evidence.

**Counterfeiting — Forgery** (Ind. Code § 35-43-5-2)

893. Counterfeiting is where a person knowingly/intentionally makes or utters a written instrument that purports to have been made by, or by the authority of, another person. Ind. Code § 35-43-5-2(a)(1).

894. Forgery is where a person, with intent to defraud, makes, utters, or possesses a written instrument that purports to be made by, or by the authority of, another person. *Id*. § 35-43-5-2(b).

895. Forgery can encompass two distinct and independent crimes: the making of and the uttering of a forged written instrument. *Jordan v. State*, 502 N.E.2d 910, 1987 Ind. LEXIS 817 (Ind. 1987).[14]

---

[13] To "exert control over property" is to "obtain, take, carry, …, conceal, abandon, sell, convey, encumber, or possess property, or to … extend a right to property." Ind. Code § 35-43-4-1(a).

[14] To "make" a written instrument means to "prepare, complete, counterfeit, copy, reproduce, or alter any written instrument in whole or in part." Id. § 35-43-5-1(m).

To "utter" a written instrument means to 'issue, authenticate, transfer, publish, deliver, sell, transmit, present, or use' such an instrument. Id. § 35-41-1-27. To utter a written instrument is therefore to use or misrepresent a forged instrument, such as the Falsified Applications, as genuine. See *Gresham*, 412 N.E.2d at 118.

896. One who aids, induces, or causes another to commit counterfeiting or forgery is subject to the same potential liability as that of the direct offender. *Ralston*, 412 N.E.2d 239 (Ind. Ct. App. 1980).

897. Here, the Falsified Applications constitute counterfeited instruments, which the Apartment Defendants possessed and disclosed to the respective Tenant Screeners for leasing purposes without following their own internal applicant screening and data privacy policies and procedures.

898. The presented Falsified Applications under Plaintiff's falsely assumed identity also constitutes forgery, which was aided and/or caused by the Apartments' head scratching approvals of them.

899. This separate interconnected conduct aided and enabled the statutorily proscribed acts of counterfeiting and forgery as contemplated by Indiana Code Section 35-43-5-2.

***Identity Deception*** (Ind. Code § 35-43-5-3.5)

900. Identity deception is when a person, with intent to harm or defraud another, knowingly or intentionally obtains, possesses, transfers, or uses identifying information to be another person.

901. If a victim of identity deception resides in Indiana, it is then presumed that the conduct that is the lack of the victim's consent occurred in Indiana. See Ind. Code § 35-41-1-1.

902. By permitting leases to be opened under Plaintiff's PII after approving Falsified Applications that should have been known to be falsified, the Apartment Defendants enabled the Identity Theft, which directly facilitated the subsequent serially committed Lease Fraud.

903. By failing to follow and/or implement adequate identity verification, tenant screening, and/or fraud prevention measures, the respective interconnected conduct of the Apartment, Furnisher, and CRA Defendants directly and/or indirectly enabled the Identity Theft as well as aided the Lease Fraud.

***Statutory Fraud*** (Ind. Code § 35-43-5-4)

904. Statutory fraud applies to any person who makes false or misleading statements, creates false impressions, possesses or alters documents with intent to obtain property or benefits, and/or engages in schemes to commit fraud. See Ind. Code § 35-43-5-4.

905. Indiana law imposes liability on parties who knowingly permit themselves to be used as enabling channels in connection with fraudulent activities. See *Eastern Trading Co.*, 229 F.3d 617 at 624.

906. The Apartments' failures to detect the Falsified Applications, the CRAs' facilitation of them becoming approved, and the resulting procurements of Fraudulent Accounts, the Apartment, CRA, and Tenant Screening Furnisher Defendants aided the Lease Fraud, whose respective reasonable knowledge of the underlying fraudulent conduct may be effectively inferred.

**CVRA Liability**

907. The CVRA—Indian Crime Victim Relief Act—defines "person" as an individual, corporation, limited liability company, partnership, firm, association, or organization. Ind. Code § 35-43-9-2.

908. The CVRA governs Defendants and disallows them from shifting fault to Plaintiff, one another, or non-parties. *Ind. Bell Tel. Co. v. Ward*, 2005 U.S. Dist. LEXIS 12939 (S.D. Ind. June 24, 2005).

