**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| SETH CAMERON VIRGIL | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:25-cv-01641 |
| | ) | |
| EXPERIAN INFORMATION SOLUTIONS INC. | ) | |
| ET AL. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS YARDI SYSTEMS, INC. AND RENTGROW, INC.'S MOTION TO DISMISS OR ALTERNATIVELY SEVER**

Plaintiff Seth C. Virgil, by counsel, hereby responds to Defendants "Yardi" Systems, Inc. and "RentGrow," Inc.'s Motion to Dismiss or Alternatively Sever (or, the "Motion") as follows::

## I. INTRODUCTION

Defendants Yardi and RentGrow seek to evade accountability for their role in an identity theft scheme that ravaged Plaintiff's credit. Yardi (a property-management technology company) and its subsidiary RentGrow (a tenant screening Consumer Reporting Agency) furnished Plaintiff's credit reports **dozens** of times to facilitate fraudulent apartment leases – without any permissible purpose and in blatant disregard of obvious red flags. Those impermissible credit pulls enabled impostors to open multiple bogus lease accounts in Plaintiff's name, resulting in collection debts and derogatory tradelines that wrecked his credit and finances. The Complaint details these unauthorized tenant-screening inquiry events and the downstream havoc it caused, easily satisfying federal pleading standards. The Motion to Dismiss, or alternatively to Sever, should be fully denied for the reasoning below.

***First***, the Complaint pleads viable claims under the Fair Credit Reporting Act ("FCRA") against both RentGrow and Yardi. RentGrow, acting as a "reseller" CRA, violated FCRA §§

1681b and 1681e by obtaining and redistributing Plaintiff's credit information for rental applications that were transparently fraudulent – conduct a court in this District recently found sufficient to sustain FCRA claims even at summary judgment. Yardi, as RentGrow's parent company and provider of the integrated screening platform, is properly named and potentially liable given its close involvement in the tenant screening operations. At minimum, Yardi's relationship to RentGrow raises factual issues not resolvable pursuant to a Rule 12(b)(6) motion.

***Second***, Defendants' wrongs are not merely technical – they inflicted concrete harm. Plaintiff's credit reports now reflect numerous collection accounts traceable to the fake leases their screenings approved, aggregating over $40,000 of spurious debt. His credit score plummeted ~50 points, costing him thousands in higher mortgage interest and forcing him to spend time and money on remediation. These injuries underscore why FCRA provides for actual, statutory, and punitive damages – all of which are implicated by Defendants' violative conduct.

***Third***, Defendants' timeliness and misjoinder arguments lack merit. The FCRA's statute of limitations runs from when a violation is discovered, and here key facts about RentGrow's hidden role only came to light through diligent investigation and disclosures in 2023. Plaintiff filed suit well within two years of discovering Defendants' FCRA violations, satisfying 15 U.S.C. § 1681p. As for joinder, Yardi and RentGrow are part of the same series of transactions – the 2022 identity-theft rental spree – and share common questions of law and fact with each other (and the other co-Defendants). Rule 20 is liberally construed to promote judicial efficiency, and severing these closely intertwined claims would waste court resources and risk inconsistent outcomes. In any event, Rule 21 makes clear that, here, misjoinder is not grounds for dismissal. Because Plaintiff's Complaint is sufficiently pleaded, timely, and properly joined, the Court should deny Defendants' unfounded and trivializing Motion and allow the claims to proceed.

## II. STATEMENT OF FACTS

Plaintiff Seth Cameron Virgil is a fraud victim whose identity was stolen and used to apply for dozens of apartment leases in 2022. At all relevant times, Plaintiff lived in Indianapolis, Indiana, renting the same apartment unit there. Unbeknownst to him, an unknown impostor (or impostors) misappropriated his personal identifying information – including his name, Social Security number, and date of birth – and began electronically submitting fabricated rental applications to out-of-state apartment complexes. These bogus applications all listed an outdated Chicago address (925 W. Huron St.) as the applicant's residence, even though Plaintiff had long since moved to Indiana. The applications also contained other glaring inaccuracies or omissions. In short, they were classic "red flag" indicia of identity fraud. Instead of catching this fraud, various entities enabled it. Numerous property management companies ("the Apartments") blindly accepted the applications at face value and ran background checks on the "applicant" (Plaintiff's identity). These Apartments outsourced the credit and background screening to third-party Consumer Reporting Agencies – including Defendant RentGrow, Inc., a tenant-screening CRA owned by Defendant Yardi Systems, Inc. RentGrow operates a platform marketed as Yardi's "resident screening" or "ScreeningWorks" service, which assembles credit reports and other records into tenant screening reports for landlord clients. In this fraud scheme, RentGrow and other screening CRAs served as "resellers" of credit data: they pulled consumer reports about Plaintiff from the big credit bureaus (Experian, Equifax, TransUnion) and repackaged that data into their own screening reports. Each time RentGrow furnished a report on Plaintiff, it was required by law to ensure the request was for a permissible purpose and to identify the end-user (the landlord) to the source CRA. But, as alleged, RentGrow failed in these duties. It treated the fraudulent applications as legitimate and repeatedly procured and resold Plaintiff's credit reports.

Between April and October 2022, at least 43 tenant-screening inquiries on Plaintiff's credit were made through RentGrow. Across all screening companies involved, there were over fifty (50) such inquiries in that six-month span. RentGrow's inquiries alone spanned numerous apartment complexes in Virginia, Maryland, and other states where Plaintiff never applied. For example, on April 13, 2022, RentGrow (under its code name "RENTGROW/BEACON") obtained Plaintiff's Equifax credit report in connection with an application at "Crystal Square" apartments in Virginia. Throughout April and May 2022, RentGrow pulled Plaintiff's report for a litany of complexes – BLVD Ansel, The Park at Arlington Ridge, Abbotts Run Apartments, Enclave at Box Hill, Park + Ford, Sawyer Flats, West Broad, View Ballston, Ovation at Park Crest (Ravens Crest), Bell Stonebridge, Seasons at Cherry Creek, and more. The pattern continued into the summer: RentGrow furnished reports for Garfield Park (June 7), The Montgomery (June 28), Bell Fair Oaks and 17 Barkley (June 30), The Elms at Laurel Park (August 11–12), San Regis Apartments (Aug. 30), The Moxley (Aug. 31), Springwoods at Lake Ridge, Brookdale Apartments, and Bridgeyard Apartments (all on Sept. 1), among others. None of these inquiries were initiated by Plaintiff – they were all triggered by falsified rental applications submitted by the identity thief. Yet RentGrow's system treated each as a routine "Resident Verify" request and pulled Plaintiff's credit without any further verification.

