**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| SETH CAMERON VIRGIL | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:25-cv-01641-MPB-MJD |
| | ) | |
| EXPERIAN INFORMATION SOLUTIONS INC, ET AL. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO MISSION ROCK RESIDENTIAL, LLC AND ABBOTTS RUN ASSET MANAGEMENT, LLC'S MOTION TO DISMISS**

Plaintiff Seth Cameron Virgil ("Plaintiff"), through counsel, submits his Brief in Opposition to Defendants Mission Rock Residential, LLC and Abbotts Run Asset Management, LLC (collectively, "Defendants")' Motion to Dismiss and, in support of the same, states as follows:

## I. INTRODUCTION

An impostor's fraudulent rental application (April 20, 2022) bearing Plaintiff's Indiana identifiers was "accepted" through Defendants' tenant-screening pipeline, resulting in a lease debt of $14,661 opened in Plaintiff's name. Defendants turned that fraud-derived debt over to their collection agent, Genesis/Columbia Debt Recovery ("Genesis"), which furnished the derogatory account to consumer credit bureaus – even appearing twice on Plaintiff's credit reports under two different account numbers (ending ***7366 and ***7368) for the same lease. Despite Plaintiff's numerous fraud alerts, disputes, and notices – including a notarized FTC identity theft report sent to Genesis in March 2023 – the negative item persisted and even reappeared after supposed deletion. Only in October 2023 did Genesis finally submit an automated data form instructing "Delete due to Fraud" for the Abbotts Run account. Defendants' Motion to Dismiss ("MTD") relies on a flawed narrative and unfounded arguments. Defendants contend they had a "permissible

purpose" to pull Plaintiff's credit because they supposedly didn't know the application was fake, and they deny any responsibility as "furnishers" of credit information. But at this stage, Plaintiff's well-pleaded allegations must be accepted as true, and all inferences drawn in his favor. The record already reveals glaring red flags that Defendants ignored and a post-notice reporting pattern inconsistent with an innocent mistake. Indeed, in a parallel case arising from the same identity theft, this Court denied summary judgment to Equifax on permissible-purpose and reasonable-procedures claims, citing "obvious indications of fraud" and "barebones" verification efforts.

That MSJ Order (*Virgil v. Equifax*, No. 1:23-cv-01488) documented the Genesis/Abbotts Run lease account and noted that identity-theft dispute codes were transmitted through the credit bureau's system – underscoring that a furnisher's cursory "all good" response can be unreasonable considering clear fraud evidence. Defendants' jurisdictional and Rule 12(b)(6) arguments are unfounded. Plaintiff states a plausible entitlement to relief under the Fair Credit Reporting Act and Indiana law, and this Court can and should exercise personal jurisdiction given Defendants' purposeful direction of conduct toward an Indiana consumer resulting in harm felt in Indiana. At minimum, if the Court harbors any doubt, Plaintiff should be permitted limited jurisdictional discovery or leave to amend. Dismissal with prejudice – as Defendants request – would be improper on this record, where a concrete identity theft scheme and Defendants' post-notice failures are already well-supported by documentary evidence. The MTD should thus be denied.

## II. FACTUAL BACKGROUND (ABBOTTS RUN IDENTITY THEFT SCHEME)

**A. Defendants' screening process identified Plaintiff as an Indiana consumer – yet approved the fraud**. On April 20, 2022, RentGrow generated a tenant Screening Report – Seth Virgil for the property "Abbotts Run (Z4832)" managed by Defendants. The report's internal alerts plainly flagged Plaintiff's Indiana identity: it listed Plaintiff's primary address in Indianapolis,

Indiana (307 N. Pennsylvania St.) and noted the Social Security number "was confirmed" and "issued in 1992 in IN." Despite these Indiana markers, the application (which used a Chicago, IL address as a current address) sailed through Defendants' system with an "Accept (Standard Deposit)" decision. RentGrow disclaims making the rental decision itself, stating that all criteria and decisions are set by the property manager/owner. Thus, it was Mission Rock/Abbotts Run's responsibility to review the flagged information and detect potential fraud. The green-lighting of this out-of-state application – replete with mismatched addresses and other red flags – shows Defendants' pipeline failed to "detect and prevent fraud" despite tools to do so. Notably, Defendants' own privacy policy acknowledges the use of integrated data vendors (RealPage, Aptexx, etc.) in their operations and touts data analytics used to "help detect and prevent fraud." But, in this instance, Defendants' screening controls did not stop an obvious imposter scenario.