909. The CVRA provides relief to persons who incur a pecuniary loss as a result of enumerated violations of the provisions of Article 43 of Indiana's Criminal Code. See Ind. Code § 34-24-3-1.

910. The CVRA is triggered by a violation of a statutorily proscribed predicate act, which must be proved by a preponderance of the evidence. *Leapers*, 203 F. Supp. 3d 969, 973 (S.D. Ind. 2016).

911. The CVRA permits recovery of trebled pecuniary damages caused by a committed predicate act, a reasonably attorney's fee, and other allowed expenses. See *id*. §§ 35-43, 35-45-9; 35-46-10.

912. CVRA liability for caused pecuniary loss may be imposed jointly and severally, "regardless of the degree of [each Defendant's] participation." See *SJS Refractory Co.*, 952 N.E.2d at 75.

913. Liability under the CVRA does not displace the tort causes of action that are alleged below by this Complaint. See *LeSEA, Inc.*, 2021 U.S. Dist. LEXIS 204033, at *8 (N.D. Ind. Oct. 21, 2021).

914. The CVRA applies to the alleged facts of this case and the underlying conduct of the Defendants, without regard to any conduct occurring outside of Indiana. See Ind. Code § 35-41-1-1(a)-(d).

915. The Apartments disclosed Falsified Applications with Plaintiff's falsified PII to Tenant Screeners.

916. The Tenant Screeners disclosed Plaintiff's PII per the Falsified Applications the involved CRAs.

917. The CRAs impermissibly returned Plaintiff's consumer reports to the involved Tenant Screeners.

918. The Tenant Screening Reports were relied upon by the Apartments to open Fraudulent Accounts.

919. The Fraudulent Accounts incurred delinquency balances under Plaintiff's misappropriated PII.

920. Certain of these delinquent Fraudulent Accounts were assigned by Apartments to Debt Collectors.

921. Those Debt Collectors dunned Plaintiff, encumbered his time, and diminished his credit records.

922. Plaintiff resulting incurred pecuniary loss, including out-of-pocket and credit-related damages.

923. As such, Plaintiff is entitled to recourse against the respective Defendants, including but not limited to, trebled actual damages and remunerated attorney fees under Indiana Code § 34-24-3-1.

## ELEVENTH STATUTORY CAUSE OF ACTION
### INDIANA ANTI-RACKETEERING STATUTE

924. Each preceding paragraph assertion is reincorporated hereunder as if restated and realleged below.

925. Under Indiana law, aiding and abetting liability applies to those who knowingly or intentionally assist in the commission of a crime, such as Defendants, whose interconnected and coordinated conduct enabled the underlying Lease Fraud, which subjects them to aiding and abetting liability.

926. Under Indiana's RICO statute, liability for committing "corrupt business influence" arises from knowing or intentional conduct or participation in the activities of an "enterprise" through a "pattern of racketeering activity." See Ind. Code 35-45-6-2.

927. Liability under Indiana's RICO statute may also be predicated by aiding and abetting liability in connection with knowingly or intentionally participating in such a pattern of racketeering activity.

928. A person/entity employed by or associated with an enterprise who knowingly conducts or participates in its activities via this proscribed pattern thereby commits corrupt business influence.

929. To establish statutory liability, the plaintiff must prove: that (1) the defendant was employed or associated with an enterprise; that (2) the defendant conducted or participated in the enterprise's activities; and that (3) such participation occurred through a pattern of racketeering activity.

930. An enterprise encompasses any group associated in fact, whether or not it is a legal entity, which has a structure and goals separate from the predicate acts themselves.

931. Racketeering activity encompasses committing, attempting to commit, conspiring to commit, and/or aiding or abetting the receipt of stolen property (35-43-4-2), statutory conversion (35-43-4-3), forgery (35-43-5-2), identity deception (35-43-5-3.5), and statutory fraud (35-43-5-4).

932. A pattern of such activity encompasses two or more incidents of racketeering activity occurring with a five-year period that are interrelated by intent, result, accomplice, victim, or method of commission, which poses a threat of continued criminal activity.