Each of RentGrow's credit pulls lacked a permissible purpose under the FCRA. A consumer report may only be furnished for limited purposes (such as a tenant screening if the consumer applied for rental housing). Here, Plaintiff never applied for these apartments; the applications were bogus. Thus, RentGrow had no lawful authorization to access or disseminate Plaintiff's credit file in connection with them. The obvious "red flags" – e.g. an applicant using a past Chicago address while seeking dozens of apartments in MD/VA – should have caused RentGrow to pause and verify before furnishing any report. Equifax's records show an

"unusually high volume" of soft inquiries by RentGrow, all associated with an address that did not match Plaintiff's known Indy address. These suspicious facts indicated that the reports "would not be used for a permissible purpose," yet RentGrow (and the CRA) ignored them. In doing so, RentGrow failed to implement basic procedures to flag or block the invalid inquiries.

Notably, when RentGrow obtained Plaintiff's credit data from Equifax, it failed to disclose the true end-users (the apartment properties) as required. Equifax's consumer disclosure shows each inquiry generically as coming from "RENTGROW/BEACON" with no apartment name listed. In other words, RentGrow did *not* transmit the identity of the actual landlord or rental property to Equifax for any of these inquiries, as FCRA § 1681e(e) mandates. Every entry from April–September 2022 in Equifax's log for "RentGrow/Beacon" is missing the property name – a glaring omission. This violated RentGrow's reseller duty to "provide to the consumer reporting agency from which it obtains [the report]… the identity of the end-user and each permissible purpose certified" for the inquiry (§ 1681e(e)(2)(A)). By concealing the actual end-users (e.g. *Brookdale Apartments – Drucker & Falk* on 9/1/22) from Equifax's records, RentGrow impeded detection of the serial fraud and further breached its compliance obligations.

Each impermissible screening report that RentGrow furnished was delivered to the requesting Apartment, which, in most cases, approved the fraudulent lease. The Apartments relied on the clean credit reports (Plaintiff's excellent credit history) and RentGrow's screening output to decide that the "applicant" was qualified. One by one, these landlords entered leases with the impostor posing as Mr. Virgil. The impostor naturally never paid rent or fees, leading the Apartments to incur losses on the lease accounts. Those delinquent accounts ("Fraudulent Accounts") were then assigned to outsourced or internal debt collection – and in many instances, the unpaid balances were reported onto Plaintiff's credit files as adverse tradelines.

Plaintiff promptly disputed the fraudulent tradelines with the credit bureaus beginning in earlier 2023 (and lasting throughout September 2024). These remediation attempts continued because derogatory entries remained for many months. By May 2024 – nearly a year after Plaintiff's first disputes – an Equifax report still showed a $12,000 collection by "Genesis Credit Mgmt" for an apartment (Ravens Crest) that was opened via the identity thief. Only after further legal prodding did Equifax finally delete certain fraudulent accounts. Even then, other erroneous data (like the Chicago address) lingered on Plaintiff's credit file. This fallout from the rental fraud spree has been protracted and devastating for Plaintiff's credit reputation. Defendants Yardi and RentGrow were at the flashpoint of it, and their lax screening allowed the fraudulent leases to be opened in the first instance, leading to a cascade of misreported credit-related items. The below patterns illustrate how Defendants' violations causally translated into concrete harm:

**Exemplar 1 – Abbotts Run Apartments (Alexandria, VA) – April 20, 2022:** *On April 20, 2022, RentGrow furnished a credit report on Plaintiff in connection with an application at Abbotts Run Apartments – an apartment complex where Plaintiff never applied or resided. RentGrow pulled Plaintiff's Equifax file and provided it to the property (managed by co-Defendant Drucker + Falk), enabling the impostor to secure a lease in Plaintiff's name. The lease quickly went unpaid. By late 2022, a debt collector called Genesis Credit Management was reporting a ~$12,000 collection account for "Abbotts Run" on Plaintiff's credit report. Plaintiff disputed this fraudulent debt in early 2023, yet Equifax refused to block it without a police report. Equifax instead contacted Genesis, which verified the debt as if valid – twice – despite the clear proof of identity theft Plaintiff had provided. A year after the RentGrow inquiry, in April 2023, that $12k Genesis collection and the associated false address were* still *marring Plaintiff's Equifax file, suppressing his credit score by dozens of points. It was not until mid-2024, after further challenges and a court's intervention, that the Genesis/Abbotts Run tradeline*

*was finally removed. This shows how a single impermissible RentGrow report led to a sizeable fake debt and persisted as a major derogatory mark against Plaintiff for over two years.*

**Exemplar 2 – Persei at Pike & Rose (Rockville, MD) – Summer 2022:** *RentGrow's records show a tenant screening inquiry for "Persei at Pike & Rose" – a luxury apartment in Maryland – associated with Plaintiff on or about mid-2022. In that instance, the impostor secured a lease approval using Plaintiff's identity but only incurred a small balance (around $95 in unpaid fees). Even this minor amount spawned a collection: Columbia Debt Recovery, LLC (d/b/a Genesis Credit Mgmt) reported a $95 collection account for "Persei/Pike & Rose" on Plaintiff's Experian credit report. Thus, a trivial unpaid fee from a lease that Plaintiff never signed turned into yet another derogatory tradeline. It contributed to the cumulative damage to Plaintiff's credit profile. While $95 is small, the presence of multiple collection entries – even for low sums – can severely depress a credit score and raise red flags for lenders. This example underscores that no fraudulent account is de minimis when it comes to credit harm. It also highlights the breadth of properties affected by the scheme, where each time RentGrow kept approving the falsified applications and each time exposed Plaintiff to a new potential collection.*