**B. The fraudulent Abbotts Run lease was placed for collection with Genesis, resulting in duplicative credit reporting ( 7366**& 7368**).** After the lease account (opened in Plaintiff's name) went unpaid, Defendants assigned the debt to Genesis on or about December 29, 2022 for collection. Genesis – operating as "Columbia Debt Recovery, LLC d/b/a Genesis Credit Management" – in turn furnished the debt to the credit bureaus. By May 2023, Plaintiff's credit file with Equifax showed two separate collection entries by "GENESIS CREDIT MANAGEMENT LLC", each with the same assignment date (12/29/2022) but with different account numbers ending in 7366 and 7368. Both entries reflected an identical balance of $14,661, indicating they stemmed from the single Abbotts Run lease obligation. This duplicate reporting of one debt under two tradelines is strong evidence of an error in Defendants' and/or Genesis's handling of the account – effectively re-reporting the debt after it had been removed, or reporting it simultaneously under two numbers. Indeed, the account number format

("DLOGMR…7366/7368") corresponds to "Original Creditor: Abbotts Run Apartment Homes" in Genesis's records, confirming that both tradelines traced back to the same lease. Defendants attempt to distance themselves from this credit reporting, but the facts tie them inexorably to it: Abbotts Run was listed as the original creditor, Genesis was merely the collection agent acting on Defendants' behalf, and the consumer reporting agencies received the data with Defendants' knowledge (if not at Defendants' direct instruction). At the pleadings stage, it is more than plausible to infer that Defendants, as the entities for whom the debt was being collected, "transmit[ed] information" about the lease (directly or indirectly) to credit bureaus, making them furnishers under the FCRA

**C. Plaintiff gave clear Indiana-directed notice of identity theft: fraud disputes, attorney correspondence, and a preservation demand – met with a promise (by Genesis) to delete the tradeline**. In early 2023, upon discovering Defendants' false debt on his credit, Plaintiff alerted the credit bureaus and Defendants' agent to the fraud. On March 1, 2023, Plaintiff mailed fraud-block requests and identity theft dispute letters to Experian (a Consumer Reporting Agency), putting Experian (and by extension any data furnishers it contacted) on notice of the identity theft. Thereafter, on March 13, 2023, Equifax (another CRA) issued dispute results to Plaintiff indicating that the disputed collection item was no longer showing on his Equifax file: "THE DISPUTED ITEM IS NOT CURRENTLY REPORTING ON THE EQUIFAX CREDIT FILE." Equifax's follow-up correspondence on March 25, 2023 reiterated that the fraudulent address associated with the lease "has been deleted" and again that "THE DISPUTED ITEM IS NOT CURRENTLY REPORTING." These results suggested that the Genesis/Abbotts Run collection had been suppressed or removed in response to the fraud dispute – at least temporarily. Meanwhile, Plaintiff's counsel independently reached out to Genesis. On March 31, 2023, counsel (writing

from an Indianapolis address) emailed a detailed dispute package to Genesis, including a notarized FTC Identity Theft Affidavit and a letter formally disputing the debt as fraudulent. The letter explicitly identified the creditor as "Abbotts Run Apartment Homes" and demanded immediate suppression of any credit reporting, as well as underlying account records (citing FCRA provisions including 15 U.S.C. § 1681g(e), which governs information available to identity theft victims). In addition, counsel sent preservation-of-evidence correspondence to ensure Defendants and their agents retained all relevant records of this fiasco. Genesis responded within days: in an April 3, 2023 letter, Genesis acknowledged the dispute and assured Plaintiff's counsel that if the provided identity theft documents were received and verified, "the account will be closed, and all data furnished to credit bureaus will be deleted." This writing from Defendants' authorized agent demonstrates two key points: (1) Genesis and Defendants were treating the account as authentically disputed due to identity theft, and (2) they understood their obligation to delete any credit reporting related to the account upon verification of the fraud. It is undisputed that Plaintiff's affidavit and documentation were in order – Genesis does not contend otherwise. As of April 2023, one would expect the Abbotts Run collection to vanish from all consumer reports permanently.

**D. "Fraud deleted" – but not really: the account reappeared, indicating continued or duplicate reporting after suppression**. Notwithstanding Genesis's April 2023 assurance, Plaintiff's credit reports soon told a different story. As noted above, by May 20, 2023, an Equifax single-bureau report showed two Genesis collection entries for the same $14.6k debt. Whether this was a re-reporting of an item that had been previously removed (in violation of FCRA's reinsertion rules) or the belated appearance of a duplicate record that had escaped the initial suppression, the effect on Plaintiff was the same – the fraudulent debt lingered on his credit, damaging his credit score and reputation. The persistence of both tradelines (***7366 and ***7368) demonstrates that

Defendants' post-dispute procedures were deficient. Either Genesis failed to communicate the delete instruction to all credit bureaus, or Defendants (as the data furnisher via Genesis) issued new reports of the debt despite having notice of fraud. Such conduct occurred after Defendants received direct notice of identity theft from Plaintiff's counsel, and thus falls squarely into the realm of post-transaction unfair practices that Indiana's consumer protection law forbids. Moreover, the reappearance of the account underscores the foreseeable harm in Indiana: Plaintiff, an Indiana resident, continued to experience credit denials and distress because the Indiana-related fraudulent debt was erroneously reported anew. Defendants benefited from this continued reporting but yet did nothing to correct it, despite their agent's earlier commitment.