933. To be entitled to recourse under the statute, a plaintiff must show foreseeably sustained injury as a natural consequence of a person's participation or involvement in the racketeering enterprise.

934. The Apartment, Tenant Screener, Furnisher, and CRA Defendants' coordinated actions demonstrate an association-in-fact enterprise by virtue of their interconnected housing rental, tenant screening, credit reporting, and assigned collection activity in Indiana and across state lines.

935. Their coordinated acts, including approvals of Falsified Applications, unauthorized control over and misuse of Plaintiff's PII and consumer reports, opening of resulting Fraudulent Accounts, and their subsequent assignment to debt collection constitutes receipt of stolen property, statutory conversion or aiding it, as well as the aiding of forgery, statutory fraud, and identity deception.

936. These acts are interrelated by intent, method of commission, and result, and they each occurred within the statute's applicable five-year period statute of limitations period.

937. The continuity of these underlying practices and their resulting threat of continued criminal activity further support the existence of a pattern of racketeering activity under the facts of this case.

938. Each Defendant played a specific and divisible role in furtherance of this racketeering enterprise.

939. The Apartments failed to follow internal guidelines, thereby failed to detect the facially Falsified Applications, and instead blindly relied on enlisted Tenant Screeners to process and approve them.

940. The CRAs enabled the Fraudulent Accounts from the Falsified Applications by impermissibly permitting Tenant Screeners access to Plaintiff's credit reports on behalf of respective Apartments.

941. The outsourced Tenant Screening Furnishers supplied inaccurate and compromised data to the Tenant Screeners, who integrated this unreliable data within their Tenant Screening Reports.

942. Certain Apartments assigned delinquent Fraudulent Accounts to Debt Collectors, who pursued Plaintiff for payment on the unpaid Fraudulent Accounts, some which became furnished to CRAs.

943. These alleged actions demonstrate Defendants' knowing participation in the enterprise's activities.

944. These interconnected actions are indicative of a consciously coordinated pattern of racketeering activity predicated by the receipt (*id*. § 35-43-5-4) and conversion (*id*. § 35-43-4-3) of Plaintiff's Misused Property, the enabled commission of forgery (*id*. § 35-43-4-3) and statutory fraud (*id*. § 35-43-5-4), and the facilitation of undetected identity deception (*id*. § 35-43-5-3.5).

945. Accordingly, the Apartment, Tenant Screener, Tenant Screening and Credit Furnisher, CRA, Debt Collector, and other third-party data provider Defendants collectively constitute a racketeering enterprise under Indiana's RICO statute, and their interrelated but divisible conduct satisfies the statutory requirements for a pattern of racketeering activity, which proximately damaged Plaintiff.

946. Plaintiffs' divisibly incurred damages from this pattern of racketeering activity include diminishment in value of his Misused Property, out-of-pocket costs, Identity Theft and Fraud mitigation expense, diminished credit scores and creditworthiness, lost contemplated credit and money earning capacity, and lost ability to control his misused PII and unrectified credit profiles.

947. As such, Plaintiff constitutes an aggrieved person as contemplated by Indiana's RICO statute and is thus entitled to available statutory recourse in connection with his proximate incurred damages.

## TWELFTH CAUSE OF ACTION
### APARTMENT NEGLIGENCE

948. Each preceding paragraph allegation is reincorporated hereunder as if restated and realleged below.

**NEGLIGENT ENABLEMENT OF IDENTITY DECEPTION**

949. Under Indiana law, a negligence claim is established by showing: (1) a duty owed to [him], (2) a breach of [that] duty by [a defendant] allowing [its] conduct to fall below the applicable standard of care, and (3) compensable injury [to Plaintiff] proximately caused by [that] breach of duty.

950. Businesses have a common-law duty to exercise ordinary and reasonable care in the conduct of their operations for the safety of others whose injuries should reasonably have been foreseen or anticipated. *WEOC, Inc. v. Niebauer*, 226 N.E.3d 771, 778 (Ind. 2024).

951. Indiana follows the Restatement (Second) of Torts section 302, which imposes a duty on anyone who affirmatively acts to act reasonably—"by taking the affirmative act of collecting the PII, [Defendants] assume a duty to maintain that information in a reasonable manner." *Id*.