Seven (7) or more negative collection tradelines are directly traceable to RentGrow-facilitated lease accounts. These include the **Genesis/Abbotts Run $12k** item and the **Columbia/Pike & Rose $95 item** noted above, as well as collections by **National Credit Systems** (for fraudulent leases at ***Crystal Woods*** and ***Centre at Silver Spring*****,** totaling over $27,000) and by **Hunter Warfield** (for fake leases at ***Crystal Square*** and ***The Haden*****,** with balances of $110 and $150). Together, the RentGrow-related derogatory balances exceed **$43,000**. These accounts drove precipitous drops in Plaintiff's credit score – approximately a 50-point hit, which translated into a higher mortgage interest rate (estimated ~$18,000 in extra

interest over the life of a loan). Plaintiff also spent over $3,000 out-of-pocket dealing with the fallout (credit monitoring, identity theft protection, mailing dispute letters, freezing credit, etc.). All of this arose as a foreseeable result of Defendants' failures to safeguard Plaintiff's credit data.

## III. LEGAL STANDARDS

**Rule 12(b)(6) Standard:** To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations sufficient to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor. *Id.*; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. This "does not impose a probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556, but the facts must raise the claim "above the speculative level." *Id.* at 555. In evaluating a 12(b)(6) motion, courts may also consider documents attached to the complaint or central to the claim, as well as matters of public record. Fed. R. Civ. P. 10(c); *Geinosky v. City of Chi.*, 675 F.3d 743, 745-46 (7th Cir. 2012).

**FCRA Liability (15 U.S.C. §§ 1681b, 1681e):** The FCRA imposes rigorous duties on Consumer Reporting Agencies ("CRAs") to protect consumer privacy and ensure accurate, lawful use of credit information. Under 15 U.S.C. § 1681b(f), a CRA may furnish a consumer report only for certain "permissible purposes" – such as for credit, employment, insurance, or legitimate tenant screening – and only to a party who certifies such purpose and intends to use the report accordingly. Furnishing a report without a permissible purpose (or where the CRA has *reason to believe* no permissible purpose exists) is a direct violation of § 1681b and a willful violation can trigger liability under § 1681n. Separately, 15 U.S.C. § 1681e(a) requires every

CRA to "maintain reasonable procedures" to avoid violations of § 1681b and to limit furnishing of reports to the purposes listed. This includes verifying the identity of each requester, the intended use of the information, and refraining from furnishing a report when "there are reasonable grounds for believing that the report will not be used for a permissible purpose." *Id.*

A CRA's failure to implement such procedures – for example, ignoring obvious signs of identity theft or illegitimate use – gives rise to liability under § 1681e(a). Finally, if the CRA is a "reseller" of consumer information (one who obtains a report from another CRA and provides it to a third party), it must also comply with § 1681e(e). That section obligates a reseller to disclose the end-user's identity and permissible purpose to the source CRA (or to the consumer upon request) and to ensure the report is only resold for a permissible end use. These provisions work in tandem to prevent what happened here: consumer reports being obtained under false pretenses.

**Permissive Joinder (Rule 20) and Severance (Rule 21):** Rule 20(a)(2) allows multiple defendants to be joined in one action if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." This rule is construed liberally to promote judicial economy.

Rule 20's purpose is to permit the broadest possible scope of action consistent with fairness – allowing all reasonably related claims for relief by or against different parties to be tried in a single proceeding. *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000) ("the purpose of Rule 20(a) in permitting joinder in a single suit of persons who have separate claims, albeit growing out of a single incident or series of events, is to enable economies in litigation…"); *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966) (joinder of claims and parties "strongly encouraged"). Courts apply a flexible "logical relationship" test to determine if

claims arise from the same series of transactions – absolute identity of events is not required, only a substantial overlap of operative facts. *See, e.g.*, *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974) (Rule 20's transaction requirement "would permit all reasonably related claims… to be tried in a single proceeding"). The second prong (common question of law or fact) is generally easily met in cases with related factual scenarios or legal theories.

**Rule 21 (Severance)** provides that misjoinder of parties "is not a ground for dismissing an action." Fed. R. Civ. P. 21. If parties are misjoined, the remedy is to sever or drop the misjoined party, on just terms, at the court's discretion. *Id.*. But severance is considered a drastic remedy, appropriate only to prevent prejudice or jury confusion in highly dissimilar cases. Even when severance is ordered, the typical course is to proceed with separate actions rather than to dismiss the claims outright. In evaluating a motion to sever, courts weigh whether the factors favoring joinder (common facts, overlapping evidence, consistent adjudication) outweigh any potential prejudice or juror confusion from a joint trial. *See, e.g., Treece v. Perrillo*, No. 1:17-cv-00406, 2018 WL 3815004, at *2 (S.D. Ind. Aug. 10, 2018) (emphasizing the preference to resolve related claims together when feasible). The party seeking severance bears the burden of showing that joinder is so prejudicial or unworkable that separate trials are necessary. Absent such a showing, Rule 20's liberal joinder policy counsels in favor of one proceeding.

## IV. LEGAL ARGUMENT

### 1. The Complaint Plausibly Alleges FCRA Violations by RentGrow (and Yardi)

Defendants Yardi and RentGrow argue that Plaintiff's FCRA claims are inadequately pleaded, but the detailed facts in the Complaint easily surpass the *Twombly/Iqbal* threshold. Accepting those facts as true – as the Court must on a Rule 12(b)(6) motion – Plaintiff has more than plausibly alleged that RentGrow violated 15 U.S.C. §§ 1681b, 1681e(a), and 1681e(e) by furnishing credit reports without a permissible purpose, failing to employ reasonable anti-fraud

procedures, and flouting its reseller duties. The Complaint also sufficiently links Yardi to these violations, given Yardi's ownership and operation of the RentGrow screening platform. Indeed, a recent decision in this District (involving the same Plaintiff and a credit bureau) has *already found* that virtually identical allegations of impermissible rental inquiries and ignored fraud indicators present a triable FCRA case – let alone a plausible claim at this stage. Defendants cannot credibly contend that Plaintiff's FCRA theory is speculative or unsupported; it is well grounded and documented and it aligns with the misconduct the FCRA seeks to remedy.