**E. Internal records confirm the eventual fraud deletion instruction**. Ultimately, it was not until October 9, 2023 – roughly six months after Plaintiff's disputes – that Genesis/Columbia processed an official deletion through the credit bureaus' system. An Automated Universal Dataform (AUD) from that date shows an entry for account number dlogmrr003001007368 (the Genesis/Abbotts Run account ending in 7368) with an "AUD Correction Indicator 7: Delete due to Fraud." In other words, at that time the furnisher formally told the CRAs to delete the account as fraudulent. This record is essentially an admission that the account was not legitimate (i.e., it had to be purged for fraud). The question remains why it took so long – and why only after Plaintiff had endured duplicate entries and prolonged credit damage did Defendants and their agents finally do what they promised in April. The e-OSCAR dispute logs and AUD codes are evidence that will be explored in discovery, but even at the pleading stage they corroborate Plaintiff's allegations.

**F. Defendants' operations are data-centric and nationwide, making Indiana harm foreseeable.** Mission Rock is a large property management company that uses centralized digital platforms for leasing and rent collection. Its Privacy Policy reveals that Mission Rock partners

with technology providers 1 to run its business, and that these partners "collect information (including Personal Information) about you through the Services and share it with us." The Policy further states that Mission Rock analyzes user data and employs tools to "help…detect and prevent fraud." In other words, Mission Rock is not a local mom-and-pop oblivious to modern fraud risks; it is a sophisticated operation that intentionally combines data from various sources (across state lines) and specifically professes to guard against identity fraud. Here, Mission Rock and Abbotts Run chose to use a third-party screening company (RentGrow/RealPage) to pull credit on an applicant who — as their own data showed — was tied to Indiana. They then engaged another vendor (Genesis) to collect and report the resulting debt, which they knew (once Plaintiff notified them) involved an Indiana victim of identity theft. As such, Defendants can reasonably expect to be haled into court where the consumer is injured. The harm from a false tradeline on an Indiana resident's credit report is felt primarily in Indiana, where that person lives, works, and applies for credit. By availing themselves of nationwide credit reporting and collection networks, Defendants purposefully directed their activities toward the forum state. The factual record here – from the initial SSN trace showing "issued in IN" to the Indianapolis address on Plaintiff's dispute letters – reinforces that Indiana was at the center of the consequences of Defendants' conduct.

## III. THE EQUIFAX MSJ ORDER UNDERCUTS DEFENDANTS' MTD PREMISES

In *Virgil v. Equifax*, Case No. 1:23-cv-01488-SEB-MJD (S.D. Ind.), this Court recently addressed a closely related scenario on summary judgment. That case involved the same Plaintiff and the fallout from the same identity theft spree, but focused on Equifax's liability as a credit bureau. The Court's Order (dated Nov. 12, 2025) provides critical context that flatly contradicts Defendants' portrayal of events here. First, the Order recounts how over 50 tenant-screening inquiries were made on Mr. Virgil's Equifax credit file in spring 2022 for apartments in VA/MD

– even though Mr. Virgil actually resided in Indiana. The Court noted these as "obvious indications of fraud" (a flurry of out-of-state applications tied to an incorrect address) that Equifax "overlooked." This finding underscores that the underlying rental applications (including the Abbotts Run application managed by Defendants) bore clear hallmarks of identity theft. Equifax's failure to stop those inquiries was deemed potential non-compliance with §1681e(a)'s duty to prevent unauthorized disclosures. The Court similarity found a triable issue under §1681b as to "whether these credit pulls by an identity thief truly had a 'permissible purpose,' since Mr. Virgil never initiated or authorized those rental applications." Notably, the judge characterized this as a novel issue not suitable for summary judgment – meaning a jury will decide if furnishing credit reports on those fraud-driven inquiries (like the one Mission Rock obtained on April 20, 2022) violated FCRA §1681b. This directly undercuts Defendants' argument that their credit pulls were automatically lawful: when a consumer's data is taken and used without consent, permissible purpose is not a foregone conclusion but a fact question. The MSJ Order also examined what happened after Plaintiff alerted Equifax to the fraud. By late 2022 and early 2023, multiple collection accounts from bogus leases (including Abbotts Run) had landed on Plaintiff's Equifax report, contributing to a drop in his FICO score from the 800s to the mid-600s. The Court highlighted evidence that Equifax's dispute handling was perfunctory – Equifax simply forwarded automated dispute verification forms to the furnishers, and the furnishers sent back "verified" responses with little investigation. The Order specifically notes that a furnisher's **"barebones" verification can render a CRA's reinvestigation unreasonable when identity-theft documentation is in play. In Mr. Virgil's case, the dispute records show that Equifax did transmit the fraud dispute code and materials to Genesis (Columbia Debt) regarding the Abbotts Run account. Genesis nonetheless initially responded in a manner indicating the debt was valid – a response belied by

the extensive fraud proof Equifax had. While the Court stopped short of declaring Equifax's conduct willful at summary judgment (especially since Equifax followed its standard ACDV procedure), it left the door open for willfulness and preserved the §§1681e(a) and 1681b claims.