952. That duty "includes protecting against the unauthorized disclosure and thus the wrongful appropriation of [Plaintiff's] PII. Rogers v. Martin, 63 N.E.3d 316, 325 (Ind. 2016).

953. A duty owed to Plaintiff has thus been established in accordance with this negligence claim. See, e.g., *McLaughlin v. Taylor Univ*., 2024 U.S. Dist. LEXIS 172249, at *5 (N.D. Ind. Sept. 23, 2024) (finding that defendant owed plaintiffs a duty to keep their personal identifying information safe).

954. This is the case "whether [Defendants] have a direct contract relationship with the actual Plaintiff or not." See *Webster v. Bradford-Scott Data, LLC*, 2025 U.S. Dist. LEXIS 30291, at *19 (N.D. Ind. Feb. 20, 2025) ("[I]f you are going to collect it, you better (reasonably) protect it.").

955. This duty to protect Plaintiff's PII has also been assumed. See *Lamarr v. Goshen Health Sys., Inc*., 2024 Ind. Super. LEXIS 107, *9 (derived duty from disclosed privacy policy that acknowledged an assumed duty to protect personal identifying information but, here, did not follow that duty).

956. Redressable harm that is traceable to the negligent conduct is also established. See, i.e., *In re Horizon Healthcare Servs. Data Breach Litig*., 846 F.3d 625, 640 (3d Cir. 2017) (the unauthorized dissemination of private information is "the very injury that FCRA is intended to prevent"); *id*. at 236 ("unlawful disclosure of legally protected information" constitutes "a clear de facto injury").

957. Here, each Apartment Defendant assumed a duty to protect Plaintiff's PII, and to not misappropriate it, pursuant to their respective internal tenant screening and informational security policies, which were not followed because, if otherwise, the Fraudulent Accounts would not have originated and, thus, Plaintiff's would not have incurred traceable privacy and other damages.

958. The respective Apartment Defendants' failures to detect Falsified Applications, assignments of Fraudulent Accounts to Debt Collectors, and misuses of Plaintiff's misappropriated PII and credit history data constitute breaches of foreseeable duties owed to Plaintiff under Indiana law.

959. As an initial matter, the respective Apartment Defendants expressly and/or implicitly assumed foreseeable duties to safeguard Plaintiff's compromised PII per the applicable standards of conduct subsumed within the respective Apartments' informational security and tenant screening policies.

960. These same Apartment Defendants breached their duties of care to ensure the accuracy, verifiability, and legitimacy of the Falsified Applications in failing to implement adequate fraud protection and applicant verification measures, which would have detected the Lease Fraud.

961. These respective failures by the Apartment Defendants facilitated the creation of Fraudulent Accounts , which directly harmed Plaintiff's credit and background screening history profiles.

962. This alleged negligence is further compounded by the foreseeability of harm resulting from the undetected Identity Theft and the unrectified Lease Fraud, which the Apartments perpetuated.

963. Yet all but one known Apartment community directly notified Plaintiff of a submitted Falsified Application whereas the apparent  rest of them failed to notify Plaintiff of the detectably fraudulent activity, depriving Plaintiff of the opportunity to mitigate the harms that they themselves caused.

964. Regarding the Apartments that engaged Debt Collectors, they also assumed a separate duty to act commercially reasonably in safeguarding Plaintiff's PII and identity misattributions rather than further misappropriate Plaintiff's PII and identity by assigning underlying debts to collection.

965. The respective assignment of Frauudlant Accounts to Debt Collectors without proper investigation demonstrates a reckless disregard for truth, which not only perpetuated the harms occasioned by the initial Identity Theft but subjected Plaintiff to additional financial and reputational damages.

966. Regarding the Apartments that directed Debt Collectors to furnish Fraudulent Account Tradelines to the CRAs, those Debt Collectors and Apartments breached foreseeable duties owed to Plaintiff, which caused him damage, including but not limited to perceived diminished creditworthiness.