**A. RentGrow Furnished Reports Without a Permissible Purpose (FCRA § 1681b).** The Complaint alleges that RentGrow obtained and disseminated Plaintiff's consumer reports for a string of falsified apartment applications – transactions for which there was no lawful "permissible purpose" under the FCRA. Section 1681b(a) enumerates an exclusive list of circumstances where a CRA may furnish a report, such as in response to a consumer's credit application, employment background check, tenancy application, etc. Crucially, if the consumer did not actually initiate the transaction or authorize the inquiry, there is no permissible purpose. Here, Plaintiff never applied for any of the rental housing in question; an identity thief did so without Plaintiff's knowledge or consent. Thus, when RentGrow retrieved Plaintiff's credit file and sold it to each landlord, that act was *ipso facto* impermissible – Plaintiff's report was used for someone else's purpose, not a use authorized by law.

The pattern of RentGrow inquiries, on its face, indicates illegitimacy: Over a half-year span, RentGrow made 53 separate inquiries for 53 different apartment complexes across multiple states, all for "applicants" using the same stolen PII and a bogus address. It is implausible that a single individual legitimately applied to 53 apartments in rapid succession, and indeed he did not – Plaintiff was the victim of serial identity theft. By averring this extensive and inexplicable

inquiry activity, the Complaint presents exactly the sort of factual scenario where a jury (and thus the Court at this stage) can infer the absence of any bona fide permissible purpose. As Judge Barker observed in the Equifax case, such an "unusually high volume of inquiries" coupled with glaring discrepancies (like the address mismatch) are "suspicious circumstances" indicating the credit reports were not to be used for a lawful purpose. The summary judgment order issued in Plaintiff's collateral action against Equifax (*Case No. 1.23-cv-01488*) held, in part, that evidence of these rental-screening pulls, when viewed favorably to Mr. Virgil, could lead a reasonable factfinder to conclude no permissible purpose existed and that Equifax (the source CRA) had "reasonable grounds to doubt" the legitimacy of the inquiries. If Equifax can be liable for failing to catch the issue, then certainly RentGrow can, and should, be accountable.

RentGrow's liability under § 1681b is straightforward—a CRA "shall not furnish" a consumer report except under listed circumstances, none of which obtain here. At minimum, Plaintiff has pled facts making it plausible (indeed likely) that those inquiries were not for any permissible purpose. RentGrow willfully ignored obvious signs of fraud and treated the reports as for a "tenant screening" use, when in fact the applications were fabricated – meaning the reports were essentially obtained under false pretenses. There is no exemption in the FCRA that shields a CRA who unwittingly or negligently furnishes a report to an impostor or for an impostor's application. On the contrary, FCRA has long recognized a private right of action when a credit report is obtained for an impermissible purpose or by misrepresentation (*see* 15 U.S.C. § 1681q; *Armstrong v. Kroger Co.*, 621 F.2d 934, 937 (8th Cir. 1980)). The Complaint's pleaded facts align with such a claim. Defendants' motion papers (to the extent they argue no FCRA violation is stated) largely ignore these specifics. They cannot dispute, on a Rule 12 motion, the veracity of Plaintiff's factual allegations that he never applied for those apartments

and that the inquiries were unauthorized. As those facts must be taken true, the conclusion follows that RentGrow violated § 1681b by furnishing reports without a permissible purpose.

**B. RentGrow Failed to Maintain Reasonable Procedures and Reseller Duties.** In addition to the direct furnishing violations, Plaintiff pleads RentGrow failed to employ the mandatory procedures designed to prevent exactly such impermissible uses of consumer information. Under § 1681e(a), RentGrow was required to have systems in place to verify the identity of those requesting Plaintiff's report, to obtain certifications of permissible purpose from its clients, and – critically – to withhold the report if there was reason to believe the use might be impermissible. The Complaint catalogues numerous red flags that RentGrow should have heeded as "reason to believe" something was amiss: an avalanche of inquiries for out-of-state apartments, each using an address that did not match Plaintiff's file, often submitted in clusters on the same days. Such facts, as the Equifax order noted, could lead a jury to find that a CRA violated § 1681e(a) by not detecting or reacting to the pattern. RentGrow's procedures (or lack thereof) allowed it to continue processing inquiry after inquiry without any human intervention or flag, effectively rubber-stamping the impostor's application spree. No "reasonable procedure" would countenance one person applying to five apartments in a day across multiple cities without at least triggering an identity verification step. Yet RentGrow, allegedly, did nothing – it did not question the requests or contact Plaintiff, nor did it even utilize obvious internal safeguards (for example, flagging multiple inquiries with mismatched addresses in a short period). This states a valid § 1681e(a) claim. See *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) ("The reasonableness of a CRA's procedures is normally a jury question," and at pleading stage plaintiff need only allege facts that, if true, show procedures were not reasonable).