The Order confirms that the Genesis/Abbotts Run debt was indeed part of the identified fraud pattern; it confirms that Genesis received notice of fraud through the ACDV process; and it establishes that whether transactions like these had a permissible purpose is a legitimate, unresolved issue. In other words, a federal judge has already found Plaintiff's core theory – that credit reporting agencies (and by extension, those furnishing to them or using their reports) may violate the FCRA when they fail to screen out an obvious identity theft – to be sufficiently grounded in fact and law to warrant a trial. Defendants' Motion to Dismiss, by contrast, asks the Court to view the same scenario as "implausible" or insufficient as a matter of law. The MSJ Order strongly suggests otherwise. At minimum, it "undercuts" the premise that Defendants were blameless or that Plaintiff's claims are mere speculation. This Court should be guided by the MSJ Order's recognition that identity theft red flags and post-notice lapses are serious matters under the FCRA, not to be swept aside on the pleadings.

## IV. LEGAL STANDARDS

**A. Rule 12(b)(2) (Personal Jurisdiction)**. Where a defendant challenges personal jurisdiction, the plaintiff need only make a prima facie showing of jurisdictional facts to proceed. In the absence of an evidentiary hearing, the court "accept[s] all well-pleaded allegations in the complaint as true" and resolves factual disputes in the plaintiff's favor. To establish specific jurisdiction, a plaintiff must demonstrate: (1) the defendant purposefully directed activities at the forum state or purposefully availed itself of doing business there; (2) the plaintiff's claims arise out of or relate to the defendant's forum-directed activities; and (3) the exercise of jurisdiction is

fair and reasonable. See Defendants' Br. at 6 (acknowledging this three-part test). At this stage, any conflicting evidence or affidavits must be construed in Plaintiff's favor, and the Court may defer final resolution of jurisdictional issues pending discovery if the facts are not clear.

**B. Rule 12(b)(6) (Failure to State a Claim).** To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must draw all reasonable inferences in favor of the plaintiff and may not weigh evidence or resolve factual disputes at the pleading stage. Id. at 679. Defendants concede these standards (see Defs.' Br. at 4) and indeed cite the principle that an "obvious alternative explanation" for the alleged conduct can render a claim implausible. Here, as shown below, Plaintiff's allegations easily meet this threshold for each claim asserted, especially when augmented by the concrete record materials referenced in the Complaint. Defendants' attempts to demand proof or to inject their own version of events ("we didn't know it was fraud!") are premature merits arguments that cannot defeat well-pleaded claims.

## V. ARGUMENT

**A. Specific personal jurisdiction is proper in Indiana because Defendants' conduct was aimed at an Indiana consumer and caused harm in Indiana**. Defendants – companies based in Colorado and California that manage a Virginia apartment complex – argue they have no ties to Indiana. They note they are not registered to do business in Indiana, have no property or offices here, and did not directly solicit Plaintiff in Indiana. But this misses the crux of specific jurisdiction: it is Defendants' intentional actions connecting to Indiana that matter, not general business presence. Here, Defendants purposefully directed their activities at Indiana by processing and approving a fraudulent transaction that they knew (or should have known) was tethered to an Indiana identity. When Defendants ran Plaintiff's credit through RentGrow, they effectively

reached into Indiana – accessing an Indiana resident's credit file (from Equifax/Experian) for a transaction involving an Indiana social security number and prior address. They then facilitated the reporting and collection of a debt that would inevitably impact Plaintiff in Indiana (where he lives and applies for credit). Courts have found purposeful availment when an out-of-state defendant's use of national credit reporting mechanisms causes harm to the forum resident's credit reputation. See, e.g., *Myers v. Asset Acceptance, LLC,* 750 F.3d 910, 915–17 (11th Cir. 2014) (holding that reporting a debt to credit bureaus, knowing it will impact plaintiff's credit in his home state, can establish minimum contacts). Defendants also knew of Plaintiff's Indiana connection early on and continued their course of conduct. The screening report explicitly highlighted Indiana data (address and SSN), putting Defendants on notice that their decision concerned an Indiana person (even if that person was being impersonated). Later, when Plaintiff's Indiana attorney contacted Genesis and when fraud disputes arrived from Indiana, Defendants (through Genesis) communicated back to an Indiana address. Far from being random or unilateral contacts by Plaintiff, these were responsive communications in the context of Defendants' business dealings that had already involved the Indiana-based consumer. In other words, Defendants chose to engage with an individual with clear Indiana ties, and the foreseeable result of their failure to halt the fraud was injury to an Indiana resident. The "relatedness" prong is easily satisfied: Plaintiff's claims directly arise out of Defendants' forum-directed conduct. The claims are about the credit inquiry on Plaintiff's Indiana credit file, the debt collection and reporting activities that harmed Plaintiff in Indiana, and Defendants' failure to correct the record after being notified by an Indiana consumer. Each alleged statutory violation (FCRA and DCSA) stems from those very contacts. Finally, exercising jurisdiction is fair because Indiana has a strong interest in protecting its residents from identity theft and fraudulent credit harm. Defendants, by leveraging nationwide

credit and leasing systems, cannot credibly claim unfair surprise at being called into an Indiana court when their conduct inflicts damage here. The burden on Defendants is minimal. Defendants have "purposefully availed" themselves of the privilege of conducting business in Indiana (albeit electronically and through agents) by virtue of the acts described. If any doubt remains, Plaintiff respectfully requests the opportunity to conduct focused jurisdictional discovery (for example, to uncover contracts or communications showing Defendants' knowledge of Plaintiff's Indiana residency and their data-sharing networks that reach into Indiana).