967.  Accordingly, Plaintiff is entitled to "assert [his] negligence-based claims [against these Apartment Defendants by virtue of his] private information [being] mishandled." *Z.D. V. Cmty. Health Network*, 237 N.E.3d 527, 538 (Ind. 2023); see also *Lamarr v. Goshen Health Sys., Inc.*, 2024 Ind. Super. LEXIS 107, *7 (compensability of the diminished value of private health-related data).

968.  Plaintiff's proximate caused damages include, but are not limited to, the opportunity to control his PII and rectify his credit standing , invaded privacy from the ongoing unauthorized disclosures of that credit-related data, out-of-pocket costs from fruitlessly attempting to prevent, detect, and recover from the Identity Theft, perpetuated Lease Fraud, and such's caused subjection to unlawful debt collection and negative credit reporting impairment, as well as lost time and opportunity costs from generating commercial brokerage income and securing pre-approved mortgage financing.

**PER SE NEGLIGENCE**

969.  The unexcused violation of a statute or ordinance constitutes negligence per se if the provision (1) protects the class of persons in which the plaintiff is included and (2) protects against the type of harm that has occurred as a result of the violation.  See *Gresser*, 160 N.E.3d at 191.

970.  A per se negligence claim may also be predicated by the assumption of a duty that was not acting in accordance with, such as the tenant screening and data privacy policies at issue om this case.

971.  Here, the respective Apartment Defendants expressly and/or implicitly acknowledged the obvious duty to safeguard private, personal information by virtue of their data security and applicant screening policies, which set a standard of conduct for them to follow, which they did not do, and which enabled the Lease Fraud and Plaintiff's corollary harms, thus breaching their internal policy guidelines and, as such, their corresponding foreseeable duties owed to Plaintiff.

972.  The DCSA may serve as a basis for a per se negligence claim.  See *Outzen*, 2021 U.S. Dist. LEXIS 44862 at *49. In this regard, the Apartment Defendants are alleged to have violated the DCSA's proscription against unfair, deceptive, and unconscionable acts and/or practices and, as such, that alleged conduct may serve as a basis for their alleged negligence per se liability to the extent that the sought statutory recovery under the DCSA is not duplicative of the per se negligence recovery.

973.  The FTC Act ("FTCA") may also serve as the basis of a negligence per se claim, which, under Section 5, prohibits "unfair . . . acts or practices in or affecting commerce."  15 U.S.C. § 45 (prohibits unfair or deceptive acts and practices in commerce, including consumer privacy violations caused by improper data collection, use, and disclosure).

974.  FTCA violations are proven upon a showing of (1) fraud, (2) bad faith, (3) a public policy violation, and/or (4) oppression, which does not require that a consumer be deceived and/or defrauded, only that the company's actions are conducive to an outcome of a consumer being defrauded, in which case the company is also liable for any violative acts of its employees, representatives, and agents.

975.  And a "[f]ailure to maintain reasonable and appropriate data security [over] sensitive personal information can constitute an unfair method of competition in commerce in violation of the Act". In re Equifax, Inc., Customer Data Sec. Breach Litig., 362 F.Supp.3d 1295, 1327 (N.D. Ga. 2019).

976.  Any tangible or intangible invasion of a legally protected interest may constitute "injury" within the meaning of FTC Act Section 5(n). See Kochava Inc., 2023 U.S. Dist. LEXIS at *13 (a company could cause substantial consumer injury by selling sensitive data to the wrong third parties hands).

977. As such, the Apartment Defendants' respective conduct violated the DCSA's and the FTCA's prohibition against unfair and/or deceptive acts and/or practices by failing to maintain reasonable and appropriate security measures over Plaintiff's compromised PII, which these Apartment misattributed to the Fraudulent Accounts in the first place, before misappropriating that PII to the CRA credit reports, Tenant Screeners, and implicated Debt Collectors, which caused Plaintiff to sustain foreseeable injuries, including but not limited to, invasions of his privacy.

978. Accordingly, Plaintiff seeks entitled recourse arising from this alleged conduct that enabled the Identity Theft and Lease Fraud and that resultingly caused and exacerbated his damages.