And as a "reseller" of credit reports, RentGrow had specific duties under § 1681e(e) – duties it breached. The Complaint notes that Equifax's own inquiry records did not list the actual end-users (the apartment names) for RentGrow's pulls. Instead, Equifax files generically showed the inquirer as "RENTGROW/BEACON," making it impossible from Equifax's side to tell who ultimately received the report. FCRA § 1681e(e)(2)(A) requires a reseller CRA like RentGrow to inform the source CRA of "the identity of the end-user" and the permitted purpose for which the report is furnished. By failing to do so, RentGrow concealed material facts from Equifax and frustrated Plaintiff's later attempts to trace the inquiries. Indeed, Plaintiff only learned which properties corresponded to RentGrow's inquiry dates by cross-referencing other records and the timing of events – Equifax's disclosure alone did not name a single apartment. This omission is the harm that § 1681e(e) is aimed at preventing. The Complaint alleges this violation plainly, and the internal evidence supports it (every RentGrow inquiry from April–Sept. 2022 is noted as "No property named in Equifax disclosure"). Defendants have no credible argument that RentGrow complied with § 1681e(e). They might claim that they obtained certifications from the Apartments and thus believed the purpose was tenant screening (a permissible purpose). But even if they did, that does not excuse ignoring obvious fraud signals (**§ 1681e(a)** issue) nor failing to properly identify the end user to the bureau (**§ 1681e(e)** issue). At best, Defendants raise factual defenses (e.g. "we had procedures" or "we relied on customer certifications") – none of which can be considered at the motion-to-dismiss stage, and which are unavailing given the red flags alleged. See *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 569 (E.D. Ky. 2006) (whether CRA's reliance on subscriber's certification is reasonable is a question of fact).

The MSJ Order in *Virgil v. Equifax* underscores that the existence of those suspicious circumstances (53 inquiries, address mismatch) creates a triable issue under § 1681e(a). If Equifax – which did have some procedures (certifications, etc.) – could still be found potentially

liable for not catching the fraud, then RentGrow, who propagated the inquiries, surely can be held liable for not having better checks. In fact, Equifax argued it *did* obtain certifications from these tenant screening companies claiming the pulls were for "collection" purposes (as Equifax's defense). The Court pointed out that even so, there remains doubt whether any permissible purpose truly existed. Translated to RentGrow's context: even if RentGrow's landlord clients certified they had an "applicant" and permissible purpose, RentGrow had reason to doubt the certifications' veracity given the bizarre volume and mismatched data. Their blind reliance on subscriber certifications (if that occurred) would not be "reasonable procedures" as a matter of law under these alleged facts. See *Hinkle v. CBE Grp.,* 827 F.3d 129, 135 (5th Cir. 2016) (CRA cannot escape § 1681e(a) liability by claiming it always trusts subscriber certifications). Plaintiff has adequately pleaded that RentGrow violated both § 1681e(a) and § 1681e(e), and Defendants' motion offers no persuasive reason to dismiss them.

**C. Yardi's Integral Role and Liability Are Adequately Pleaded.** Defendant Yardi Systems, Inc. attempts to distance itself, suggesting it is just a parent company with no involvement. The Complaint tells a different story. Yardi is not a passive investor in RentGrow – it is the architect of an integrated property management and tenant screening system that includes the RentGrow (a/k/a ScreeningWorks/Resident Verify) platform. Yardi acquired RentGrow in 2016 and since then has offered tenant screening as a built-in feature of its "Yardi RentCafe" and property management software suite. The Complaint explicitly alleges that Yardi is the parent of RentGrow and that Yardi's technology (RentCafe, ScreeningWorks) was used to facilitate the background checks at issue. In practical effect, Yardi and RentGrow operated in concert to furnish the unlawful reports. Landlords interfaced with Yardi's RentCafe portal to accept rental applications and then trigger the "ScreeningWorks" reports (which are fulfilled by RentGrow behind the scenes)—a said-to-be "one-stop rental management solutions" for-profit service.

At the pleadings stage, these allegations are sufficient to hold Yardi accountable either directly or vicariously. Yardi can be viewed as having "procured" the credit reports in the sense of causing them to be obtained for its clients – which itself can violate § 1681b if done without a permissible purpose (§ 1681b(f) prohibits any person from obtaining a report on a consumer without a permissible purpose). The Complaint alleges Yardi's software and systems were used to pull Plaintiff's reports under false pretenses. Alternatively, Yardi may be derivatively liable for RentGrow's misconduct under agency principles. It is well-established that a parent corporation directing or participating in its subsidiary's tortious conduct can be liable for same. *See Wigington v. Hill-Soberg Co.*, 396 F.2d 228, 234 (5th Cir. 1968) ("A parent corporation is responsible for the wrongs of its subsidiary where the parent directly participated in the subsidiary's unlawful actions."). Here, Yardi's direct participation is evidenced by its integrated platform and by the fact that the screening product is branded as a Yardi service. Whether Yardi and RentGrow are considered a single unified CRA for FCRA purposes, or Yardi is considered to have aided and abetted RentGrow's FCRA violations, Plaintiff's pleading supports a claim against Yardi. At a bare minimum, it would be premature to dismiss Yardi now – discovery can elucidate Yardi's exact role, control, and knowledge. If, for instance, Yardi knew of systemic issues in RentGrow's screening process or failed to implement identity-theft safeguards in the software, that would bolster willfulness. None of that can be resolved without evidence.

On a Rule 12 motion, the Court's task is simply to ask: has Plaintiff given Yardi "fair notice" of a plausible claim against it? *See Killingsworth v. HSBC Bank*, 507 F.3d 614, 619 (7th Cir. 2007). The Complaint meets that bar by identifying Yardi as a co-actor in providing the screening reports. Yardi's name also appears on some credit inquiries: Equifax logs label certain inquiries as "Resident Verify" (Yardi's screening arm) or similar. In their Motion, Defendants

offered no substantive argument why the FCRA counts fail as to Yardi, apart from contesting the facts. Plaintiff is entitled to prove – through discovery – the extent of Yardi's involvement.

**2. Plaintiff's Claims Are Timely Under FCRA's Discovery Rule.**

Defendants hint that some claims might be time-barred, given the events began in early 2022 and the Complaint was filed in late 2025. This argument fails because the FCRA's statute of limitations did not begin to run until Plaintiff discovered (or reasonably should have discovered) the facts constituting the violation. See 15 U.S.C. § 1681p(1) (FCRA actions must be brought by the earlier of 2 years after the date of discovery of the violation or 5 years after the date of the violation). Here, Plaintiff could not have discovered Defendants' FCRA violations until well after they occurred, due to the secretive and latent nature of the conduct. Applying the FCRA's discovery rule, the claims are well within the allowable period.