**B. Plaintiff states plausible FCRA claims; Defendants' arguments about "permissible purpose" and "furnisher" status raise fact issues inappropriate for resolution at this stage**. Defendants attack two of Plaintiff's Fair Credit Reporting Act claims: (1) that Defendants impermissibly obtained Plaintiff's credit report without a lawful purpose (15 U.S.C. §§ 1681b and 1681q), and (2) that Defendants failed to meet their duties as furnishers to investigate and correct false information after being notified of a dispute (15 U.S.C. § 1681s-2(b)). The Complaint sufficiently alleges both violations.

**(1) No Permissible Purpose – An identity thief's application is not "a transaction initiated by the consumer."** The FCRA provides that a consumer report may be furnished for certain "permissible purposes," including when the person obtaining the report "has a legitimate business need for the information…in connection with a business transaction that is initiated by the consumer." 15 U.S.C. § 1681b(a)(3)(F)(i). Defendants argue that, because they believed the rental application was real, they had a legitimate business need and thus a permissible purpose to pull Plaintiff's credit. This argument glosses over the critical phrase: "initiated by the consumer." Plaintiff alleges – and it must be accepted as true – that he never applied for any lease with Defendants. The transaction was initiated by a fraudster using Plaintiff's identity, without

Plaintiff's knowledge or consent. By the plain terms of §1681b, a credit pull under those circumstances is not covered by subsection (F)(i) because the consumer (Plaintiff) did not initiate the transaction. Defendants rely on *Heim v. Comcast Cable Comm'cns LLC*, 2020 WL 9211285 (N.D. Ill. June 1, 2020), where a cable company obtained a credit report when an imposter opened an account, and the court found a permissible purpose because the company reasonably believed the consumer was applying. But *Heim* (a non-binding district case) is not a universal escape hatch for fraud situations – it turned on the particular facts and the defendant's lack of notice of any irregularity. Here, by contrast, Plaintiff has pointed to several irregularities and red flags that should have put Defendants on notice even before obtaining the report (e.g., the SSN/address mismatch and the volume of contemporaneous rental inquiries. *Heim* recognized that the defendant's belief was reasonable under the circumstances; reasonableness is a fact question. Another court in this Circuit, addressing identity theft in the credit context, observed that where a transaction was "not in fact initiated by the consumer," the purported user of the report may still be liable if it "should have known" of the false pretenses. See *Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1192–93 (7th Cir. 2021) (discussing §1681b and §1681q). At the pleading stage, Plaintiff has alleged enough to question the propriety of Defendants' purpose: the application bore obvious signs of fraud and yet Defendants "blindly accepted" it. Once the fraud was discovered and brought to Defendants' attention, any subsequent access or use of Plaintiff's credit information by Defendants or their agents would certainly lack a permissible purpose. The Equifax MSJ Order reinforces that these facts warrant scrutiny – that Order explicitly left for trial the question of whether credit pulls like Mission Rock's, arising from identity theft, meet the FCRA's "permissible purpose" requirement. If Equifax, which furnished the report, can be liable for an unauthorized disclosure, then surely the end-user who initiated that disclosure (Mission

Rock/Abbotts Run) does not get a free pass as a matter of law. In sum, Plaintiff's §1681b claim is plausible: Defendants obtained his credit report for a transaction that the real consumer did not initiate, and they cannot immunize themselves by simply claiming ignorance, especially when clues pointed to fraud. Whether Defendants' professed belief was genuine and reasonable is an issue for discovery and fact-finding – not a basis for dismissal.

**(2) Furnisher Duties (Reinvestigation) – Plaintiff plausibly alleges Defendants' responsibility for the credit reporting and their failure to correct it after notice.** Defendants next contend they are not "furnishers" under the FCRA and therefore cannot be liable under §1681s-2(b). This is a factual contention, at odds with the Complaint's allegations and the reasonable inferences therefrom. A "furnisher of information" is broadly understood as any entity that provides information relating to consumers to a Credit Reporting Agency (CRA) – typically creditors, lenders, or debt collectors who report consumers' account histories. Plaintiff alleged that "the Apartment Defendants" (which include Mission Rock and Abbotts Run) furnished or caused to be furnished false information to the CRAs, both directly and through Genesis (their debt collector) (Compl. ¶¶ 763–767). Defendants label this a "naked assertion," but Plaintiff has proffered concrete facts making it more than plausible. Specifically: the Genesis collection entries on Equifax's report identified Abbotts Run as the original creditor and were tied to the lease that Mission Rock/Abbotts Run created. Genesis was acting on behalf of Abbotts Run – a relationship they do not dispute. Genesis's communications (like the April 3, 2023 letter) and actions (the October 2023 AUD deletion) make clear that Genesis was the intermediary handling the credit reporting for the benefit of the property manager/owner (Defendants). In FCRA parlance, it is entirely plausible to view Abbotts Run (the landlord) and Mission Rock (the manager) as the parties "responsible for the accuracy of information provided to CRAs" about the lease account,