## THIRTEENTH CAUSE OF ACTION
### INVASION OF PRIVACY

979. The preceding paragraph assertions, as applicable, are hereby reincorporated as if alleged below.

980. Dissemination of information to a third party in which a person has a right to privacy establishes a redressable injury. *Duffy v. Lewis Bros. Bakeries, Inc*., 760 F. Supp. 3d 704 (S.D. Ind. 2024).

981. Privacy invasion includes four separate wrongdoings: [1] intrusion upon seclusion, [2] appropriation of name or likeness, [3] publicity to private life, and [4] false light publicity. See *id.*

982. As the Complaint viably alleges malicious or willful conveyances of defamatory statements about Plaintiff with respect to the applicable Defendants, preemption is avoided under § 1681h(e).

983. Accordingly, the Complaint's invaded privacy causes of action are not subject to the FCRA's preemption provision – Section 1681h(e) – that, in any event, allows invaded privacy claims to proceed when the conduct alleged also concerns negligent or willful FCRA violations.

984. Invaded privacy—by intrusion upon seclusion has been equated to unauthorized intrusions into a person's private credit history. See Persinger, 20 F.4th at 1192 (equating an unauthorized inquiry into a propensity-to-pay score to an unlawful peering into one's mail or bank account).

985. Invaded privacy—by misappropriation of name and likeness—occurs "whenever the defendant makes use of the plaintiff's name or likeness for his own purposes or benefit … even if the benefit sought to be obtained is not a pecuniary one." *Felsher*, 727 N.E.2d 783, 787.

986. Invaded privacy—by public disclosure of private facts has four elements: (1) the information disclosed is private in nature; (2) the disclosure is made to the public; (3) the disclosure would be highly offensive to a reasonable person; and (4) the disclosure is not of legitimate public concern.

987. The respective Defendants' actions in failing to detect Falsified Applications and subsequently assigning Fraudulent Accounts to Debt Collectors resulted in the public disclosure of Plaintiff's private information, including his PII and credit-related information, which was disseminated to third parties, including Debt Collectors, without Plaintiff's knowledge or authorization.

988. Here, "Plaintiff[']s past harm of invasion of privacy, which is traceable to [the Apartment, Furnisher, and CRA] Defendants' alleged disclosure of Plaintiff[']s social security number[] to a cybergang, resembles the tort of publicity given to private life." *Duffy*, 760 F. Supp. 3d at 704.

989. Because this wrongly disclosed information concerning Plaintiff was not of legitimate public concern but was instead private and confidential, the respective Defendants' conduct constitutes invasions of Plaintiff's privacy under Indiana common law.

990. Because Plaintiff's invaded privacy damages are attributable to the respective Defendants' negligent, knowing, and/or intentional underlying conduct, Plaintiff is entitled to compensatory damage recovery from each of them for having proximately caused an invasion of his privacy.

991. Plaintiff's damages include, but are not limited to, materialized Identity Theft mitigation costs, efforts necessitated from attempting to monitor, rectify, and prevent the continued fraudulent use of his PII, and the same's resulting diminution of his credit history, scores, and overall standing.

992. Plaintiff also seeks compensatory damages for out-of-pocket expenses associated with his Identity Theft and Lease Fraud prevention, detection, recovery, and remediation efforts, which should not have needed to be exhausted by him in the first instance.[15]

993. Plaintiff also seeks damages from time lost toward income generation and from allocated time and efforts toward trying to clear up the issues protractedly caused by the conduct of the Defendants.[16]

## FOURTEENTH CAUSE OF ACTION
### COMMON LAW CONVERSION

994. Each preceding paragraph assertion is reincorporated hereunder as if restated and realleged below.

995. Civil conversion is a common law cause of action that arises when a defendant wrongfully exercises unauthorized dominion or control over the property of another.

996. Plaintiff's digitally stored and distributed PII and credit data qualifies as property per Indiana law.

997. Plaintiff had a reasonable expectation of privacy in his converted digital property, which Defendants' respective conduct caused to become misappropriated and diminished in its value.

998. Because Plaintiff has proprietary rights in his convertible personal indicative data and credit information, Defendants are subject to liability for converting the same under this cause of action.

999. Defendants knowingly or intentionally exerted unauthorized control over this property in exclusion and defiance of Plaintif's proprietary rights.