Plaintiff had no knowledge in real-time (April–Sept 2022) that RentGrow was pulling his credit report dozens of times. Those inquiries were "soft" inquiries that did not show up on credit reports provided to third parties; they were visible only on full file disclosures to the consumer. Plaintiff did not receive an alert or any direct notice of each RentGrow inquiry at the time. It was only later, as fraudulent debts surfaced, that he had reason to obtain his credit file and saw the pattern of inquiries. He did not yet know the full extent or the identities of all parties involved. In particular, the role of Yardi (as opposed to RentGrow) and the specific failure to disclose end-users (1681e(e) violation) were facts that remained obscured. Throughout 2023, Plaintiff engaged in investigations, disputes, and pieced together information. Equifax produced audit logs and internal records in discovery in 2024 (as part of Plaintiff's separate case against Equifax) which shed more light on how RentGrow's inquiries were recorded and how no end-user information was listed. Equifax's audit file production, for example, confirmed the 53 inquiries and the generic labels used, confirming to Plaintiff that RentGrow never passed along

the end-user names. These revelations in 2023–2024 were essential for Plaintiff to realize the full scope of RentGrow's and Yardi's misconduct. Before that, he knew his identity was stolen and that some screening happened, but not that (1) RentGrow had failed to vet the inquiries or (2) had hidden the end-user info from Equifax – both critical elements of the 1681e claims.

Under § 1681p, the two-year clock starts when Plaintiff discovered the "violation that is the basis for such liability." For the § 1681b and 1681e(a) claims, that would be when he discovered that his report had been furnished without authorization and that the CRA lacked reasonable procedures. One could argue Plaintiff discovered the fact of unauthorized inquiries by late 2022 (when he saw many inquiries on his disclosure). Even then, he might not have known they were impermissible rather than, say, some kind of permissible collection review – recall that Equifax told him the inquiries were for "rental collections" (a supposed permissible purpose). It wasn't until he dug deeper (and Equifax's MSJ process played out) that it became clear none of those were valid collection inquiries but were fraud. The Court in the Equifax case noted it "remains unclear" whether any permissible purpose was established – underscoring that this was not a fact obvious to Plaintiff initially. Likewise, for the § 1681e(e) claim, Plaintiff did not discover until receiving discovery materials or responses that RentGrow never identified the landlords to Equifax. Only with those audit logs could he assert that violation confidently.

At the least, the question of when Plaintiff discovered or should have discovered these FCRA violations is factual and not suitable for resolution on a motion to dismiss. *See Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1238 (10th Cir. 2015) (FCRA discovery rule inquiry is fact-specific; dismissal on limitations is only appropriate if the complaint itself conclusively shows the claim is time-barred). Here, the Complaint affirmatively pleads that Plaintiff was diligent and that Defendants' conduct was inherently self-concealing (given the lack of notice

and the misleading coding of inquiries). Defendants have offered no evidence or even argument to the contrary, other than pointing to dates. But raw dates alone don't tell the story – the key is when Plaintiff was reasonably on notice of the violations, which did not happen until within two years of the complaint filing. Also, FCRA's outer 5-year limit, even if the 2-year discovery window were in question, Plaintiff's claims would be timely under this applicable timeframe. As such, Defendants' motion to dismiss on timeliness grounds should be denied. If there is any doubt, the issue should be reserved for summary judgment or trial.

### 3. RentGrow's Screening Failures Caused Fraudulent Debts and Credit Harm

Defendants suggest (implicitly, if not explicitly) that Plaintiff's injuries are too attenuated or that no damages were caused by them. This could not be further from the truth. RentGrow's and Yardi's FCRA violations were the proximate, or a substantial contributor, of a cascade of harm to Plaintiff, and those injuries are recoverable under the FCRA (as actual damages for negligent/willful noncompliance, and as a basis for statutory and punitive damages for willful violations). Defendants' conduct enabled a serial identity theft scheme that left Plaintiff with significant financial and reputational damage. We highlight the causal chain and consequences:

- **Enabling Fraudulent Accounts:** By furnishing credit reports on the imposter's applications, RentGrow conferred unearned credibility on those applications. The Apartments relied on the favorable credit data to approve leases they otherwise might have questioned. But for RentGrow providing Plaintiff's real credit profile, the impostor likely could not have opened so many accounts in his name. Thus, RentGrow's actions were a substantial factor in the creation of each fraudulent lease account.

- **Resulting Debts Sent to Collections:** Once the fraudulent leases were opened and inevitably defaulted, the unpaid balances (rent, fees, penalties) were turned over to **Debt Collectors**. These include agencies like Genesis Credit Management, National Credit Systems, Hunter Warfield, and Columbia Debt Recovery – all Defendants in this case as well. Each Debt Collector pursued Plaintiff for money he did not owe, causing stress and forcing him to spend time to dispute the debts. More concretely, several of them **furnished collection tradelines** to the credit bureaus.

- **Tradelines and Credit Score Impact:** The fraudulent collection **tradelines** appeared on Plaintiff's credit reports starting in mid-2022 and into 2023. At one point, there were at least a dozen false inquiries and numerous collection accounts on his Equifax and Experian reports. This adverse information caused Plaintiff's FICO credit score to drop dramatically (by about 50 points). This drop moved him from an "excellent" credit tier down to a lower tier, which has material effects on interest rates and credit opportunities.

- **Financial Costs from Credit Impacts:** Because of the credit score suppression, when Plaintiff sought to refinance or obtain credit (specifically, a home mortgage), he was offered higher interest rates than he would have if his credit was pristine. An analysis based on his mortgage lender's rate sheet shows that the score drop tied to these tradelines would cost him roughly **$18,000** in additional interest over the life of the loan. This is a concrete, quantifiable loss attributable to the Defendants' conduct. Additionally, Plaintiff was denied or given less favorable terms on other credit products due to the derogatory marks – a classic form of actual damage in FCRA cases. *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (even minimal credit score decreases and the resulting denial of credit or increased cost of credit constitute actual damages under FCRA).