even if they utilized an agent to do the actual data furnishing. Indeed, vicarious liability is not foreign to the FCRA – companies have been held liable for FCRA violations committed by authorized agents in the scope of their duties. See, e.g., *Jones v. Federated Fin. Rsrv. Corp.*, 144 F.3d 961, 966 (6th Cir. 1998) (company can be liable under FCRA for acts of its agents under standard agency principles). Here, Genesis acted as Defendants' collection department in all but name. It would be an absurd result if Defendants could evade furnisher obligations simply by outsourcing the dirty work to a third party, especially when the information being reported (and misreported) is fundamentally Defendants' account. Apart from vicarious liability, Plaintiff has alleged direct involvement sufficient to survive dismissal. The Complaint notes that Abbotts Run is described as having "reported … collection data to the CRAs directly as well as through Genesis." (Compl. ¶ 63). Defendants protest that this is conclusory, but one reasonably infers "direct" reporting from the fact that duplicate tradelines showed up (one could have been placed by Genesis, another perhaps via a property management software or another agency channel). Additionally, Mission Rock's own Privacy Policy acknowledges they share data with third-party processors and receive personal information back from them – implying a two-way flow of information. If Mission Rock supplied Plaintiff's PII and lease account data to Genesis with the understanding it would be reported, that is effectively an act of furnishing via a conduit. And crucially, when disputes were submitted, the FCRA's regulations required the CRAs to notify both the debt collector (Genesis) and potentially the original creditor/owner if identified. Discovery may reveal whether Experian or Equifax sent an ACDV (Automated Consumer Dispute Verification) directly to Abbotts Run in addition to Genesis. The Equifax MSJ Order confirms that dispute codes about fraud were sent to Genesis; it's silent on Abbotts Run's internal role, but given Genesis's response was lacking, Abbotts Run cannot now hide behind ignorance. At minimum,

whether Mission Rock/Abbotts Run qualify as "furnishers" (either directly or through agency) is a mixed question of law and fact that should not be resolved against Plaintiff without evidence. Other courts have allowed §1681s-2(b) claims to proceed where a plaintiff, as here, alleges that a creditor and its debt collector both failed to correct false credit information after disputes. E.g., *Schuh v. American Express Bank, FSB*, 2019 WL 132741, at 3–4 (N.D. Ind. Jan. 8, 2019)* (denying motion to dismiss §1681s-2(b) claim against creditor who argued it wasn't the furnisher, where credit report listed debt collector but plaintiff alleged creditor was source of information). Accordingly, Plaintiff has stated a viable claim that Defendants violated §1681s-2(b) by failing to conduct a reasonable investigation and ensure deletion of the fraudulent account after receiving notice from the CRAs. The factual argument that "we never furnished anything" cannot be credited at this stage, especially when the undisputed outcome (the account eventually had to be deleted for fraud) strongly implies mishandling by whoever furnished it on Defendants' behalf. The Complaint gives Defendants fair notice of this claim, and it should proceed to discovery.

**C. The FCRA statute of limitations cannot be resolved on a one-size-fits-all "March 2023 accrual" theory**. Defendants next assert that all of Plaintiff's claims are time-barred because, in their view, Plaintiff discovered the fraud by March 2023 and did not file suit until August 2025 (over two years later). This argument oversimplifies both the law and the timeline. The FCRA's statute of limitations is 2 years from the date of discovery of the violation, or 5 years from the violation, whichever is sooner. 15 U.S.C. § 1681p. Importantly, it runs from discovery of the violation, not just discovery of the existence of the account or identity theft in general. Here, while Plaintiff knew by early 2023 that he was a victim of identity theft and that an Abbotts Run/Genesis account had appeared on his credit, he did not yet know the full extent of Defendants' FCRA violations – in particular, that the item would be reinserted or duplicated after being removed, and