1000. This includes failing to verify the legitimacy of the Falsified Applications, opening up derived Fraudulent Accounts, monetizing from consumer report sales, charging illicit nonpayment fees to those unpaid accounts, assigning various of these debts to collection, and reporting them to CRAs.

1001. From this, one or more Defendants intentionally (or blindly so) assumed unauthorized control over Plaintiff's PII and credit data, including via sold consumer reports and Tenant Screening reports.

---

[15] See *Krupa v. TIC Int'l Corp.*, 2023 U.S. Dist. LEXIS 4039, at *2 n.1 (S.D. Ind. Jan. 10, 2023) (explaining that "mitigation expenses qualify as actual injuries . . . when the harm is imminent, and a data breach that has already occurred is sufficiently immediate to justify mitigation efforts").

[16] See also *Johnson v. Nice Pak Prods.*, 736 F. Supp. 3d 639, 643 (S.D. Ind. 2024) ("time and effort spent protecting against and mitigating the risks created by data [theft]") (citing *Remijas*, 794 F.3d at 694 (lost time for remedying materialized fraud harm and increased risk of future fraud); *Lewert*, 819 F.3d at 967 (increased risk of fraud).

1002. Defendants exercised dominion and control over this property was done in a manner that was inconsistent with Plaintiff's proprietary rights and without Plaintiff's authorization or consent.

1003. As a result of this respective unauthorized use and retention of Plaintiff's personal, credit, and financial background data, Plaintiff proximately sustained measurable resulting damages.

1004. As such, Plaintiff is entitled to conversion damages against the applicable Defendants, including for purposes of remedying his derived losses arising from diminished credit scores and worthiness.

## FIFTEENTH CAUSE OF ACTION
### UNJUST ENRICHMENT

1005. Each preceding paragraph assertion is reincorporated hereunder as if restated and realleged below.

1006. Defendants knowingly or recklessly relied on incomplete, fabricated, or inadequately vetted information in processing and approving the Falsified Applications, which led to the opening of respective Fraudulent Accounts under Plaintiff's misappropriated PII and misattributed identity.

1007. When these Fraudulent Accounts went delinquent, they accrued unpaid application fees, returned check charges, and unpaid lease liabilities.

1008. Numerous of these debts were then passed on to Debt Collectors and then inaccurately furnished to CRAs as Tradelines reflecting negative credit misattributions.

1009. As a result, the Apartments charged and retained application and administrative fees; the Tenant Screeners received compensation per application screened; the Screening Furnishers monetized from accessing Plaintiff's consumer data; and the CRAs and Credit Furnishers derived commercial benefit from furnishing and reporting this underlying Tradeline information, accurate or not.

1010. Under Indiana law, when one has been unjustly enriched at the expense of another, and where legal remedies are inadequate, a plaintiff is entitled to restitution and disgorgement of the unjust gains. *Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind. 1991) (unjust enrichment and equitable restitution).

1011. At no time did Plaintiff authorize, consent to, or benefit from the use of his PII and consumer credit information in connection with the Falsified Applications or any of the resulting transactions.

1012. Defendants' retentions of profits derived from the Lease Frau (profits obtained by use of Plaintiff's identity and personal information) was unjust, as it was acquired at Plaintiff's expense and in violation of Indiana's laws protecting privacy, credit reporting, and fair consumer practices.

1013. Plaintiff is not seeking legal damages under this cause of action, but rather equitable restitution in the form of disgorgement of all profits derived by Defendants from their respective monetizations.

1014. Plaintiff has no adequate remedy at law, as such does not adequately account for Defendants' retention of benefits by misappropriation and unauthorized commercial use of Plaintiff's identity.

1015. Therefore, Plaintiff seeks an order of equitable restitution, requiring that each Defendant disgorge all revenues, fees, compensation, or other profits obtained—either directly or indirectly—as a result of processing, evaluating, accepting, reporting, furnishing, or otherwise monetizing any applications, accounts, or tradelines that included Plaintiff's misappropriated PII.

## JURY DEMAND

In accordance with Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury as to all triable issues in accordance with the Complaint's pleaded causes of action.