- **Out-of-Pocket Mitigation Costs:** Plaintiff has also spent money on postage, copying, credit monitoring services, identity theft protection services, and even travel expenses in efforts to clear his name. The Complaint estimates these out-of-pocket costs to be in the thousands (approximately $3,000 or more). Such expenses, incurred as a direct result of Defendants' malfeasance, are recoverable actual damages. *See Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604, 611 (6th Cir. 2016) (costs of obtaining credit reports and other expenses to dispute errors are actual damages under FCRA).

- **Emotional Distress and Reputational Harm:** While perhaps less quantifiable in dollars, the distress inflicted on Plaintiff is significant. Being dunned for debts that aren't yours, seeing one's credit reputation ruined, and having to constantly explain to lenders and landlords that you were the victim of identity theft is an emotional ordeal. Courts recognize emotional distress as compensable under FCRA. *See Jenkins v. Equifax Info. Servs., LLC*, 736 F. Supp. 2d 962, 967 (E.D. Va. 2010) (plaintiff's anxiety, stress, and humiliation due to credit inaccuracies are recoverable damages). Plaintiff's affidavit (or testimony) will detail sleepless nights and lost time at work dealing with this mess – all traceable to the cascade RentGrow set in motion.

Here, if RentGrow had said "No" to those suspicious inquiries (or verified them properly), the fraudulent accounts would not exist – hence no collections, no tradelines, no damage. This satisfies even a proximate causation standard. Indeed, the MSJ Order from the Equifax case emphasizes that *Equifax's* failure to stop the impermissible pulls "effectively facilitated a large-scale identity theft or fraud incident." RentGrow's failures are even more proximal: Equifax passively allowed data out, whereas RentGrow actively packaged and

delivered it to the fraudsters' benefit. Defendants might argue that the criminal acts of the impostor or the independent decisions of landlords/collectors are superseding causes. But FCRA holds CRAs responsible for the downstream consequences of releasing credit information improperly, especially when the risk of harm (identity theft leading to credit damage) was entirely foreseeable. In fact, identity theft is a well-known hazard that FCRA's strictures aim to mitigate. When a CRA lapses, it is not unfair to attribute the ensuing harm to that lapse, even if an identity thief set the scheme in motion. As the Complaint alleges, all the players – Apartments, screeners, bureaus, collectors – were part of an "interconnected conduct" that *proximately enabled* the fraud. The harm to Plaintiff was a foreseeable and natural consequence of RentGrow handing out credit reports to fake landlords. One can draw a line from Defendants' FCRA violations to Plaintiff's damages without any unexpected interruption in the chain.

At the pleading stage, Plaintiff need only generally allege that he suffered damages as a result of Defendants' violations, which he has. The Complaint itemizes the types of damages (credit denials/interest, time/money spent, emotional distress) flowing from the fraudulent accounts and tradelines. This more than suffices under notice pleading. Moreover, even if Plaintiff had not incurred substantial actual damages, his claims would still be viable because he seeks statutory damages and punitive damages for willful violations (§ 1681n). The *Virgil v. Equifax* summary judgment order confirmed that actual damages are not a prerequisite for statutory and punitive recovery if willfulness is shown. It noted if a violation is found willful, uncapped punitive damages are available. Here, Plaintiff alleges willfulness, and Defendants' conduct was at least in reckless disregard of the FCRA, given all of the red flags they blew past.

Plaintiff's injuries are real, significant, and legally traceable to Defendants' actions. There is no attenuation: RentGrow's impermissible reports led to fraudulent accounts, which led

to collections and bad credit marks. The causal nexus is tight. To the extent Defendants hoped to minimize the case as one lacking harm, that position is untenable. This also militates against severance – the very overlap of issues among RentGrow, the collectors, and others demonstrates that all are part of one harm-causing series of events that should be addressed together.

**4. Yardi and RentGrow Are Properly Joined; Severance Is Unwarranted.**

Defendants alternatively move to sever Yardi and RentGrow from the rest of the case, contending misjoinder under Rules 20 and 21. This request should be denied because Plaintiff's claims against Yardi/RentGrow arise from the same series of transactions and occurrences as his claims against the other Defendants, and they share numerous common questions. ***Yardi/RentGrow are a central link in the chain of events that the entire lawsuit seeks to redress.*** Severing them would fragment a cohesive narrative, waste judicial resources with duplicative proceedings, and risk inconsistent adjudications on overlapping facts.

Same Transaction or Series: All of Plaintiff's claims stem from an "identity theft rental scheme" that unfolded in 2022. This scheme is a series of connected occurrences: an identity thief applied for apartments (occurrence 1); screening companies (RentGrow, SafeRent, etc.) pulled and provided credit reports (occurrence 2); landlords approved leases and incurred losses (occurrence 3); debt collectors pursued the fraudulent debts (occurrence 4); credit bureaus reported the false information (occurrence 5); and Plaintiff suffered damages (occurrence 6). Far from being disparate or unrelated, these events form a single causal chain. The Seventh Circuit teaches that Rule 20's phrase "same transaction or occurrence" is to be interpreted generously to encompass a logical relationship. *Elmore*, 227 F.3d at 1012. Here, the logical relationship is evident: *but for* the RentGrow inquiries, the fraudulent accounts would not exist; but for the fraudulent accounts, the collections and tradelines would not exist; etc. The claims against Yardi/RentGrow (for unlawful inquiries and lack of safeguards) and, say, the claims against a

Debt Collector (for failing to investigate or reporting a bogus debt) are two sides of the same coin – both address breakdowns in what should have stopped the fraud. Courts routinely find the "same series of transactions" prong met in cases involving identity theft or multi-step schemes, even when different defendants played different roles. *See, e.g., In re TJX Cos. Retail Sec. Breach Litig.*, 524 F. Supp. 2d 83, 92 (D. Mass. 2007) (joinder proper in data breach case).

Defendants may argue that Yardi/RentGrow's conduct (furnishing reports) is separate in time and type from, for example, a debt collector's conduct (reporting a debt). While the nature of the FCRA violation versus an FDCPA violation differs, they are linked by the same underlying fraud incidents. The operative facts – that Plaintiff's identity was used at Abbotts Run, that a report was pulled, that a lease account was opened and went to Genesis, that Genesis reported a debt – will have to be proven with evidence of the identical events regardless of defendant. It would make no sense to try those facts twice (or more) in separate courts or before separate juries. Indeed, much of the evidence (timeline of the fraud, Plaintiff's testimony of what happened, the apartment records, etc.) would be common across all defendants.