that Defendants would fail to carry out their promised deletion. Those wrongful acts (or omissions) occurred and were discovered later in 2023. For instance, Plaintiff obtained the Equifax report dated May 20, 2023 showing the duplicate entries – likely the first time he became aware that the account was back on his file (despite the March 13/25 indications of deletion). Even if one pegs March 2023 as the time Plaintiff "knew" of the basic fraud, the specific violation of re-reporting after notice was not evident until May 2023. The complaint was filed in August 2025, which is within 2 years of that discovery. Furthermore, Defendants continued to violate their duties each day the false credit information remained and each time they failed to correct it upon notice. The FCRA limitations period would restart with each new publication of the credit report containing the false item (under the "discovery rule" and a "continuing violation" theory recognized by some courts in FCRA cases). See *Mack v. Equable Ascent Fin., L.L.C.*, 748 F.3d 663, 665–66 (5th Cir. 2014) (recognizing that a new credit report to a third party can constitute a separate FCRA violation with its own limitations period). At minimum, there are factual questions about when Plaintiff learned of each violation. Resolving statute of limitations on a Rule 12(b)(6) motion is disfavored unless the complaint itself conclusively demonstrates untimeliness – which this one does not. Defendants' "no later than March 2023" date ignores the evolving nature of the harm and Defendants' ongoing conduct. Their limitations defense is not suitable for dismissal at this stage.

**D. Plaintiff's Indiana Deceptive Consumer Sales Act (DCSA) claim is validly pled.** Defendants seek dismissal of the DCSA count, arguing that the statute does not apply to them or the conduct alleged. This argument cannot be reconciled with the DCSA's broad language, recent Indiana precedents, or the complaint's detailed factual narrative. Indiana's DCSA (Indiana Code § 24-5-0.5-1 et seq.) is a remedial statute that "shall be liberally construed and applied to promote its purposes and policies." Ind. Code § 24-5-0.5-1(a). One primary purpose is to protect consumers

from suppliers who engage in unconscionable, deceptive, or unfair practices. The statute prohibits any "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction," whether the bad conduct occurs "before, during, or after the transaction." Ind. Code § 24-5-0.5-3(a). It also specifies that a prohibited act or practice "includes both implicit and explicit misrepresentations." Id. § 24-5-0.5-3(a). In short, the DCSA's scope is expansive – covering not just classic point-of-sale deception, but also post-transaction behavior and even implicit false impressions. Defendants first suggest that they are not "suppliers" and the lease/collection is not a "consumer transaction" within the DCSA. The Court should reject this cramped view. The DCSA defines a "consumer transaction" to include "the collection of or attempt to collect a debt by a debt collector." Ind. Code § 24-5-0.5-2(a)(1). And it defines "supplier" to include not only direct sellers, lessors, etc., but also any "person who regularly engages in or solicits consumer transactions… The term includes a manufacturer, wholesaler, or retailer, whether the person deals directly with the consumer," as well as "a debt collector." Id. § 24-5-0.5-2(a)(3). Under these definitions, Defendants squarely qualify as suppliers. Abbotts Run is a lessor that regularly engages in consumer leases (renting apartments). Mission Rock is in the business of managing residential properties – effectively an agent of lessors – and thus also "regularly engages in consumer transactions" even if it doesn't sign the lease directly. Defendants hired Genesis, which meets the definition of a "debt collector" (and indeed would also be a "supplier" under DCSA). The fact that Genesis interfaced with Plaintiff to collect the debt does not remove Defendants from the equation; by statutory design, a supplier can be liable even if it does not deal directly with the consumer. The Indiana Court of Appeals' recent decision in *Rock Creek Capital, LLC v. Tibbett,* 231 N.E.3d 256 (Ind. Ct. App. 2024), is instructive. In Tibbett, a landlord argued it wasn't subject to DCSA when its debt collector harassed a tenant, but the court, quoting the definitions above, held that the

landlord and its collector were both "suppliers" and that debt collection on a lease was clearly a consumer transaction. So too here: Defendants, as lessor/manager, engaged a debt collector to pursue a lease debt – this falls squarely under the DCSA's umbrella.

Next, Defendants contend that Plaintiff hasn't alleged an actionable misrepresentation or deception on their part, especially since they themselves didn't communicate directly with Plaintiff. This is a misunderstanding of the DCSA's reach. Plaintiff's DCSA claim is grounded in Defendants' overall course of conduct "in connection with" the lease transaction, including: allowing the lease to be opened under false pretenses, implicitly misrepresenting the legitimacy of that debt by placing it into collection and credit reporting, failing to disclose or correct the error once it was known, and thereby effectively misrepresenting (by silence and inaction) that the debt was rightfully owed by Plaintiff. All of this occurred after the transaction (the lease) and was "in connection with" it, which is precisely what the statute covers. The 2014 amendments to the DCSA were specifically aimed at closing loopholes and ensuring that post-transaction and implicit misconduct are actionable. Even if Defendants never explicitly told Plaintiff "you owe this debt," their act of furnishing the debt to credit bureaus (through Genesis) is an implicit representation to any viewer of the credit report that the debt is valid and attributable to Plaintiff. That implicit message was false and deceptive. It caused Plaintiff harm by tainting his credit reputation and pressuring him to resolve a debt he didn't owe. Under DCSA § 3(a), as amended, "implicit misrepresentations" and omissions can be unfair or deceptive practices. *Tibbett* confirms that implicit misrepresentations (like creating a misleading impression through one's conduct) are actionable, and *State v. TikTok, Inc.*, 2024 Ind. App. LEXIS 272, ¶¶ 42–46 (Ind. Ct. App. 2024), similarly emphasizes that courts must not read extra limitations into the statute at the Rule 12 stage. Applying these principles, Plaintiff unquestionably pleads a viable DCSA claim. He alleges an