## PRAYER FOR RELIEF

WHEREFORE, in accordance with the preceding Complaint allegations, Plaintiff, Seth Cameron Virgil, respectfully requests judgments in his favor and awarded monetary and equitable relief from and against each Defendant, including reimbursed pre-litigation and post-filed litigation attorney's fees and costs and respective recovery of actual (and trebled) damages, statutory (and enhanced) damages, and punitive damages, specifically including but not limited to:

Per the Fair Credit Reporting Act (15 U.S.C. § 1681 *et seq*.):
Statutory damages of up to $1,000 per impermissible consumer report furnished, obtained, used, and/or redisclosed, together with actual damages, including causative downstream damages flowing from those unauthorized and misattributed uses of Plaintiff's reports;

Statutory damages of up to $1,000 per inadequately employed policy that enabled the disclosures of Plaintiff's consumer reports. See *id*. §§ 1681e(a), 1681e(b), and 1681e(e);

Statutory damages of up to $1,000 per furnished Fraudulent Account Tradeline and corresponding item(s) of information, including sourced fraudulent addresses seeded by the approved Falsified Applications and connected Tenant Screening Reports;

Statutory damages of up to $1,000 per reported Tradeline, sourced item of information, and employed policy that contributed to such adverse reporting, together with actual damages;

Statutory damages of up to $1,000 per unreasonable (re)investigation of each disputed item of reported information in response to Plaintiff's received Fraud block demands and/or Identity Theft disputes, together with protracted actual damages;

Statutory damages of up to $1,000 per denied right to access requested consumer file disclosures in order to investigate, rectify, and attempt to mitigate the Identity Theft, Lease Fraud, and caused credit, reporting, and collection conduct, together with actual damages;

Punitive damages commensurate with the degree of intentionality, knowingness, willful inadvertence, and/or egregiousness predicating the alleged FCRA violations.

Per the Indiana Deceptive Consumer Sales Act (Ind. Code § 24-5-0.5):

Statutory damages of up to $1,000 per deceptive, unfair, and/or unconscionable act, omission, and/or practice (trebled where willful), together with attorney's fees and costs;

Statutory damages of up to $1,000 per deceptive consumer report inquiry, procurement, furnishment, and/or use and for each unfairly implemented underlying practice or policy;

Statutory damages of up to $1,000 per deceptively approved Falsified Application and each derived Fraudulent Account, assigned collection account, and furnished/reported Tradeline;

Statutory damages of up to $1,000 per each deceptively, unfairly, and/or unconscionably furnished, reported, and improperly (re)investigated Fraudulent Account Tradeline item;

Statutory damages of up to $1,000 per act or practice violating Indiana Code § 24-5-0.5-3.

Per the Indiana Crime Victims' Relief Act (Ind. Code § 34-24-3-1):

Statutory or actual damages, including enhanced and treble damages, for each originated Fraudulent Account and preceding impermissible  consumer report-related transaction;

Statutory or actual damages, including enhanced and treble damages, for each debt collection account tied to a Fraudulent Account, each Frauudlant account assignment to a Debt Collector, and each attempted debt collection occurrence, together with costs and fees;

Statutory or actual damages, including enhanced and treble damages, for each furnished, reported, and unreasonably (re)investigated Fraudulent Account Tradeline item.

Per the Indiana Corrupt Business Influence Statute (Ind. Code § 35-45-6):

Treble damages per caused or aided predicate act commission, including statutory conversion, statutory Fraud, identity deception, and dealing pursuant to false pretenses.

Per the pleaded Common Law Tort and Equitable Claims:

Damages from the negligently, willfully blindly, or intentionally enabled and/or aided Lease Fraud, which proximately and foreseeably caused protracted materialized harm to Plaintiff ;

Damages arising from caused or contributed to pecuniary, privacy, and reputational losses;

Proximate caused damages arising from the conversions of Plaintiff's Misused Property.

Disgorgement of monetized financial gains from Defendants' respective tortious conduct.

Respectfully submitted,

/s/ James Louis Policchio

James Louis Policchio  (34737-49)

**JL POLICCHIO LAW LLC**

james@jlouislaw.com; 317.779.9919

**Counsel For Plaintiff**