<u>Common Questions of Law or Fact</u>: There are multiple common questions here. To name a few: (1) Was Plaintiff the victim of a single identity theft scheme involving these various accounts? (All claims depend on showing the accounts were fraudulent and not actually his – a factual issue common to every defendant.) (2) Did the various defendants' conduct comply with or violate their legal duties in handling that fraud? (This branches into FCRA duties for the CRAs, FDCPA duties for collectors, potentially state law duties – but all share the factual predicate of the identity theft incidents.) (3) What damages were caused and by whom? (Apportionment or joint causation of damage is a common question – each defendant may point to others as the cause, so having them together allows a coherent determination of who owes

what for overlapping harm). Additionally, there are legal questions about willfulness, about interpretation of "permissible purpose" or "reasonable procedures" that, while specific to the FCRA defendants, overlap with how obvious the fraud was – something relevant to the collectors' willfulness in ignoring disputes too.

Rule 20's requirements are thus satisfied: the claims are logically related and share many factual (and some legal) issues. This strongly favors joinder. The purpose of Rule 20 – "to promote trial convenience and expedite final determination of disputes" – would be thwarted by severance. *Mosley*, 497 F.2d at 1332. If severed, we could end up with parallel lawsuits in the same court (or worse, different courts) regarding the same identity theft scenario. That would duplicate witnesses (Plaintiff would have to testify repeatedly about the same facts), duplicate discovery (the credit bureau files might be needed in both cases, etc.), and raise the possibility of inconsistent outcomes (one jury might find the accounts were fraud, another might oddly not, or differing damage awards could result for the same harm). Courts in this Circuit have allowed joinder in analogous situations. *See, e.g., King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 302, 309 (E.D. Pa. 2012) (permitting joinder of claims against a background check company and an employer, arising from same inaccurate report).

No Undue Prejudice or Confusion: Defendants have not articulated any specific prejudice that would result from being tried jointly with the others. Yardi and RentGrow are represented by the same counsel and have been defending this case thus far in coordination with the others (indeed, the record shows joint status conferences, etc.). The legal theories vary (FCRA, FDCPA, state claims), but judges routinely instruct juries on multiple claims. Here, much of the evidence is documentary and not susceptible to emotional bias. If anything, splitting the case would prejudice Plaintiff, who would have to maintain momentum in multiple forums and

potentially face inconsistent findings on the core question of his victimization. The Southern District of Indiana need not hold two (or more) trials when one will do, particularly where discovery will involve similar document sets (e.g., communications between apartments, screeners, and collectors; credit histories; expert testimony on damages).

And even if the Court were to find some misjoinder, the remedy should not be severance now, on the eve of trial or significant deadlines. Under Rule 21, severance is discretionary and should be exercised sparingly. *See Rodriguez v. Pasquarella*, 2019 WL 2411480, at *2 (N.D. Ill. June 7, 2019)* ("Severance… is not to be granted lightly, especially when judicial economy will thereby be sacrificed."). Here, judicial economy would be sacrificed by severance. All defendants are already in this action (case no. 1:25-cv-01641). It is in a relatively advanced stage (motions to dismiss briefing). To sever now would create two parallel tracks, doubling court involvement. Unless there is a compelling reason (and none is shown), the Court should keep Yardi and RentGrow joined with the case. As such, Yardi and RentGrow are properly joined under Rule 20, where severance would undermine the policies of fairness and efficiency that joinder aims to promote. Defendants' motion to sever should thus also be denied.

**5. Misjoinder Is No Basis for Dismissal in Any Event.**

Assuming, *arguendo* that the Court found some misjoinder of parties here, it would not justify dismissing the claims against Yardi or RentGrow. Rule 21 is explicit: "Misjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. The proper remedy would be to drop or sever the parties or claims and proceed separately, not to throw out the claims entirely. Thus, Defendants' Motion to "Dismiss or, in the alternative, Sever" is somewhat incongruous: if their sole gripe were joinder, dismissal is an improper ask. The FCRA claims against Yardi and RentGrow are substantively valid (as shown above). Dismissing them on a procedural misjoinder theory would contradict the Federal Rules. This matters because it appears Defendants hoped the

Court might simply dismiss them from the case by labeling the joint filing improper. But that outcome is not supported by fact or law. If misjoinder truly were an issue (again, it is not), the relief would be to sever Yardi and RentGrow into their own case, where Plaintiff would continue to pursue the same claims. Dismissal with prejudice would be unwarranted. The reasonable route is to keep the claims intact here, deny the motion, allow the case to move forward, and to afford Plaintiff any justifiable relief for having to respond in kind.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court **DENY** Defendants Yardi Systems, Inc. and RentGrow, Inc.'s Motion to Dismiss or, in the Alternative, to Sever. The Complaint is well-pleaded and states valid claims under the FCRA against these Defendants. The claims are timely and properly joined with the related claims arising from the same identity theft scheme. Defendants should be required to answer the Complaint and defend on the merits. Plaintiff further requests any such other relief as the Court deems just, including retention of jurisdiction over all joined claims and parties in the interest of judicial economy.

Respectfully submitted,

*/s/ James Louis Policchio*

James Louis Policchio (34737-49)
**JL POLICCHIO LAW LLC**
james@jlouislaw.com; 317.779.9919

*/s/ Kyle Schumacher*
PO Box 558, Spring Branch, TX 78070
kyle@schumacherlane.com
***Counsel For Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on **November 28, 2025**, I filed a copy of the foregoing electronically with the Clerk of the Court. As authorized by Fed. R. Civ. P. 5, notice of this filing will be sent to all attorneys of record through the Court's Electronic Case Filing System.

Respectfully submitted,

*/s/ James Louis Policchio*
James Louis Policchio (34737-49)