unfair and deceptive course of conduct: Defendants, through their agent, treated and advertised a fraudulent lease as if it were a legitimate obligation of Plaintiff, implicitly misrepresenting Plaintiff's responsibility for that debt to third parties (creditors, credit bureaus) and failing to correct that false impression even after being fully informed of the truth. They continued to permit the use of Plaintiff's personal data (name, SSN, etc.) in connection with the debt collection, effectively holding him out as the debtor when they knew otherwise. Such conduct is "unfair" (at the very least) and was in connection with a consumer transaction (the lease and its collection). The foreseeable reliance by others on these misrepresentations is evident: reasonable people (landlords, lenders, etc.) would and did rely on the appearance of a valid lease debt on Plaintiff's credit report, and Plaintiff himself detrimentally relied on Genesis's representation that the item would be deleted (which turned out not to be true, at least for a time). While not all reliance elements need be proven at this stage, it's worth noting that the mischief here – falsely making a consumer seem delinquent – is exactly the kind of marketplace deception the DCSA is meant to redress. Finally, Defendants argue they can't be liable for what Genesis did. But the DCSA's "supplier" definition and case law say otherwise. Tibbett explicitly found a landlord could be accountable for the acts of its debt collector under the DCSA, given the breadth of the term "supplier." And *Horizon Bank v. Huizar*, 178 N.E.3d 326 (Ind. Ct. App. 2021), rejected the notion that a bank could escape DCSA liability simply because its repo agent carried out the wrongful conduct – the bank was still a "supplier" in the transaction and thus on the hook. Here, Defendants benefited from Genesis's actions (the debt was being pursued for their benefit, and any leverage from credit reporting inured to them). They cannot wash their hands of Genesis's methods. If Genesis committed an unfair or deceptive act in the course of collecting Defendants' debt (and failing to honor a fraud deletion promise certainly qualifies), Defendants are vicariously and

directly liable as the originating "supplier" who put the process in motion. The DCSA explicitly contemplates vicarious liability by including those who do not deal directly with the consumer. Plaintiff's DCSA count is solidly grounded in the statutory text and the facts: Defendants (suppliers) engaged in an unfair and deceptive practice by allowing a fraudulent debt to be used against Plaintiff (a consumer) and failing to rectify it, which was connected to a consumer transaction (the lease/debt collection). The motion to dismiss this claim should be denied.

**E. Dismissal with prejudice is unwarranted.** Defendants boldly ask for dismissal with prejudice , implying Plaintiff could never state a valid claim against them. That request should be rejected. As demonstrated above, Plaintiff's claims are supported by specific facts and credible evidence. But even if the Court were to find any pleading deficiency, the proper course would be to allow amendment under Fed. R. Civ. P. 15(a)(2), especially in a case of this complexity and importance. There is no showing of futility – quite the opposite, given the parallel Equifax case has survived summary judgment on similar issues. Dismissing with prejudice at the 12(b)(6) stage, without affording Plaintiff an opportunity to cure or further develop the record, would be unduly harsh and inconsistent with the liberal amendment policy. The Court should also remember that much of Defendants' argument rests on disputing facts (permissible purpose, furnishing, etc.) – if any factual clarity is needed, it should come via discovery, not outright termination of the claim. Dismissal with prejudice is not justified here.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court DENY Defendants Mission Rock's and Abbotts Run's Motion to Dismiss in its entirety. The Complaint articulates a plausible entitlement to relief under the FCRA and Indiana law, and this Court has jurisdiction to adjudicate those claims. Defendants' Motion invites the Court to prematurely weigh evidence and

accept Defendants' self-serving explanations, contrary to Rule 12 standards. That invitation should be declined. If the Court finds any aspect of Plaintiff's pleading lacking, Plaintiff asks for leave to amend rather than dismissal with prejudice – but at this juncture, Plaintiff believes he has amply alleged facts to proceed to discovery on all claims. Defendants set in motion a chain of events that victimized an Indiana consumer, and the law provides redress. The Motion to Dismiss should be denied, and the case should advance toward a resolution on the merits.

Respectfully submitted,

*/s/ James Louis Policchio*
James Louis Policchio (34737-49)
**JL POLICCHIO LAW LLC**
james@jlouislaw.com; 317.779.9919

*/s/ Kyle Schumacher*
PO Box 558, Spring Branch, TX 78070
503-482-8137;kyle@schumacherlane.com
***Counsel For Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, I filed a copy of the foregoing electronically with the Clerk of the Court. As authorized by Fed. R. Civ. P. 5, notice of this filing will be sent to all attorneys of record through the Court's Electronic Case Filing System.

Respectfully submitted,

*/s/ James Louis Policchio*
James Louis Policchio (34737-49)